UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| STEPHEN T. SAMMARTANO | : | |
| Plaintiff | : | |
| | : | |
| VS | : | C.A. NO. 06-535S |
| | : | |
| RAYTHEON | : | |
| Defendant | : | |

**DEFENDANT, RAYTHEON'S MOTION FOR SUMMARY JUDGMENT**

Defendant, Raytheon moves for summary judgment pursuant to Rule 56(c) of the Federal Court Rules of Civil Procedure. In support of its Motion, Defendant relies on the accompanying Memorandum of Law, the Statement of Undisputed Facts, and the affidavits of Sandra W. Vanier, Robert Froncillo, and Heather Lemmon.

RAYTHEON

By its Attorneys,

/s/ Joseph D. Whelan
Joseph D. Whelan (#5694)
Hinckley, Allen & Snyder LLP
50 Kennedy Plaza, Suite 1500
Providence, RI 02903
(401) 274-2000
(401) 277-9600 (fax)
jwhelan@haslaw.com

Dated: November 1, 2007

**CERTIFICATION OF SERVICE**

To:

Stephen Sammartano, pro se
75 Arthur Street #4
Pawtucket, RI 02860

I hereby certify that on this 1st day of November, 2007, I served a copy of the foregoing motion by mail on the above-named party.

/s/ Joseph D. Whelan

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| STEPHEN T. SAMMARTANO<br>Plaintiff | : | |
| | : | |
| VS | : | C.A. NO. 06-535S |
| | : | |
| RAYTHEON<br>Defendant | : | |

**DEFENDANT RAYTHEON'S MEMORANDUM OF LAW**
**IN SUPPORT OF ITS**
**MOTION FOR SUMMARY JUDGMENT**

Joseph D. Whelan (#5694)
Hinckley, Allen & Snyder LLP
50 Kennedy Plaza, Suite 1500
Providence, RI 02903
401-274-2000
401-277-9600 (fax)
jwhelan@haslaw.com

Dated: November 1, 2007

TABLE OF CONTENTS


| | | | |
|---|---|---|---|
| A. | Pleadings | | 1 |
| B. | Facts | | 2 |
| | 1. | Sammartano's Testimony Regarding His Claims | 3 |
| | 2. | Sammartano Had a History of Behavioral and Performance Issues. | 4 |
| | 3. | Raytheon Placed Sammartano on a Performance Improvement Plan | 7 |
| | 4. | Sammartano Sent Coworkers a Threatening Electronic Mail Message | 8 |
| | 5. | Raytheon Suspended Sammartano and Terminated His Employment | 10 |
| C. | Issues | | 12 |
| D | Points and Authorities | | 12 |
| | 1. | Standard of Review | 12 |
| | 3. | Sammartano's Claim for Disability Discrimination Fails. | 13 |
| | 3. | Sammartano Cannot Establish a Prima Facie Case of Disability Discrimination. | 14 |
| | | a. Sammartano Did Not Suffer From a Disability | 15 |
| | | b. Raytheon Did Not Take Adverse Employment Action Against Sammartano Because of his Disability. | 19 |
| | 4. | Raytheon Has Proffered Evidence That It Placed Sammartano on the PIP and Terminated His Employment for Legitimate, Non-Discriminatory Reasons. | 20 |
| | 5. | Sammartano Cannot Establish That Raytheon's Legitimate Non-Discriminatory Reasons for Its Actions Were a Pretext for Disability Discrimination. | 20 |

6. Sammartano Cannot Establish a Failure to Accommodate Case. ..... 22

a. Sammartano Was Not a Qualified Individual With a Disability ..... 22

b. Sammartano Cannot Prove That Raytheon Did Not Accommodate His Limitations. ..... 22

c. Sammartano Cannot Show That Raytheon's Failure to Accommodate His Stuttering Affected the Terms, Conditions, or Privileges of His Employment ..... 24

7. Sammartano Was Not Subject to Harassment at Raytheon Due to His Disability ..... 25

a. Sammartano Was Not Disabled ..... 25

b. Sammartano Was Not Subjected to a Hostile Environment . ..... 25

c. No Hostility Was Directed at Sammartano Because of His Disability ..... 26

8. Raytheon Did Not Retaliate Against Sammartano for Attempting to Obtain a Reasonable Accommodation ..... 27

a. Sammartano Did Not Engage in Protected Conduct ..... 27

b. There Was No Causal Connection Between the Protected Conduct and the Adverse Employment Action ..... 27

c. Raytheon Can Articulate a Nonretaliatory Motive for the Adverse Employment Actions ..... 28

d. Sammartano Cannot Prove That Raytheon's Nonretaliatory Motives Were a Pretext for Retaliation ..... 28

9. Conclusion ..... 29

E. Table of Authorities ..... 30

## A. PLEADINGS

Plaintiff, Stephen T. Sammartano ("Sammartano"), has brought claims for disability discrimination against Defendant, Raytheon. Sammartano asserts that he was terminated from his position with Raytheon as a software engineer because of his disability, i.e., stuttering. First Amended Complaint ("Compl."), ¶ 43. Sammartano asserts a "failure to accommodate" claim against Raytheon. Compl. ¶¶ 39, 40. Sammartano also asserts that Raytheon subjected him to a hostile work environment due to his disability. Compl. ¶¶ 42, 44. Finally, Sammartano asserts that Raytheon unlawfully retaliated against him for attempting to obtain a reasonable accommodation. Compl. ¶¶ 45, 46.

Raytheon denies these allegations, and will proffer evidence that Sammartano (i) was not disabled within the meaning of the law; (ii) was not discriminated against on the basis of his disability; (iii) was not denied a reasonable accommodation; (iv) was not subjected to a hostile working environment due to his disability; (v) was not retaliated against; and (vi) was terminated for legitimate, nondiscriminatory reasons. Specifically, Raytheon terminated Sammartano based on his ongoing behavioral issues, culminating in an alarming and threatening electronic mail message sent to coworkers referencing "three incidents involving physical violence," including a "killing spree," and his refusal to be evaluated by a psychiatrist to prove that he was fit for work.

Sammartano brings his claims under the Americans with Disabilities Act of 1990, 42 U.S.C. §12101 et seq. ("ADA"); the Rhode Island Fair Employment Practices Act, R.I.G.L. §28-5-1 et seq. ("FEPA"); the Rhode Island Civil Rights Act, R.I.G.L. § 42-112-1 et seq. ("RICRA"); and the Rhode Island Civil Rights of People with Disabilities Act ("RIPDA"), R.I.G.L. § 42-87-1 et seq.

State law claims under RIPDA and FEPA "require the same analysis as that utilized for the corresponding federal statutes." Tardie v. Rehab. Hosp. of R.I., 6 F. Supp. 2d 125, 132-33 (D.R.I. 1998) (citing, *inter alia*, Newport Shipyard Inc. v. R.I. Comm'n for Human Rights, 484 A.2d 893, 897-98 (R.I. 1984)). See also DeCamp v. Dollar Tree Stores, Inc., 875 A.2d 13 (R.I. 2005) (citing federal law pursuant to the ADA in its analysis of whether the plaintiff was disabled under FEPA and RICRA). Therefore, federal case law analysis is appropriate for Sammartano's state law claims.

## B. FACTS[1]

Sammartano is an individual who currently resides in Pawtucket, Rhode Island. Complaint ("Compl.") ¶ 1. Defendant Raytheon is a corporation specializing in defense, homeland security, and other government markets throughout the world. Raytheon's Integrated Defense Systems' Integrated Warfare and Sensor System Software Engineering Department ("Engineering Department") is located at Raytheon's Portsmouth, Rhode Island facility. Raytheon employed Sammartano as a software engineer in the Engineering Department from November 10, 2003 until Raytheon terminated his employment on March 24, 2006.

Sammartano stutters. He characterized his stuttering as "not very pronounced" in the charge he filed on August 8, 2006 against Raytheon with the Equal Employment Opportunity Commission ("EEOC")[2]. When asked, based on his EEOC charge, whether he believed that his stutter was not very pronounced, he testified, "there are times when it's – when it's pronounced and times when it's not very pronounced." Deposition of Stephen Sammartano, August 8, 2007[3] ("Sammartano Dep.") 54:12-14. He also testified, "[s]ometimes it affects my speech and

---

[1] The facts set forth in this Memorandum are contained in the accompanying Statement of Undisputed Facts ("Facts").
[2] A copy of the August 8, 2006 charge is attached to the Facts as Exhibit C.
[3] The relevant portions of the deposition of Stephen Sammartano dated August 8, 2007, are attached to the Facts as Exhibit A.

sometimes it doesn't." Sammartano Dep. 21:11-12. Furthermore, Sammartano testified "[m]y stuttering is not as bad as it was when I was younger." Sammartano Dep. 8:21-23.

### 1. **<u>Sammartano's Testimony Regarding His Claims</u>**

When asked to identify the basis for his claim of disability discrimination, Sammartano testified:

> Q. So the basis of your claim is that the issue of communication came up in connection with your employment?
> A. And that I explained that – that, yeah – yeah, and that the – the – the –the – the connection of stuttering was made.
> …
> Q. Okay. Can you identify any instance in which somebody referenced or in any way inferred that your stuttering was creating a communication problem?
> A. In the Performance Improvement Plan, as an example, they had a section on communication.
> Q. Okay. Did it reference stuttering in any manner?
> A. It referenced communication and I – I – I understand what communication is; some people don't.
> …
> Q. Does communication and stuttering mean the same thing to you?
> A. Yes.
> …
> Q. Is there anything else other than the use of the word "communication"?
> A. No.

Sammartano Dep. 9:9-14, 10:24-11:9, 12:18-20, 15:18-20.

When asked what accommodation he requested for his stutter, Sammartano testified:

> Q. Okay. What accommodation did you request?
> A. Well, in – in my case, there was unhappiness with e-mail being expressed and there was – there were – unhappiness was calling for a restriction, and my – my accommodation was to understand why the restriction was being placed upon me to better understand it so that I could – so that I could remove it.
> …

Q. So that was your request for reasonable accommodation was to understand what you were doing wrong?
A. Right. Right. Right. Right. They're calling out and saying there's a problem. As an example they would say your e-mails are rambling and not understandable. Okay. That's an allegation. Now, let's – let's – so I'd say, you know, I – I take you at face value. Let's print them out, look at them, understand what we can do to correct it; let me understand what I am doing wrong.

Sammartano Dep. 143:5-12; 144:24-145:9. Sammartano also alleged that he "mentioned to a number of people including coworkers and managers during [his] time at Raytheon that [he] found it easier to send e-mail than to have a conversation because of [his] speech problem" and that in so doing, he was "implicitly requesting the alternative form of communication because of [his] speech problem." Plaintiff's Response to Defendant's First Set of Interrogatories, No. 15.[4]

Sammartano never expressly requested an accommodation. Vanier[5] Aff. ¶ 21; Lemmon[6] Aff. ¶ 35; Froncillo[7] Aff. ¶ 7. In fact, Sammartano minimized the effect of his stutter on his ability to communicate with other employees. For example, in March of 2005, Sammartano sent an electronic mail message to Vanier in which he compared his stutter to an "accent" and wrote: "I can more often than not speak properly. My communication is effective." Vanier Aff. ¶ 13.

**2. <u>Sammartano Had a History of Behavioral and Performance Issues</u>**

As early as August of 2004, Sammartano exhibited various behavioral and performance issues at work. In August of 2004, Sammartano's section manager, Vanier received complaints from Sammartano's immediate supervisor, Christine Lowrie ("Lowrie"), about a string of bizarre

---

[4] Plaintiff's Response to Defendant's First Set of Interrogatories, No. 15 is attached to the Facts as Exhibit B.
[5] Sandra W. Vanier ("Vanier") is a section manager in the Engineering Department, and was Sammartano's section manager from May of 2004 until January of 2006. Affidavit of Sandra W. Vanier ("Vanier Aff.") ¶¶ 2, 3.
[6] Heather Lemmon ("Lemmon") was a Consulting Human Resource Generalist in the Integrated Warfare and Sensor System Software Engineering Human Resource Organization from November 6, 2004 until June 30, 2007. She currently is Manager III of Human Resources. Affidavit of Heather Lemmon ("Lemmon Aff.") ¶ 2.
[7] Robert Froncillo ("Froncillo") is a manager in the Engineering Department, and was Sammartano's section manager from January of 2006 until Raytheon terminated Sammartano's employment. Affidavit of Robert Froncillo ("Froncillo Aff.") ¶¶ 2, 4.

electronic and voice mail messages he sent to Lowrie in the span of a few days that led Lowrie to complain to Vanier that she thought Sammartano was "a bit scary." Vanier Aff. ¶¶ 4, 5.

On December 7, 2004, Vanier met with Lemmon to discuss Vanier's concerns about Sammartano's behavior. Vanier addressed the following issues at the meeting: (i) he frequently left lengthy voice and electronic mail messages at all hours of the day and night to managers in which he stated that people were plotting against him and preventing him from using his skills; (ii) he was always the first to be taken off a project when it was downsized because he was difficult to work with; and (iii) he never accepted responsibility for any problems and instead blamed other people. Vanier Aff. ¶ 7; Lemmon Aff. ¶ 3.

Shortly after Vanier met with Lemmon, she met with Sammartano to address his behavioral issues. She informed Sammartano that his antagonistic reactions to coworkers and management were inappropriate. She emphasized that his lengthy voice mail and electronic mail messages had to stop. Vanier Aff. ¶ 8.

On January 26, 2005, Vanier received a complaint from another of Sammartano's coworkers, Christina Erwin ("Erwin"). Specifically, Erwin forwarded Vanier a series of electronic mail messages from Sammartano that Erwin complained made her "quite offended." Id. at ¶ 9. Vanier attempted to address these complaints with Sammartano, but he became angry and denied that he had done anything wrong. Id. at ¶ 10.

On March 10, 2005, Vanier met with Sammartano to discuss his 2004 Performance Review. The review included a "needs" section that addressed his need to improve his communication skills, specifically in reference to his use of electronic and voice mail. The 2004 Performance Review did not address, indirectly or directly, any issues caused by Sammartano's stutter. Vanier Aff. ¶ 11. In the span of one day – March 10, 2005 into the early morning of

March 11, 2005 - Sammartano left an excessive number of electronic mail messages (i.e., over twenty (20)) for Vanier regarding his 2004 Performance Review. Id. at ¶ 12.

On August 24, 2005, Sammartano received his "Mid Year Performance 2005" review, which included areas for improvement. Id. at ¶ 14. Specifically, the review indicated that Sammartano needed "to interact more with the team and realize that the team is working toward the same goal"; "needs improvement on comprehension of the bigger picture"; "has some trouble prioritizing tasks"; and "sometimes tasks take longer than expected to complete." Id. Sammartano again responded inappropriately, sending Vanier a lengthy and antagonistic electronic mail message regarding the review. Id. at ¶ 15.

On October 25, 2005, Lemmon first met with Sammartano to discuss troubling interpersonal behavioral issues that had been addressed with her by Sammartano's coworkers and managers. Lemmon Aff. ¶ 5. Specifically, Lemmon addressed Sammartano's antagonistic reactions to coworkers, his concerns about management being "against him," and his use of voice and electronic mail. Sammartano refused to acknowledge or take responsibility for the issues that were addressed with him, and accused Raytheon's management of "separating him from his technology." Id.

On November 7, 2005, Lemmon, Vanier, Kelly[8], and Kooris[9], met to discuss management's concerns with Sammartano's behaviors and his refusal to acknowledge or take responsibility for any of the behavioral issues that were identified to him. They decided to refer Sammartano to Raytheon's on-site EAP representative, Daniel Musholt ("Musholt"). Lemmon Aff. ¶ 6. The following day, Lemmon, Vanier and Kelly, met with Sammartano to discuss his

8 John Kelly ("Kelly") is the Senior Manager of the Engineering Department, and was Sammartano's manager during the entire tenure of Sammartano's employment at Raytheon.
9 Irvin Kooris ("Kooris"), was the Manager of Raytheon's Employee Assistance Program ("EAP") and has since left Raytheon.

need to improve his communication and interpersonal skills, and to refer him to Musholt. Lemmon Aff. ¶ 6.

After the November 8th meeting, Sammartano sent Lemmon a strange and paranoid voice mail message in which he claimed that someone was stalking him. Id. at ¶ 10. He also sent two electronic mail messages to Lemmon, copying Kelly, first writing that his November 8th review "was in error" and then, in another strange and paranoid message, writing:

> The company is stopping me from living my life, John. You're taking my technology, my friends, my mentors, and now my family and separating me from them. You complain about email, complain about voice mail and do so many things wrong that it's too much to list and complain about how long the list is. Stop doing things wrong.

Id. at ¶ 10.

### 3. Raytheon Placed Sammartano on a Performance Improvement Plan

On January 13, 2006, Raytheon placed Sammartano on a "Performance Improvement Plan[10]" ("PIP") to address Raytheon's concerns relating to his poor interpersonal and communication skills and performance-related issues. Lemmon Aff. ¶ 13. The PIP outlined issues such as Sammartano's inability to (i) prioritize tasks and complete tasks; (ii) follow common procedures; (iii) work in a team atmosphere; (iv) understand the "bigger picture"; and (v) accept accountability of identified performance issues.

The PIP also included a section on "communication" that discussed Sammartano's inappropriate use of voice and electronic mail. The PIP addressed the fact that Sammartano tended to obsess over issues and leave frequent and repetitive voice and electronic mail messages

---

[10] At Raytheon, a PIP is generally a tool designed to help employees address specific performance issues and work towards improvement. Its purpose is to turn substandard performance around and to assist an employee in producing results that meet or exceed the established standard. A PIP is designed to assess individual performance against established and agreed upon goals and objectives. The ultimate objective is a successful outcome for the employee and Raytheon Company. A potential consequence of a PIP is termination if the employee does not improve his or her performance during the specified time period. An employee is typically placed on a PIP at anytime throughout the year when management determines he or she is not meeting the expectations of the job. Lemmon Aff. ¶ 14.

for his coworkers discussing such issues. The PIP did not address in any way Sammartano's stutter or limit his ability to use electronic mail rather than verbal communication. Rather, the PIP clearly stated that Sammartano needed to use electronic and voice mail more selectively and avoid long, ambiguous, repetitive messages.

Sammartano's bizarre and unacceptable conduct only got worse after he received the PIP. He wrote a lengthy (i.e., nine (9) pages) and rambling single-spaced electronic mail message to Lemmon discussing his response to the PIP. Lemmon Aff. ¶ 16. He also left Lemmon numerous other electronic and voice mail messages regarding the PIP. Id. at ¶ 15.

After receiving the PIP, Sammartano was required to meet weekly with Froncillo, who replaced Vanier in January of 2006 as Sammartano's section manager, to discuss his progress in addressing the issues set forth in the PIP. Froncillo Aff. ¶ 5. The first of the PIP status meetings, on January 19, 2006, took place without incident. Id. at ¶ 8. However, at the following two meetings, which occurred on January 23rd and 30th, Sammartano refused to acknowledge the PIP, or to address any of the concerns set forth in the PIP. Id. at ¶¶ 9, 10. Furthermore, Sammartano was visibly tense and agitated at the weekly meetings. Id. at ¶ 11; Lemmon Aff. ¶ 19.

**4. Sammartano Sent Coworkers a Threatening Electronic Mail Message**

Sammartano's conduct, which had been frequently strange and unprofessional, turned decidedly and unacceptably threatening on February 6, 2006. That morning, Froncillo sent an electronic mail message to Sammartano and Lemmon asking whether they were available that afternoon for the next PIP status meeting. Froncillo Aff. ¶ 12. In response to Froncillo's request, Sammartano sent a threatening electronic mail message to Froncillo and Lemmon (the "E-mail").

In the E-mail, Sammartano complained about the PIP meetings and accused Froncillo and Lemmon of being "irrational." He then wrote threatening and bizarre references to "physical violence" and a "killing spree." Specifically, he wrote:

> Sorry, I guess I don't really feel comfortable meeting with either of you anymore. You continue to make allegations which you refuse to offer support for. … Your acts are irrational. Who is to say what your motives are. Certainly not I. Fortunately, there is in general no expectation that I nor anyone else determine the extent of, the implication of, or the reason for irrationality which potentially puts them at risk. …
>
> I will summarize by explicitly saying that I believe that these meetings are potentially unsafe for me and having been in the area of three incidents involving physical violence (the last incident occurring last week in New Bedford as reported in the local newspapers – the killing spree which led to numerous deaths), I believe I am eminently qualified to make such a determination.

Froncillo Aff. ¶ 13; Lemmon Aff. ¶ 20.

Froncillo and Lemmon reasonably understood the E-mail as threatening that the "irrational" actions taken by them "potentially puts them at risk" from Sammartano. Froncillo Aff. ¶ 14; Lemmon Aff. ¶ 21. They found the E-mail extremely alarming in its references to "three incidents involving physical violence," including a "killing spree." Froncillo Aff. ¶ 14; Lemmon Aff. ¶ 21. Lemmon immediately discussed the E-mail with Froncillo and Deborah Belsinger, Manager II of Security. They forwarded a copy of the E-mail to Raytheon's Workplace Violence Committee (the "Committee"). Lemmon Aff. ¶ 23. That same day, the Committee decided to place Sammartano on paid administrative leave commencing immediately, pending an evaluation by a psychiatrist to certify that he was fit to return to work.

Sammartano did not deny that he sent the E-mail. Sammartano Dep. 125:9-12. In his testimony, he alleged that he feared for his own safety and believed that it was possible that one of his supervisors, for example, Froncillo, might shoot him. Sammartano Dep. 131:16-132:15.

Sammartano echoed his irrational and paranoid fear in the FAC: "In light of the killing spree and of the Plaintiff's recognition of Defendant's callousness to the Plaintiff's interest, the Plaintiff became alarmed having no reason to believe that Defendant was not capable of the worst or would not get ideas from the killing spree for reasons unknown to the Plaintiff." Compl. ¶ 32. The "killing spree" Sammartano referenced in the Complaint and in the E-mail was an incident involving a man who entered a gay nightclub in New Bedford, MA with a gun, a hatchet and a machete and indiscriminately attacked patrons. The incident was not connected in any way to Raytheon or to Sammartano.

Sammartano testified that the only reason that he thought his supervisors might harm him physically was because he did not understand why he was criticized in the PIP, and based on that "disconnect," he feared for his physical safety. Sammartano Dep. 188:3-18. However, Sammartano admitted that no one at Raytheon ever threatened violence against him. Plaintiff's Response to Defendant Raytheon's First Set of Interrogatories, No. 22.

### 5. Raytheon Suspended Sammartano and Terminated His Employment

Based on Sammartano's bizarre and threatening E-mail, Raytheon immediately placed him on a paid leave of absence. Lemmon Aff. ¶ 23. Lemmon made an appointment for Sammartano with a psychiatrist, Dr. Ronald Stewart. Id. at ¶ 24. On February 20, 2006, Lemmon sent Sammartano a letter notifying him of the appointment. Id. at ¶ 26. Lemmon stressed to Sammartano that the best way for him to return to work was to commit to attending the appointment. Id. at Ex. H.

On February 24, 2006, after Sammartano failed to attend the appointment, Lemmon wrote him a letter notifying him of the fact that he was being placed on unpaid leave, and again

informing him that he would not be permitted to return to work until he was able to provide documentation that he was fit to return to work. Id. at ¶ 29.

On March 10, 2006, Lemmon wrote Sammartano a third letter informing him that if he did not immediately contact her regarding scheduling an appointment with a psychiatrist, she would commence processing the termination of his employment with Raytheon. Id. at ¶ 31. Sammartano took no action. Id. at ¶ 32. In his testimony, Sammartano admitted that he refused to be examined by a psychiatrist. He provided the following explanation:

> Q. And you did fail to go see Dr. Stewart, correct?
> A. Yes, I did.
> Q. And ultimately you elected that you did not want to go and get certified to return to work, correct?
> A. That's not – no, I didn't want to go see a forensic psychiatrist. I understand the power of a forensic psychiatrist and that's not – I don't want to be around that power. I choose not to be around that power, first of all, but – what I should say second of all. First of all, I couldn't see why. I hadn't done anything.
> Q. You hadn't done anything?
> A. I couldn't see why. I had not done anything.
> Q. Right.
> A. An so – so now for the second reason, you know, the – the – for – the first thing I saying is I don't know why, given that I haven't done anything. The second reason is I know what forensic psychiatrists can do.

Sammartano Dep. 118:6-25; 119:1-2.

Raytheon terminated Sammartano's employment effective March 24, 2006. Ultimately, Raytheon based its decision to terminate Sammartano's employment on his on-going behavioral issues, culminating in the alarming and threatening E-Mail he sent to coworkers referencing "three incidents involving physical violence," including a "killing spree," and his refusal to be evaluated by a psychiatrist to prove that he was fit for work.

On August 8, 2006, Sammartano filed a charge with the EEOC alleging that Raytheon discriminated against him based on his disability (stuttering). On September 11, 2006, the EEOC determined that it lacks jurisdiction to investigate Sammartano's charge based on its finding that Sammartano does not have an impairment that rises to the level of a disability.[11]

## C. ISSUES

1. Whether Sammartano can establish a prima facie case of disability discrimination.

2. If Sammartano can establish a prima facie case of disability discrimination, whether Sammartano can establish that the legitimate non-discriminatory reasons for the PIP and his termination proffered by Raytheon are a pretext for disability discrimination.

3. Whether Sammartano can establish a "failure to accommodate" case.

4. Whether Sammartano can establish that he was subjected to a hostile working environment.

5. Whether Sammartano can establish a prima facie case of retaliation.

6. If Sammartano can establish a prima facie case of retaliation, whether Sammartano can establish that the legitimate non-discriminatory reasons for the PIP and his termination proffered by Raytheon are a pretext for retaliation.

## D. POINTS AND AUTHORITIES

### 1. Standard of Review

Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Hughes v. Boston Mut. Life Ins. Co., 26 F.3d 264, 268 (1st Cir. 1994 (quoting Fed.R.Civ.P. 56(c)). As this court has held, "when a motion for summary judgment is directed against a party that bears the burden of proof; and the motion is supported by facts that negate an essential element of the non-moving party's case or

[11] A copy of the September 11, 2006 determination is attached to the Facts as Exhibit D.

indicate a lack of proof to support that case, the non-moving party is obligated to proffer enough contrary evidence to establish that there is a genuine factual dispute requiring trial." Hodgens v. Gen. Dynamics Corp., 963 F. Supp. 102, 105 (D.R.I. 1997) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). "'Even in [disability] discrimination cases where elusive concepts such as motive or intent are at issue,' summary judgment is appropriate if the non-moving party rests 'merely upon conclusory allegations, improbable inferences, and unsupported speculation.'" Forestier Fradera v. Municipality of Mayaguez, 440 F.3d 17, 21 (1st Cir. 2006) (citing Benoit v. Technical Mfg. Corp., 331 F.3d 166, 173 (1st Cir. 2003).

Additionally, as the Supreme Court held in Celotex, 477 U.S. at 327, the "summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the federal rules as a whole, which are designed to secure the just, speedy and inexpensive determination of every action." Under these principles, summary judgment is appropriate in this case.

**2. Sammartano's Claim for Disability Discrimination Fails**

Sammartano has not proffered any direct evidence of discrimination. Accordingly, the case is governed by the burden shifting framework of McDonnell Douglas v. Green, 411 U.S. 792, 802-805 (1973). See Raytheon Co. v. Hernandez, 540 U.S. 44, 49 n.3 (2003) (applying McDonnell Douglas to disability discrimination claim. Sammartano must initially prove a prima facie showing of discrimination. McDonnell Douglas, 411 U.S. at 802. In a disability discrimination case, this requires Sammartano to prove (1) he suffers from a "disability"; (2) that he was nevertheless qualified for the job; and (3) Raytheon took adverse employment action against him in whole or in part because of his disability. See Katz v. City Metal Co., 87 F.3d 26, 30 (1st Cir. 1996). If the "[p]laintiff does not establish a prima facie case, the inference of

discrimination never arises and summary judgment is appropriate." Barber v. Verizon New England Inc., No. Civ. A. 05-390-ML, 2006 WL 3524465, at *3 (D.R.I. Dec. 6, 2006).

If the plaintiff establishes a prima facie ADA case under the McDonnell Douglas framework, the burden shifts to the defendant to "offer a legitimate, non-discriminatory reason for its employment decision and to produce credible evidence to show that the reason advanced was the real reason." Freadman v. Metro. Prop. and Cas. Ins. Co., 484 F.3d 91, 99 (1st Cir. 2007). The employer's burden is one of production, not of persuasion. "[T]the burden of proving unlawful discrimination rests with the plaintiff at all times." Id.

Once the employer produces a legitimate, nondiscriminatory reason, "the initial inference of discrimination evaporates." Id. The burden then returns to the employee, who "must ultimately present enough evidence to create a material issue of fact that defendant's non-discriminatory justification for terminating [plaintiff] … is mere pretext and that the actual reason for the adverse employment action was disability discrimination." Rivera-García v. Sistema Universitario Ana G. Méndez, 442 F.3d 3, 5 (1st Cir. 2006).

In this case, Sammartano's claim fails because (i) he cannot establish a prima facie case; and (ii) even if he can, Raytheon can demonstrate a legitimate non-discriminatory reason for terminating him, and Sammartano cannot provide any credible evidence to demonstrate that the legitimate non-discriminatory reason was a pretext for disability discrimination.

### 3. Sammartano Cannot Establish a Prima Facie Case of Disability Discrimination

As set forth above, in order to establish a prima facie case of disability discrimination, Sammartano must demonstrate that (1) he suffers from a "disability"; (2) that he was nevertheless qualified for the job; and (3) Raytheon took adverse employment action against him in whole or in part because of his disability. See Katz, 87 F.3d at 30. Even assuming for the

purposes of this motion only that Sammartano can satisfy the second element in his prima facie case (i.e., that he was qualified for the job despite his stutter), his case falls down on the first and last elements.

**a. Sammartano Did Not Suffer From a Disability**

At the time of his employment with Raytheon, Sammartano was not disabled within the meaning of the law. The ADA defines the term "disability" as: (A) a physical or mental impairment that substantially limits one or more major life activities; (B) a record of such impairment; or (C) being regarded as having such an impairment. 42 U.S.C. § 12102(2). Sammartano alleges alternatively that he had a physical or mental impairment that substantially limited one or more major life activities, or that Raytheon regarded him as having such an impairment. Compl. ¶¶ 43, 44.

To qualify as disabled under the ADA under the first test, Sammartano must prove that he had a physical or mental impairment, and that the impairment substantially limited a major life activity. According to the United States Supreme Court, in order to meet this standard, an individual must have an impairment that prevents or severely restricts the person from performing activities that are of "central importance to most people's daily lives." Toyota Motors Mfg., Kentucky, Inc. v. Williams, 534 U.S. 184, 198 (2002). When deciding whether a claimant has met this burden, the Court instructed that "the following factors should be considered: '[t]he nature and severity of the impairment; [t]he duration or expected duration of the impairment; and [t]he permanent or long-term impact resulting from the impairment.'" Id. at 196.

Here, Sammartano has put forth no evidence indicating that his stutter was so severe as to restrict him from performing activities that are of "central importance to most people's daily lives." For example, the court in Detko v. Blimplies Rest., 924 F.Supp 555 (S.D.N.Y. 1996)

granted the defendant's motion to dismiss the plaintiff's claim brought under the ADA for discrimination based on his speech impediment. Acknowledging that speaking is a major life activity, the court nonetheless found that the plaintiff's allegation that he stutters, and has particular difficulty with the letter "M," did not support a finding that the plaintiff's speech impediment "*substantially* limits his speaking or that he is regarded as having such an impairment" (emphasis in original).

Similarly, the court in Blagrove v. Walgreen Co., No. 06-P-870, 2007 WL 1791692 (Mass. App. Ct. June 21, 2007), affirmed the trial court's grant of an employer's motion for summary judgment on an employee's claim that the employer terminated him due to his disability (stuttering). The court found that the employee's stutter did not "substantially limit one or more major life activity" because the employee's stutter did not substantially limit his "ability to work, speak, and otherwise excel in each area of life related to his employment." Id. at *2

In the few cases that have found stuttering to be a disability under the law, the plaintiffs exhibited severe stuttering that plainly affected their ability to speak and work. In Andresen v. Fuddruckers, Inc., No. Civ. 03-3294, 2004 WL 2931346 (D. Minn. Dec. 14, 2004), the court denied an employer's motion to dismiss an employee's claim under the ADA based on her stuttering, where at least one speech pathologist described her stuttering disorder as "severe," causing the employee to have "difficulty breathing" and "excess build-up of saliva." In Fuddruckers, the employee's stutter-related issue of over-salivation affected her ability to perform her job (working at a Fuddruckers restaurant) due to complaints of spitting or drooling on food. Moreover, the employer specifically acknowledged that it did not want the employee to interact with guests due to her speech impediment.

In City of Columbus v. Liebhart, 621 N.E. 2d 554 (Ohio App. 10 Dist. 1993), the court found that a plaintiff's speech impediment (stutter) was a handicap under a state disability statute based on the fact that a speech pathologist testified that the plaintiff had a "markedly severe stuttering problem" that made it twice as difficult to carry on a conversation and this significantly affected the plaintiff's life. Furthermore, the defendant conceded that the plaintiff was denied a position as a fire fighter because of his stuttering and defendant's fears as to how that would impact his ability to communicate in a fire emergency.

Here, Sammartano has put forth no evidence that his stutter *substantially* limited his ability to work, speak or otherwise excel in each area of life related to his employment. To the contrary, Sammartano consistently referred to his stutter as being similar to an "accent" that did not affect his ability to communicate effectively while he was employed by Raytheon. For example, on March 11, 2005, Sammartano wrote an electronic mail message to Vanier comparing his stutter to an accent, writing that it "functionally has the same effect" and that "I can more often than not speak properly. My communication is effective." Vanier Aff. ¶ 13. On January 13, 2006, in the morning prior to receiving the PIP, he wrote an electronic mail message to Vanier stating "I have in the past had a speech problem which on occasion I exhibit a vestage [sic] of. Functionally, the affect [sic] of the speech problem is the same as that of an accent." Id. at ¶ 18. Moreover, Sammartano's employment discrimination charge states that he "was in the past a severe stutterer and still exhibits a vestige of the problem and he continues to stutter to a limited extent today." This evidence makes clear that Sammartano's stutter did not "substantially limit" a major life activity, such as speaking or working.

Alternatively, Sammartano alleges that he was discriminated against on the basis of "perception of a disability." Compl. ¶ 44. Sammartano fails to satisfy the requirements of this

test also. In order to be "regarded as" disabled, Sammartano must show that, although he did not have an impairment that substantially limited major life activities, Raytheon regarded his stuttering as substantially limiting one or more major life activities. See Cook v. R.I. Dep't of Mental Health, Retardation, & Hosps., 10 F.3d 17, 23 (1st Cir. 1993) (plaintiff had to prove that defendant treated her impairment (whether actual or perceived) as substantially limiting one or more of her major life activities).

Raytheon did not perceive Sammartano as disabled due to his stutter. Sammartano has offered no evidence to support his assertion that Raytheon regarded him as disabled due to his stutter. In fact, Sammartano has offered no evidence that Raytheon has ever expressly or impliedly referred to his stutter in any context whatsoever. The only evidence Sammartano relies on is the reference to "communication" in the PIP,

> Q. In what manner do you believe that the Respondents perceived you as being disabled?
>
> A. They believed that – that – that – they believed I had a communication problem.

Sammartano Dep. 53:13-16. However, Sammartano failed to establish any link between his stutter and the communication issues set forth in the PIP, such as the fact that he sent voluminous bizarre, repetitive, and incomprehensible voice and electronic mail to his coworkers and managers at all hours of the day and night.

Sammartano's stutter is not considered a disability under the ADA, FEPA, RICRA, or RIPDA. Furthermore, Sammartano has offered no evidence that Raytheon viewed him as disabled under the law. Therefore, his disability discrimination claim must be dismissed.

**b. Raytheon Did Not Take Adverse Employment Action Against Sammartano Because of his Disability**

The gravamen of Sammartano's complaint for disability discrimination is that the criticisms regarding his communication skills set forth in the PIP were allegedly based on his stutter, and that Raytheon allegedly terminated his employment based on his lack of communication skills, which he interpreted as based on his stutter. Sammartano made this clear in his deposition testimony when asked to identify the reasons that he believes he was discriminated against on the basis of his disability:

> Q. So the basis of your claim is that the issue of communication came up in connection with your employment?
> A. And that I explained that – that, yeah – yeah, and that the – the – the –the – the connection of stuttering was made.
> …
> Q. Okay. Can you identify any instance in which somebody referenced or in any way inferred that your stuttering was creating a communication problem?
> A. In the Performance Improvement Plan, as an example, they had a section on communication.
> Q. Okay. Did it reference stuttering in any manner?
> A. It referenced communication and I – I – I understand what communication is; some people don't.
> …
> Q. Does communication and stuttering mean the same thing to you?
> A. Yes.
> …
> Q. Is there anything else other than the use of the word "communication"?
> A. No.

Sammartano Dep. 9:9-14; 10:24-25; 11:1-9; 12:18-20; 15:18-20.

Sammartano cannot establish a prima facie case of disability discrimination because he has offered no evidence that Raytheon took adverse employment against him because of his stuttering. Therefore, his disability discrimination claim must be dismissed.

**4. Raytheon Has Proffered Evidence That It Placed Sammartano on the PIP and Terminated His Employment for Legitimate, Non-Discriminatory Reasons**

Assuming arguendo that Sammartano can establish a prima facie case of disability discrimination, Raytheon can easily satisfy its burden to put forth a legitimate, nondiscriminatory reason for placing Sammartano on the PIP, and ultimately terminating Sammartano's employment. Specifically, Raytheon terminated Sammartano's employment based on his ongoing behavioral issues – set forth in detail in the "Facts" section herein – culminating in the alarming and threatening E-mail he sent to coworkers referencing "three incidents involving physical violence," including a "killing spree," and his refusal to be evaluated by a psychiatrist to prove that he was fit for work.

Once Raytheon provides such a legitimate explanation, the burden shifts back to Sammartano to prove that Raytheon's proffered reasons are pretextual. McDonnell Douglas, 411 U.S. at 804. Therefore, Sammartano bears the ultimate burden of proving that his disability was the determinative factor in the PIP and his discharge, that is, that he would not have been placed on the PIP or fired but for his disability. See Clifford v. Barnhart, 449 F.3d 276, 281 (1st Cir. 2006) ("the burden was on [the plaintiff] to generate a material issue that disability discrimination was a determinative factor in the [employment] decisions.")

**5. Sammartano Cannot Establish That Raytheon's Legitimate Non-Discriminatory Reasons for Its Actions Were a Pretext for Disability Discrimination**

Viewing the facts in the light most favorable to Sammartano's claims, Sammartano has failed to muster the evidence required to suggest pretext. His deposition testimony could not be any clearer. When asked to identify the basis for his claim of disability discrimination, Sammartano unequivocally testified:

Q. Is there anything else other than the use of the word "communication"?
A. No.

Sammartano Dep. 15:18-20. Sammartano alleges no relevant comments, no statements, nothing that supports his necessary proof of pretext.

To show pretext, Sammartano must discredit Raytheon's proffered legitimate non-discriminatory reasons by showing that they were post-hoc fabrications or otherwise unworthy of credence. See Shorette v. Rite Aid of Me., Inc, 155 F.3d 8, 12-13 (1st Cir. 1998) ("evidence must be of such strength and quality as to permit a reasonable finding that the … [termination] was *obviously or manifestly unsupported*") (emphasis in original) (citations and internal quotation marks omitted). Moreover, the ultimate inference of discrimination is stronger when the reason for terminating the employee is "accompanied by a suspicion of mendacity." Neri v. Ross-Simons, Inc., 897 A.2d 42, 50 (R.I. 2006) (quoting Ctr. for Behavioral Health, R.I., Inc. v. Barros, 710 A.2d 680, 685 (R.I. 1998)). It follows, therefore, that a lack of evidence on this point may be fatal to a claim of discrimination. Id. Here, Sammartano provides no evidence from which the court can draw an inference of pretext, and no evidence suggesting a meaningful "suspicion of mendacity." Instead, Sammartano rests on conclusory allegations that the PIP and that his termination were based on his stutter.

Even when the evidence is read in a light most favorable to Sammartano, he fails to cast any meaningful doubt on Raytheon's legitimate and non-discriminatory reasons for issuing the PIP and terminating him, that is, his history of performance and behavioral issues, culminating in the bizarre and threatening E-mail, followed by his refusal to be evaluated by a psychiatrist to prove he was fit to return to work).

6. Sammartano Cannot Establish a Failure to Accommodate Case

"A plaintiff in a 'failure to accommodate' case must (i) furnish sufficient admissible evidence that [he] is a qualified individual with a disability within the meaning of the ADA; (ii) establish that [he] worked for an employer covered by the ADA; (iii) demonstrate that the employer, despite its knowledge of the employee's limitations, did not accommodate those limitations; and (iv) show that the employer's failure to accommodate the known limitations affected the terms, conditions, or privileges or the plaintiff's employment." Orta-Castro v. Merck, Sharp & Dohme Química P.R., Inc., 447 F.3d 105, 112 (1st Cir. 2006). Here, Sammartano cannot establish any of these requirements, other than the fact that Raytheon is an employer covered by the ADA.

a. Sammartano Was Not a Qualified Individual With a Disability

As discussed in Section 3.a. above, Sammartano has put forth no evidence indicating that his stutter was so severe as to restrict him from performing activities that are of "central importance to most people's daily lives." Nor has Sammartano put forth any evidence indicating that Raytheon perceived his stutter to be so severe as to constitute a disability under the law. Therefore, Sammartano was not a qualified individual with a disability.

b. Sammartano Cannot Prove That Raytheon Did Not Accommodate His Limitations

"Under the ADA, requests for accommodation must be express." Orta-Castro, 447 F.3d at 113. Thus, Raytheon had no obligation to provide a reasonable accommodation unless Sammartano triggered the obligation by a request. See id. Here, Sammartano never expressly requested an accommodation for his stuttering. Vanier Aff. ¶ 21; Lemmon Aff. ¶ 35; Froncillo Aff. ¶ 7. Sammartano alleged that he "mentioned to a number of people including coworkers and managers during [his] time at Raytheon that [he] found it easier to send e-mail than to have a

conversation because of [his] speech problem" and that in so doing, he was "implicitly requesting the alternative form of communication because of [his] speech problem." Plaintiff's Response to Defendant's First Set of Interrogatories, No. 15. However, Sammartano never requested to use electronic mail rather than engage in verbal communication. Sammartano attended meetings, engaged in conversations with his co-workers and, as discussed above, frequently sent voicemail messages to his co-workers. Based on Sammartano's conduct and the fact that he never requested an accommodation, Raytheon had no reason to believe that Sammartano needed an accommodation for his stutter. In fact, Raytheon had no reason to believe that Sammartano was disabled. Therefore, Raytheon was under no obligation to provide a reasonable accommodation to Sammartano.

Assuming arguendo that Sammartano triggered an obligation to provide a reasonable accommodation, he admitted that the reasonable accommodation he requested was met because, in his words: "[t]he reasonable accommodation i.e. email was already available and I used it. Noone [sic] had to ask to use email." Id.

Sammartano did not allege that he requested but was not allowed to use electronic mail as an alternative to verbal communication. Rather, he alleged that the PIP constituted a restriction on his ability to use electronic mail, presumably in violation of his "request" for a reasonable accommodation. Id. However, the PIP did not restrict his ability to choose electronic mail as an alternative to verbal communication. Sammartano continued to use (and abuse) electronic mail after he received the PIP. Moreover, Sammartano's refusal to continue to attend weekly PIP meetings had nothing to do with his discomfort at speaking in a meeting, but rather was based on his irrational and paranoid fear that one of his managers might shoot him.

As discussed above, the PIP addressed Sammartano's communication issues in the context of sending unreasonably frequent and bizarre electronic and voice mail messages to his coworkers. Sammartano established no connection between his stutter, or his preference for electronic mail over verbal communication due to his stutter, and the criticisms set out in the PIP. This is simply because there was no connection between his stutter and the criticisms set forth in the PIP.

Sammartano also asserts that by asking for an explanation of why his coworkers were unhappy with his electronic and voice mail communications, he was requesting an accommodation for his stutter. Sammartano Dep. 143:5-12; 144:24-145:9. It is not clear how this constitutes a request for an accommodation. Regardless, the PIP clearly stated that Sammartano needed to use electronic and voice mail more selectively and avoid long, ambiguous, repetitive messages. The PIP gave specific examples of Sammartano's inappropriate conduct. Thus, any requirement for an explanation of Sammartano's communication issues has been met by Raytheon.

In summary, Sammartano has not proffered any evidence that he requested an accommodation for his stuttering or that Raytheon failed to accommodate his stuttering. The only evidence Sammartano points to, the PIP, is wholly irrelevant to his alleged disability. As a result, Sammartano cannot prove that Raytheon did not accommodate his stuttering.

**c. Sammartano Cannot Show That Raytheon's Failure to Accommodate His Stuttering Affected the Terms, Conditions, or Privileges of His Employment.**

Assuming arguendo that Raytheon failed to accommodate Sammartano's stuttering, he cannot prove that this failure affected the terms, conditions, or privileges of his employment. The PIP was not related in any way to Sammartano's stuttering and did not address or restrict his

use of electronic mail in lieu of verbal communications. Furthermore, as discussed above, the reasons for Sammartano's termination of employment were completely unrelated to his stutter or use of electronic mail as a substitute for verbal communication.

In summary, Sammartano has offered no evidence of any nexus between a failure to accommodate his stuttering and the PIP or Raytheon's termination of his employment (or any other term, condition, or privilege of his employment).

### 7. Sammartano Was Not Subject to Harassment at Raytheon Due to His Disability

Sammartano alleged that Raytheon subjected him to a hostile work environment due to his disability. Compl. ¶¶ 42, 44. To succeed on a claim of disability harassment, Sammartano must prove that he was (i) disabled, (ii) subjected to a hostile environment, and (iii) that that hostility was directed at him because of his disability. Quiles-Quiles v. Henderson, 439 F.3d 1, 5 (1st Cir. 2006). Sammartano cannot prove any of the three elements of his hostile work environment claim.

#### a. Sammartano Was Not Disabled

Sammartano's allegations of harassment fail because he cannot show as a preliminary matter that he was "disabled" under the law, as set forth in Section 3.a. above.

#### b. Sammartano Was Not Subjected to a Hostile Environment

Assuming arguendo that he was "disabled," Sammartano cannot establish that he was subjected to a hostile work environment. To establish a hostile work environment, Sammartano must show that his "workplace [was] permeated with discriminatory intimidation, ridicule, and insult that [was] sufficiently sever or pervasive to alter the conditions of … his employment and create an abusive working environment." Id. at 7 (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993)). Among the factors relevant to this inquiry are the severity of the conduct, its

frequency, and whether it reasonably interfered with the victim's work performance." Id. (quoting Harris, 510 U.S. at 23).

Sammartano was not subjected to severe or pervasive intimidation, ridicule or insult. Sammartano has not alleged even one incident of "intimidation, ridicule or insult" at Raytheon and, indeed, has offered no evidence in support of his claim, other than his own conclusory allegations set forth in Compl. ¶ 42 ("Defendant … allowed the creation of a potentially hostile environment and then attempted to capitalize on such"), and Compl. ¶ 44 ("Defendant therefore allowed for at least the perception of a hostile environment to take advantage of as a pretext to terminate Plaintiff rather than accommodating Plaintiff in regards to his perceived disability").

**c. No Hostility Was Directed at Sammartano Because of His Disability**

Assuming arguendo that Sammartano was subjected to a hostile work environment, his allegations do not support a finding that the hostile conduct at issue was directed at him because of his disability. The Supreme Court has emphasized that employment discrimination laws do not establish "a general civility code" for the workplace. Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81 (1998). Rather, Sammartano must demonstrate that hostile conduct was directed at him because of his alleged disability. See id. at 80. In fact, Sammartano has not alleged that there was any hostile conduct directed against him whatsoever. The evaluations he received, including the PIP, are part of Raytheon's standard operating procedure and are applicable to all employees. Again, Sammartano offered no evidence to support his allegations that hostility was directed at him because of his stutter. Because Sammartano cannot prove a genuine issue of fact as to whether he was subject to a hostile working environment, his claim must be dismissed.

### 8. Raytheon Did Not Retaliate Against Sammartano for Attempting to Obtain a Reasonable Accommodation

Sammartano asserted that Raytheon unlawfully retaliated against him for attempting to obtain a reasonable accommodation. Compl. ¶¶ 45, 46. A retaliation claim proceeds much as a disability discrimination claim proceeds, except that the prima facie case involves proof of a causal link between the adverse employment action and the employee's assertion of rights. See Champagne v. Servistar Corp., 138 F.3d 7 (1st Cir. 1998) (employing the McDonnell Douglas framework to a retaliation claim under the ADA). Specifically, to establish a prima facie claim of retaliation, a plaintiff must show that (1) [he] engaged in protected conduct, (2) [he] suffered an adverse employment action, and (3) there was a causal connection between the protected conduct and the adverse employment action. Freadman v. Cas. Ins. Co., 484 F.3d 91, 106 (1st Cir. 2007). Sammartano cannot prove the first and third elements of his retaliation claim.

#### a. Sammartano Did Not Engage in Protected Conduct

Raytheon does not contest that requesting an accommodation is protected conduct for purposes of the ADA's retaliation provision. However, as discussed in Section 6.b. above, requests for accommodation must be expressly made, and Sammartano never expressly asked for a reasonable accommodation. Sammartano's allegation that he mentioned to coworkers that he "found it easier to send e-mail than to have a conversation" did not constitute a request for an accommodation under the law. Therefore, Sammartano did not engage in protected conduct and his claim for disability retaliation fails.

#### b. There Was No Causal Connection Between the Protected Conduct and the Adverse Employment Action

Assuming arguendo that Sammartano engaged in protected conduct by requesting an accommodation, he alleged no facts that create a causal connection between his protected

conduct and either the PIP or his termination of employment. "The proper standard of proof on the causation element of a retaliation claim is that the adverse employment action taken against the plaintiff would not have occurred 'but for' the employee's protected conduct." Shoucair v. Brown Univ., 917 A.2d 418, 429 (R.I. 2007) (internal brackets omitted). Thus, Sammartano cannot prove a prima facie case of retaliation for asserting his rights to a disability accommodation.

**c. Raytheon Can Articulate a Nonretaliatory Motive for the Adverse Employment Actions**

Assuming arguendo that Sammartano can prove a prima facie case of retaliation, Raytheon can avoid liability for retaliation by articulating a nonretaliatory motive for the adverse employment actions. See Champagne, 138 F.3d at 12. Here, Raytheon has articulated nonretaliatory motives for the PIP and for terminating Sammartano's employment. Far from being a punishment for requesting an accommodation, the PIP addressed many legitimate performance and behavioral issues, as discussed in Section 4 above. As set forth in Section 4 above, Raytheon terminated Sammartano's employment for legitimate reasons that had nothing to do with his stutter or any purported request to accommodate his stutter.

**d. Sammartano Cannot Prove That Raytheon's Nonretaliatory Motives Were a Pretext for Retaliation**

Once Raytheon meets its burden of articulating a legitimate and nondiscriminatory reason for issuing the PIP and terminating Sammartano, the burden shifts back to Sammartano to show that Raytheon's proffered reasons are a pretext for discrimination based on disability. See Champagne, 138 F.3d at 12-13. Sammartano has not elucidated any "specific facts which would enable the court to find the reasons given are not only a sham, but a sham intended to cover up [Raytheon's] real motive." Id. at 13. Because Sammartano cannot prove a genuine issue of fact

as to whether Raytheon would not have issued the PIP or terminated him but-for his alleged protected acts, Sammartano's claim for retaliation must be dismissed.

**9. <u>Conclusion</u>**

For the reasons set forth above, Raytheon requests that summary judgment be entered in its favor.

## E. TABLE OF AUTHORITIES

**Cases**

Andresen v. Fuddruckers, Inc., No. Civ. 03-3294, 2004 WL 2931346 (D. Minn. Dec. 14, 2004) ..... 16

Barber v. Verizon New England Inc., No. Civ. A. 05-390-ML, 2006 WL 3524465 (D.R.I. Dec. 6, 2006) ..... 14

Benoit v. Technical Mfg. Corp., 331 F.3d 166 (1st Cir. 2003) ..... 13

Blagrove v. Walgreen Co., 868 N.E.2d 953 (Mass. App. Ct. 2007) ..... 16

Celotex Corp. v. Catrett, 477 U.S. 317 (1986) ..... 13

Center for Behavioral Health, Rhode Island, Inc. v. Barros, 710 A.2d 680 (R.I. 1998) ..... 21

Champagne v. Servistar Corp., 138 F.3d 7 (1st Cir. 1998) ..... 27, 28

City of Columbus v. Liebhart, 621 N.E. 2d 554 (Ohio App. 10 Dist. 1993) ..... 17

Clifford v. Barnhart, 449 F.3d 276 (1st Cir. 2006) ..... 20

Cook v. R.I. Dep't of Mental Health, Retardation, & Hosps., 10 F.3d 17 (1st Cir. 1993) ..... 18

DeCamp v. Dollar Tree Stores, Inc., 875 A.2d 13 (R.I. 2005) ..... 2

Detko v. Blimplies Rest., 924 F.Supp 555 (S.D.N.Y. 1996) ..... 15

Forestier Fradera v. Municipality of Mayaguez, 440 F.3d 17 (1st Cir. 2006) ..... 13

Freadman v. Metro. Prop. and Cas. Ins. Co., 484 F.3d 91 (1st Cir. 2007) ..... 14, 27

Harris v. Forklift Sys., Inc., 510 U.S. 17 (1993) ..... 25

Hodgens v. Gen. Dynamics Corp., 963 F. Supp. 102 (D.R.I. 1997) ..... 13

Hughes v. Boston Mut. Life Ins. Co., 26 F.3d 264 (1st Cir. 1994) ..... 12

Katz v. City Metal Co., 87 F.3d 26 (1st Cir. 1996) ..... 13, 14

McDonnell Douglas v. Green, 411 U.S. 792 (1973) ..... 13, 14, 20, 27

Neri v. Ross-Simons, Inc., 897 A.2d 42 (R.I. 2006) ..... 21

Newport Shipyard Inc. v. R.I. Comm'n for Human Rights, 484 A.2d 893 (R.I. 1984) ..... 2

Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75 (1998) ..... 26

Orta-Castro v. Merck, Sharp & Dohme Química P.R., Inc., 447 F.3d 105 (1st Cir. 2006) ......... 22

Quiles-Quiles v. Henderson, 439 F.3d 1 (1st Cir. 2006) ......... 25

Raytheon Co. v. Hernandez, 540 U.S. 44 (2003) ......... 13

Rivera-García v. Sistema Universitario Ana G. Méndez, 442 F.3d 3 (1st Cir. 2006) ......... 14

Shorette v. Rite Aid of Me., Inc, 155 F.3d 8 (1st Cir. 1998) ......... 21

Shoucair v. Brown Univ., 917 A.2d 418 (R.I. 2007) ......... 28

Tardie v. Rehab. Hosp. of R.I., 6 F. Supp. 2d 125 (D.R.I. 1998) ......... 2

Toyota Motors Mfg., Kentucky, Inc. v. Williams, 534 U.S. 184 (2002) ......... 15

**Statutes**

42 U.S.C. § 12102(2) ......... 15

**Rules**

Fed.R.Civ.P. 56(c) ......... 12

Respectfully submitted,

RAYTHEON

By its Attorneys,

/s/ Joseph D. Whelan

Joseph D. Whelan (#5694)
Hinckley, Allen & Snyder LLP
50 Kennedy Plaza, Suite 1500
Providence, RI 02903
(401) 274-2000
(401) 277-9600 (fax)
jwhelan@haslaw.com

Dated: November 1, 2007

**CERTIFICATION OF SERVICE**

To:

Stephen Sammartano, pro se
75 Arthur Street #4
Pawtucket, RI 02860

I hereby certify that on this 1st day of November, 2007, I served a copy of the foregoing Memorandum by mail on the above-named party.

/s/ Joseph D. Whelan