UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| STEPHEN T. SAMMARTANO<br>Plaintiff | : | |
| VS | : | C.A. NO. 06-535S |
| RAYTHEON<br>Defendant | : | |

**AFFIDAVIT OF HEATHER LEMMON**

I, Heather Lemmon, hereby depose and say that:

1. I have personal knowledge of the facts stated herein and am competent to testify to such facts.

2. I have been employed at Raytheon since June 18, 2001. From November 6, 2004 until June 30, 2007, I was a Consulting Human Resource Generalist in the Integrated Defense Systems Engineering Human Resources Organization at Raytheon's Maritime Mission Center ("MMC") in Portsmouth, Rhode Island. Since June 30, 2007, I have been the Manager III Human Resources with responsibility over Engineering at MMC.

3. On December 7, 2004, I met with Sandra Vanier ("Vanier"), Section Manager in the Integrated Warfare and Sensor System Software Engineering Department, to discuss her concerns about Stephen Sammartano's ("Sammartano's") behavior. Vanier addressed with me the following issues: (i) Sammartano's coworkers and supervisors had difficulty working with him because he was a "loose cannon"; (ii) Sammartano frequently left lengthy voice mail and electronic mail messages at all hours of the day and night to managers in which he stated that people were plotting against him and preventing him from using his skills; (iii) Sammartano was always the first to be taken off a project when it was downsized because his behavioral issues

made him difficult to work with; and (iv) he never took responsibility for problems and instead blamed other people.

4. In October of 2005, John Kelly, Senior Manager of Integrated Warfare and Sensor System Software Engineering ("Kelly"), contacted me to schedule a meeting with him, Vanier and Sammartano to discuss the continued issues with Sammartano's behavior.

5. On October 25, 2005, I had my first in-person meeting with Sammartano to discuss the concerns raised to me by his coworkers and managers regarding his troubling interpersonal behavioral issues. Specifically, I addressed his antagonistic reactions to coworkers, his concerns about management being "against him," and his use of voice and electronic mail. During this meeting, Sammartano refused to acknowledge or take responsibility for the issues that I addressed with him. Instead, he accused Raytheon's management of "separating him from his technology." I did not raise his stutter as a performance-related issue; in fact, we did not discuss his stutter at all.

6. On November 7, 2005, I met with Kelly, Vanier, and Irvin Kooris ("Kooris"), who was the Manager of Raytheon's Employee Assistance Program ("EAP") and has since left Raytheon, to discuss management's concerns with Sammartano's behaviors and his refusal to acknowledge or take responsibility for any of the behavioral issues that I identified to him. We also discussed the option of referring Sammartano to a local EAP and/or referring him for an outside evaluation. We decided to refer Sammartano to Daniel Musholt, Raytheon's onsite EAP professional ("Musholt").

7. On November 8, 2005, I met with Sammartano, Kelly, and Vanier to discuss, in part, the need for Sammartano to improve his communication and interpersonal skills with management and coworkers. We discussed the following issues: (i) Sammartano's frequent

lengthy and rambling electronic mail messages and voice mail messages to management and co-workers at all hours of the day and night; (ii) Sammartano's expressed perception that Raytheon and its employees were plotting against him; (iii) Sammartano's lack of accountability for issues and his vocal opinion that the disagreements are always someone else's fault; (iv) Sammartano's poor interpersonal relationships and teaming skills with coworkers/management; and (v) Sammartano's repeated allegations that Raytheon was trying to "separate him from his technology."

8. At the November 8th meeting, Sammartano again accused Raytheon of separating him from his technology. He argued that the problem was not with him but with management and with the people who were stopping him from doing his work.

9. At the November 8th meeting, I informed Sammartano that I would speak to Musholt about setting up a meeting with Sammartano on November 9th.

10. Shortly after the November 8th meeting, I received a voice mail message from Sammartano in which he claimed that someone was stalking him. I also received an electronic mail message from Sammartano – addressed to Kelly and copied to me – in which he wrote: "After I received the review, it appeared that the review was in error." Later that same evening, at 7:04 p.m., I received another electronic mail message from Sammartano – addressed to Kelly and copied to me – in which he wrote:

> The company is stopping me from living my life, John [Kelly]. You're taking my technology, my friends, my mentors, and now my family and separating me from them. You complain about email, complain about voice mail and do so many things wrong that it's too much to list and complain about how long the list it. Stop doing things wrong.

True and correct copies of the two November 8, 2005 electronic mail messages are attached hereto as Exhibits A and B.

11. On November 9, 2005, Musholt contacted me to discuss his in-person meeting with Sammartano, which took place earlier that same day. Musholt told me that he was concerned that Sammartano did not understand what we had identified as troubling behaviors and reactions and that Sammartano did not feel that a part of his job was to work effectively on teams. Musholt also stated that Sammartano claimed that the police were stopping him for going through green lights. He told me that Sammartano stormed out of Musholt's office after Musholt questioned the veracity of this statement. Musholt suggested that we consider whether Sammartano needed to be evaluated externally

12. On November 30, 2005, I spoke with Musholt again about the possibility of sending Sammartano out for an external evaluation. We decided an external evaluation was not necessary at that time because Sammartano had been in the workplace since Musholt's meeting with him on November 9th without further incident.

13. On January 13, 2006, I met with Sammartano, Kelly and Vanier to discuss Raytheon's decision to place Sammartano on a Performance Improvement Plan ("PIP") based on his 2005 Performance Ratings. I provided a copy of the PIP to Sammartano. At the meeting, we discussed with Sammartano the issues set out in the PIP and explained that he would be required to attend weekly status meetings with Robert Froncillo, Senior Manager of Program Management ("Froncillo"), who replaced Sandra Vanier as Sammartano's section manager, to discuss his progress in addressing the issues set forth in the PIP. The PIP did not directly or indirectly raise any issue caused by Sammartano's stutter. A true and correct copy of the PIP is attached hereto as Exhibit C.

14. At Raytheon, a PIP is generally a tool designed to help employees address specific performance issues and work towards improvement. Its purpose is to turn substandard

performance around and to assist an employee in producing results that meet or exceed the established standard. A PIP is designed to assess individual performance against established and agreed upon goals and objectives. The ultimate objective is a successful outcome for the employee and Raytheon Company. A potential consequence of a PIP is termination if the employee does not improve his or her performance during the specified time period. An employee is typically placed on a PIP at anytime throughout the year when management determines he is not meeting the expectations of the job, e.g., missing key deadlines, poor teaming behavior.

15. On January 14 and January 15, 2006—the Saturday and Sunday following the PIP meeting—Sammartano left approximately sixteen (16) voice mail messages on my work phone in which he stated that the PIP was a misrepresentation; he did not have a communication problem; he used to have a speech problem; and that Raytheon's request that he send fewer voice mail and electronic mail messages would cause him to be less productive because his use of voice mail and electronic mail enabled him to do more than one thing at a time.

16. On January 16, 2006 at 9:34 a.m., Sammartano wrote to me a lengthy and rambling single-spaced electronic mail message discussing his response to the PIP ("Response"). In his Response, Sammartano wrote:

> The document [PIP] presents demands for improvement of skills for which there is no lack of in myself which is not also present to an equal or greater extent than in those who make the demands and are quoted in the document itself. … I used to have a speech problem and I still have a vestage [sic] of a speech problem. I will do what I can with voice mail. My emails are usually pretty good. Furthermore, a lot of people get into problems when attempting to summarize for instance the last 730 days in thirty seconds. That's not a lack of communication skill—that's a lack of understanding on the part of the listener of the true complexity of the issue. You can't stuff 730 days into a 30 second bag.

A true and correct copy of the Response is attached hereto as Exhibit D.

17. On January 17, 2006 at 9:31 a.m., Sammartano sent me a rambling electronic mail message in which he criticized Raytheon's management. A true and correct copy of the January 17, 2006 electronic mail message is attached hereto as Exhibit E.

18. On January 18, 2006 at 10:06 a.m., Sammartano sent me an electronic mail message in which he wrote: "I can't make any sense of the document [the PIP] you presented to me Friday." A true and correct copy of the January 18, 2006 electronic mail message is attached hereto as Exhibit F.

19. On January 30, 2006, I met with Sammartano and Froncillo for the third weekly PIP status meeting. During the meeting, I perceived Sammartano as being visibly tense and agitated. He firmly insisted that the PIP was not correct and refused to acknowledge that he needed improvement in any of the areas identified in the PIP.

20. On February 6, 2006 at 9:08 a.m., I received an electronic mail message from Sammartano, which he also sent to Froncillo, (the "E-mail"), in which he wrote:

> Sorry, I guess I don't really feel comfortable meeting with either of you anymore. You continue to make allegations which you refuse to offer support for. ... Your acts are irrational. Who is to say what your motives are. Certainly not I. Fortunately, there is in general no expectation that I nor anyone else determine the extent of, the implication of, or the reason for irrationality which potentially puts them at risk. ...
>
> I will summarize by explicitly saying that I believe that these meetings are potentially unsafe for me and having been in the area of three incidents involving physical violence (the last incident occurring last week in New Bedford as reported in the local newspapers – the killing spree which led to numerous deaths), I believe I am eminently qualified to make such a determination.

A true and correct copy of the E-mail is attached hereto as Exhibit G.

21. I was incredibly alarmed by the direct reference to violence in the E-mail and felt personally threatened by it. I thought that the specific language "potentially puts them at risk" was a direct threat to me.

22. At that time, I was a member of the Workplace Violence Committee (the "Committee") at MMC along with George Caras, Director I of Facilities ("Caras"), Deborah Belsinger, Manager II of Security ("Belsinger"), Damian Guerin, Senior Manager of Human Resources ("Guerin"), and Kelly. The Committee convened whenever there were any issues that affected our workplace safety, such as a threatening electronic mail message, odd or erratic behavior from an employee, or an argument or fight among employees, to discuss and assess the risk level and to determine the best course of action to ensure the safe operations and safety of all our employees and contractors/visitors at MMC.

23. On February 6, 2006, after receiving the E-mail, I discussed it with Froncillo and Belsinger, and then we forwarded a copy of the E-mail to the Committee to determine what action we should take. In light of Sammartano's exhibited level of tension and stress in the weeks after he received the PIP, and his history of hostility toward management, the Committee decided that the E-mail was sufficiently threatening that it was necessary to place Sammartano on paid administrative leave effective immediately. The Committee decided that Sammartano would be able to return to work only upon receipt of a "fitness to return to duty" evaluation by a psychiatrist. Kelly and Guerin escorted Sammartano from the Raytheon building.

24. I scheduled an appointment for Sammartano with Dr. Ronald Stewart ("Dr. Stewart"), a psychiatrist in Providence, Rhode Island, for February 21, 2006.

25. On February 20, 2006, Kelly and I called Sammartano to inform him of the details of the appointment with Dr. Stewart.

26. On February 20, 2006, I mailed Sammartano a letter for overnight delivery confirming my phone call with him and the details of his appointment with Dr. Stewart scheduled for February 21, 2006. A true and correct copy of the February 20, 2006 letter is attached hereto as Exhibit H.

27. On February 21, 2006, I learned that Sammartano had left voice mail messages for Kelly and Dr. Stewart in which he stated that he would not attend the February 21st appointment.

28. On February 24, 2006, I spoke to Sammartano on the phone regarding his failure to attend the February 21st appointment with Dr. Stewart. He was adamant that the other Raytheon employees involved should see a psychiatrist – not him.

29. On February 24, 2006, I sent Sammartano a letter confirming my phone call with him on that same day, and informed him that he had until 6:00 p.m. on Friday, March 3, 2006, to schedule an appointment with Dr. Stewart or to visit a provider of his choice, and to provide documentation to Raytheon regarding his fitness to return to work. A true and correct copy of the February 24, 2006 letter is attached hereto as Exhibit I.

30. As of March 3, 2006, Sammartano had not sent me any of the requested documentation, nor had he otherwise contacted me.

31. On March 10, 2006, I sent Sammartano another letter informing him that he had until the close of business on March 17, 2006 to provide me with the requested documentation or to contact me to discuss Raytheon's request, or Raytheon would commence termination of employment proceedings. A true and correct copy of the March 10, 2006 letter is attached hereto as Exhibit J.

32. As of March 17, 2006 at 6:00 p.m., Sammartano had not provided me with the requested documentation nor had he otherwise contacted me.

33. On March 24, 2006, I sent Sammartano a final letter informing him that Raytheon terminated his employment effective March 24, 2006. A true and correct copy of the March 24, 2006 letter is attached hereto as Exhibit K.

34. Despite Sammartano's numerous behavioral and performance issues, no one ever raised with me an issue with his stutter, nor did I ever address his stutter as an issue with him. As far as I know, Sammartano's stutter did not impact his ability to communicate effectively at work or to otherwise perform his job.

35. Sammartano never addressed with me that he needed an accommodation for his stutter.

Heather Lemmon

Heather Lemmon

STATE OF RHODE ISLAND
COUNTY OF Newport

In Portsmouth, on this 16 day of October 2007, before me personally appeared Heather Lemmon to me known and known by me to be the party executing the foregoing instrument, and she acknowledged said instrument, by her executed, to be her free act and deed.

Mary Louise Sullivan

Notary Public
Printed Name: MARY LOUISE SULLIVAN
My Commission Expires: 6/14/2010

# Exhibit A

Stephen T Sammartano/US/Raytheon
11/08/2005 06:31 PM

To John F Kelly/RES/Raytheon/US@MAIL
cc Heather_Lemmon@raytheon.com
bcc
Subject comment

After I received the review, it appeared that the review was in error. It had failed to express things which I had documented with Sandra which demonstrated that I was a consistent performer. For a period of time, it almost seemed like Sandra and Dan were collaborating over the review and expressing things in complete contrast to what had happened. To honestly address your question of why the review missed items like the examples I submitted to you, at review time when I asked Sandra why I had been in the lowest raise group, her reasons changed just as they had for why I had not been in the Corba course. First the reason was I had only been at the company a year, later I was given the reason that I was the worst performer of the E4's. Now John, on a different subject, when the Corba course first came around, the context of the email was " What do you think, people ? " It was as if management wanted to talk to me, but not just ME - everybody. Basically it asked WHO would be interested and I was one of the WHO's. Kinda like let's sit and talk people and figure out what we are going to do - you have to remember John, that in this respect, these are the types of situations in which the fact that I have not been here a long time WILL BE an issue. So I was hearing, "Let's talk about it" and management was reading my response to what I saw as "What do you think of this course ? " as a response to " Here Is A Great Course " and my response being that " The course is stupid, and you are stupid for believeing that anyone so illustrious as I, aka ME would need such a course". Hence, you have one, only one intepretation of the situation. Who is to say if Sandra Vanier didn't reject my acceptance for some other reason, but the one I provided will serve for now?

By the way, I left you voice mails when I did, because at the time I was thinking clearly and quickly and my life moves fast enough that it is difficult sometimes to capture such detail.
Recall you had expressed the fact that email was not good for you.

Instead of being mad at me for being a lot of work, you should be mad at the people causing this situation. I am low maintenance. The fact is people in management spend as long as they need in reviewing my deliverables while they are charnging the project and not on overhead and expect me to have to spend very little time even when their deliverables are incomplete and don't work. The high maintenance image that you are talking about is being created through discrimination. I am not causing the work, it is the people accusing me of doing what they are doing.

Regards,

Stephen T. Sammartano
Senior Software Engineer
Raytheon Integrated Defense Systems
1847 West Main Road
Portsmouth, Rhode Island
02871-1087 USA
Ph 401.842.3765

# Exhibit
# B

Stephen T Sammartano/US/Raytheon
11/08/2005 07:04 PM

To John F Kelly/RES/Raytheon/US@MAIL
cc Heather_Lemmon@raytheon.com
bcc
Subject another comment

In fact it is not true that I get all the good work. In fact, in spite of all my programming experience I was originally assigned to do only UML. I had to argue for a programming position and while waiting for my interim clearance AFTER a relocation I had to be so organized and qualified that I was in a position to bring in my own software and install it on my unclassified system while waiting for my interim clearance. There was at least one individual who while waiting for his interim clearance had his own private network of computers to do work on. When I started programming here while people who expressed that they were just learning C++ were using C++, Java, Corba, and UML, I had to start with coding exceptions a niche of C++ generally considered to be more advanced and I was being accused of just learning C++. I had a deliverable the following day along with a test program to test it and it was later documented as I had been off to a slow start. I then had the rigorous task of coding *constants* and I say that sarcasticly. This company made me prove that I knew C++ every step of the way and it was only because I stayed up all night one night and created multi-threaded driver which I eventually got six sigma credit in connection with that I was eventually aloud to do an event dispatcher. Meanwhile other people were being assigned broader tasks in which they could take and use my code, in which their C++ skills were not in question, and which exposed them to the big picture. I had one week last November to do what Al Gaines had been doing in Generic Services since last January - it's not my lack of understanding of the big picture nor am I high maintenance, John, it the company's direct effort to characterize me as inexperienced while providing opportunity to those less experienced than I and yet when I was attempting to leave EVS and there was no C++ work, supposedly Dennis Sagamang was claiming I was leaving him with no C++ expert.
The company is stopping me from living my life, John. You're taking my technology, my friends, my mentors, and now my family and separating me from them. You complain about email, complain about voice mail and do so many things wrong that it's too much to list and complain about how long the list is. Stop doing things wrong.

The fact is at each and every point, I have had to generate reams of documents which you have not required of other people. You want me to respond and I respond and you hold it against me. You don't want me to respond and I say I don't want to meet with you and human resources and you hold that against me.

Regards,

Stephen T. Sammartano
Senior Software Engineer
Raytheon Integrated Defense Systems
1847 West Main Road
Portsmouth, Rhode Island
02871-1087 USA
Ph 401.842.3765

# Exhibit C

Raytheon

# Performance Improvement Plan Worksheet



Employee Name: Steve T Sammartano

Employee Number: 1038555

Job Title: Senior Software Engineer II

Leader Name: Sandra Vanier

PIP Begin Date: 1/16/06

Interim Review Dates: Weekly, beginning 1/16/05

Projected End Date: 3/07/06

**Performance/Behavior Issue(s) and the Effect/Impact:**

For the year of 2005, Steve's performance as an E04 did not meet the expectations of his task lead and section manager, and there is serious concern that Steve's performance issues will continue. Steve needs to improve his performance in the following areas listed below. The impact of this unsatisfactory level of performance is not only that Steve's assignments will be negatively affected, but that the team progress will also suffer.

1 Ability to Prioritize Tasks & Complete Tasks

Steve needs to improve his skills of prioritizing tasks. He needs to understand when to ask questions of team leads and team members to ensure he has relevant knowledge to correctly prioritize his tasks. Example: Rater inputs "Steve has difficulty managing his time and prioritizing tasks. When given a specific task, he takes it and runs. Once more than one task is on his radar, he seems to have difficulty figuring out what to do next."

2. Communication

Steve needs to improve his communication skills with peers, leads, and other stakeholders. Steve needs to learn how to use e-mail and voice mail more selectively and avoid long ambiguous, repetitive messages. Steve also needs to learn that after a decision has been made to let things go, and not dwell on issues and allow it to affect his performance. See Examples below:

Performance Rater A inputs "Steve would occasionally have comments (voice mail and e-mail) that seemed to come completely from left field and left you wondering what he was talking about." "Tends to dwell on problems too long."

Performance Rater B inputs "Seems to ramble and overanalyze at times."

Performance Rater C inputs "Needs to learn to relax a little and don't overreact to situation."

March 10th 2005 - Section manager met with Steve to go over his 2004 Performance Review. It was about 4.5 hours. He left over 20 voice mails , in regards to his "Needs" section.

Section Manager also has various archive of 100's of e-mails from Steve and voice mail messages left regarding topics such as his 2004 raise, his 2004 Performance, who he wants as his raters, 2005 Performance goals, etc, etc.

3. Ability to follow Raytheon Common Processes

Steve needs to willingly conform to standard Raytheon and team process and procedures rather than performing tasks in his own way. Example: Rater A inputs: "Steve also had problems conforming to project/team processes & procedures and would often argue the value of process activities (i.e unit test) and once he finally was directed to do it he would still perform the task in his own way."

4. Teamwork

Steve needs to understand that he is part of a Software Team - not isolated Performance - does not "own" anything.

Example: Performance Rater A inputs: "Steve seems to have problems working in a team atmosphere, preferring to do his work hidden in his own area until it was complete or until he was directed to put it in the CDP clearcase area."

5. Knowledge of bigger Raytheon picture

As an E04 Steve needs to understand how his specific tasks are a part of the larger team goals/program goals as well as how his efforts and the team efforts fit into the Raytheon IDS goals. Example: Performance Rater A inputs: Needs improvement on comprehension of the bigger picture. An EO4 should understand the bigger picture (in this case TSCEI Common Design Patterns) of the project verses just coding little pieces. Discussed 5/11: Steve did not know the members of his immediate team and what they were working on. As a start, Steve should understand what everyone on his immediate team is doing and how that fits into the "BIG" picture.

6. Ownership/Accountability of issues

Steve fails to take ownership of identified performance issues by stating that management is trying to separate him from his technology and that he is not being provided the opportunities to perform because he is one of the first to be removed from programs. A number of Steve's leads and managers have attempted to identify specifically the areas that are not meeting expectations in an effort to resolve this issue; however, each time Steve states it is not his fault. Examples: Performance Rater A inputs : "Steve seems to think that management is not always on his side." Steve's 2005 Self Assessment indicates that Raytheon is responsible for Steve's performance.

The concerns mentioned in this PIP were addressed with Steve on 11/8 with Human Resources and the Department Manager.

**Expectations of Standards To Be Met:**

The expectation of this Performance Improvement Plan is that Steve makes a serious dedicated effort to improve and sustain the improved level of performance in the following areas.

1 Ability to Prioritize Tasks

Steve will be given multiple tasks, supporting 2 different functional threads that are due on the same date and he will need to prioritize his time and figure out how he can get them both accomplished to meet the deadline. He should ask questions of team leads and team members to ensure that he is aware of priorities and due dates. Once he has received this relevant knowledge, Steve should independently decide the best way to accomplish the tasks. Expectation is that all assigned tasks will be completed in a timely manner and be of acceptable quality.

2. Communication/Knowledge of bigger Raytheon picture

Steve should show improved communication skills. It is strongly recommended that Steve join Toastmasters in an effort to improve communication skills. His voice mails and e-mails should be clear and concise. Steve should ask questions to ensure understanding of assigned tasks and team goals and should communicate clearly and in a timely manner with team leads, managers and team members. Steve should be able to explain the functional threads that he works on to his group lead and section manager, as well as how the thread plays a part of the BYG-1 program.

3. Ability to follow Raytheon Common Processes

This will be measured by Steve's ability to write and conduct unit test cases for the Periscope thread (item 6) as well as his performance on other assigned tasks. If it is necessary to perform tasks outside of common Raytheon processes, he must discuss this with his leads and managers prior to taking such action.

4. Teamwork

Steve will be expected to attend and actively participate in all team meetings/activities. As an E04, he will be expected to exhibit solid team behavior such as good communication, active listening, offering different viewpoints, and offering to assist/mentor other team members. It is expected that positive feedback will be received from team members and leads regarding Steve's team interactions.

5. Ownership/Accountability of issues

Steve will accept constructive criticism, developmental feedback, and discuss appropriate moving forward steps for him and the team. He will understand that he is a member of the larger team and that his actions and accountability impacts the team's success.

**Corrective Action Plan and Time Frame*:**

The following tasks and times have been agreed upon by section manager, group lead and the employee:

1) Get acclimated to new environment, obtain new user account, learn new Development environment (Rational APEX, compiling, linking), come up to speed in NSSN lab environment (1/16/06)

2) Work with Team Members to learn entire BYG-1 Periscope Thread and Integrate Periscope Client into Ship Set 3(1/30/06)

3) Support additional Stadimeter/Periscope implementation for VA Ship Set 5 (2/6/06)

4) Assign Steve STR on or before Feb 6th in a different functional thread to work on during the same time he is working the Periscope Interface (due 3/6/06)

5) Complete regression test of Periscope thread (due 2/20/06)

6) Write and conduct unit test cases for Periscope Thread (due 3/6/06)

Weekly status reports will be submitted to section manager and group lead. Weekly meetings will be held with section manager to discuss reports and progress to date on the PIP.

**Consequences if Level of Improvement Does Not Meet Expected Standards Within Time Frame*:**

It is critical that Steve makes significant improvements in the areas listed above. Failure to so will result in further action up to and including termination.

| | | | | | |
|---|---|---|---|---|---|
| Employee | Date | Leader | Date | Human Resources | Date |
| * **Note:** There is no guarantee of continued employment during the PIP time frame. | | | | | |
| **PIP Outcome:** | | | **Actual End Date:** | | |
| **Future Expectations and Opportunities for Growth:** | | | | | |
| | | | | | |
| Employee | Date | Leader | Date | Human Resources | Date |
| For help in using the PIP forms, refer to the PIP Leader Guide available on the Performance Development web site **http://www.ray.com/desktophr/perform/** | | | | | |

# Exhibit D

Exhibit 3 p 1-9

Stephen T Sammartano/US/Raytheon

01/16/2006 09:34 AM

To Heather_Lemmon@raytheon.com

cc

bcc

Subject Reponses

Hello Heather,

I read over the document which you presented to me Friday over the weekend. The document presents demands for improvement of skills for which there is no lack of in myself which is not also present to an equal or greater extent than in those who make the demands and are quoted in the document itself. If is a mask of equal opportunity in the form of not tasking me in a way which will require me to execute full lifecycle development using standard Raytheon and government documents. It ignores the following observations.

- On MCDP, I argueably had the most difficult module and I did it with little assistance from anyone. I began with a pre-spec generation of my own which became useful as a simulator to achieve specification validation - that to itemize how the spec would have to be changed to represent a working module. I achieved six sigma credit for the event dispatcher simulator.
- I certainly used more facets of C++ - thread, copy constructors, assignment operators, and signals and the fact that I am aware of this is in contrast to how the document delivered Friday depicts me.
- My unit test programs were more complex
- Beyond having a working product, I and I alone had a demonstrably low memory loss as of the due date. A week or two later the one person being identified as rater, rater A, rater B, and rater C had a leak of over a million bytes while my own was under 2k bytes. Apparrently infininite memory loss is granted an infinite threshold of credibility and no accountability.

This event is a grander scale of what happened to me while on MCDP, the project ot most note. I was assigned unit test of two modules over a two week period and Manny Goncal was telling me that he was being told to do the same thing by the acting lead. I called the lead and asked him if this was true and he denied it. I no sooner got off the phone when Manny Goncal was again reporting to me the same thing. Finally, the acting lead came into the Mission Center and admitted that he had said such things to Manny because he didn't believe that I could do the work. The work was very easy to me and I did the work on time and on schedule two days ahead of schedule at which time Dan claimed the was more work to be done as part of that two week deadline. I complained at the time that for the remaining work the deadline had not been a two week deadline, but a two day deadline. Note that I had been pushing all year and while other people had been taking their vacation time I had saved mine. I actually carried over forty hours to this year. I complained to the acting lead and Sandra Vanier that I did not feel responsible because he withheld the information too long and so I had no time to manage. I had been managing my time and working well withing my abilities while Dan was withholding information to make it appear like I had failed.

Let me furthermore point out that the document is a long and ambiguous document. It is intentionally beside the point to hide the fact that others are being given work and information which will allow them to execute full lifecycle development using standard Raytheon and government documents . The tasks which are outlined are encompassed by what I have already done - so I would stand to learn nothing from them as written, but in fact I am being told that at least the first part represents removing code which was never there to start. In summary, I am being dumbed down by being given un-involved tasks beneath my ability and not commensurate with my accomplishments or abilities purposely to repeat a subset of what I have already done to waste my time while other people are tasked to the extent of their ability and in a way in which they become informed and use standard Raytheon and government documents. The result will be that others will appear smarter while I will appear less smart and it will be because of the opportunity which I was not given and others were.

I have taken the time to address your document which to me is arbitrary and capricious. Here are my responses.

Case 1:06-cv-00535-S-DLM Document 1-4 Filed 12/01/2006 Page 2 of 9

Exhibit 3 p 2-9

1. For the year of 2005, Steve's performance as an E04 did not meet the expectations of his task lead and section manager, and there is a serious concern that Steve's performance issues will continue. Steve needs to improve his performance in the following areas listed below. The impact of this unsatisfactory level of performance is not only that Steve's assignments will be negatively affected, but that the team progress will also suffer.

1.1 I have a copy of my "mid-year review" emailed to me from Sandra Vanier. It is dated 8/24/2005. I will quote Sandra, "Overall I think you are doing well and there are just a few areas that you need to work on ( and remember we all have areas that we need to work on." The review continues in a similar tone noting overall performance in agreement with my quote of her here in this item and includes a Strengths, Teamwork, and Areas that Need Improvement Sections. Why is there such a marked difference between the behavior of management on 8/24 and the behavior of management which produced the document presented to me, Friday, 1/13/2006.

1.2 During the year in anticipation of such a circumstance and having experienced the first year of doing well and minimal raise, I brought the issues up to John Kelly as part of the skip-level meeting procedure.

1.3 I have a copy of emails between Sandra and I which include me mentioning my receipt of the above and asking her if it will be ok to respond. She first declines, at which point I accept her answer and ask her who to respond to in place of her to present my aside at which point she accepts. I asked her for permission to email her my responses presenting my opinion and facts relative to the review and she accepted. This was not the first time when I queried Sandra Vanier in regards to whether I issue too many emails to her regarding company business which involved me.

email.

2. Ability to Prioritize Tasks & Complete Tasks

Steve needs to improve his skills of prioritizing tasks. He needs to understand when to ask questions of team leads and team members to ensure he has relevant knowledge of to correctly prioritize his tasks. Example: Rater inputs "Steve has difficulty managing his time and prioritizing tasks. When given a specific task, he takes it and runs. Once more than one task is on his radar, he seems to have difficulty figuring out what to do next."

2.1 I did ask questions of my acting lead and team members to ensure that I had relevant knowledge to correctly prioritize my tasks within the limits of the situation. The acting lead at the time had a way of being abusive enough so that I began reporting incidents to Sandra Vanier in email as they came up. Sandra Vanier claims to have archives of my emails, so I would expect that she has passed on the relevant emails to human resources. At the time, I was under the belief that I was reporting these incidents to whom I was supposed to. I was acting upon Bill Swason's Rule #18 – Never direct a complaint to the top; a serious offense is to "cc" a person's boss on a copy of a complaint before the person has a chance to respond to that complaint. Now in truth, John Kelly became aware of the situation as well during meetings brought about in connection with his skip-level meetings. I recall relating one incident to him in which I asked the acting lead for a due date and the lead responded with, "Why do you want to know?". When I did ask questions doing so was characterized as "not letting things go after a decision had been made", "dwelling on issues too long, not being relaxed or overanalyzing the situation", "having problems conforming to the project/team processes & procedures", and "often arguing the value of process activities". The only part of the quotes which I agree with is that I did so "often" and what I did was ask questions as needed especially to prevent being called negligent, however in recognition of the fact that one cannot always be doing what one chooses and that I am a team player, I did not do so as much I would have otherwise..

2.2 I do tend to take a task and run per Bill Swanson's Unwritten Rule #10.

2.3 In an email to Claudia Dunn in regards to a position in Woburn which I interviewed for I explained to her situations of my circumstances. That email is here which revealed that indeed I was doing more than one thing at a time. See that email here

email – start

----------------

Thank you for the interview yesterday. I hope I was clear in my answers. In reference to your question

Exhibit 3 p 3-9

regarding my involvement in design - I provided the technical answer, that is technically, no. However, when I first moved into a programming position in January of 2003, my eyes first set site on source on a Thursday as I was provided an initial assignment and I generated a deliverable and test program by the following day. I wrote a mult-class hash table as explained ( began with a 24 hour prototype ). I wrote a multi-threaded stress test as explained ( began with a 24 hour prototype). I was assigned checksum code on the same Thursday on which two other gentlemen were assigned serialization code hearing the announcement that after they were finished they would join me to help me, and I returned with a deliverable the following Monday before the other two men had began. I did attend the meetings here on the format of serialization and contributed, and when the gentleman with the most visibility assigned to that task went on jury duty, I wound up producing some deliverables. It is also true that I produced a pre-spec deliverable of the event dispacther which did dispatch events and which came to be used to test future contributions to the spec. Certainly all of these deliverables had to have someone to make them take shape. There was no one but me. I was not provided with a spec for these things and in many cases there was not even an official designation that I was THE MAN. However, there was no one else but me. You might say in a convenient sort of way, official design began where I stopped and/or whenever I was interrupted for official design to begin, lol. I have provided more detail on PubSub_MT below as well as the usage page displayed when the user types <PubSub_MT> without arguments. Note that some of the arguments are those of the underlying COTS product ( and are passed down into it ).
email end

Note that I am implying that I went through full life cyle development to create implementations for a software fixture to test exceptions and constants while concurrently working on pub-sub ( simply stated above as a deliverable and test program ), a hash table while concurrently working on pub-sub, a multi-threaded stress test for tscei which reduced the process and testing tscei and led to six sigma credit, 32 bit checksum while working on TSCEI-MCDP ( comparative testing was done to windows winzip and java in windows ) before delivery, Serialization code, and an event dispatcher simulator. I had no help from anyone, not because I insisted or prevented them from helping, they chose not to. Full life-cycle development consisted of proposing the idea to myself, accepting the spec as complete in my mind, designing the algorithms require to implement the functional spec, coding, review the code, testing the code, and finally using the code towards it's desired end. I went through the entire process in 8 hours for the exception testing software fixture, 24 hours for the hash-table while doing pub-sub concurrently, 24 hours for multi-threaded stress test, 12 hours for the checksum code, 15 hours for the serialization code, and about thirty days for an event dispatcher. This software all represents software which I own and for which I delivered a subscription to to Raytheon in the process of producing Raytheon deliverables for payment. Raytheon owns a subscription of my software of each of these things. I hope participant parties understand the difference. I used a subscription of Raytheon owned tscei pub-sub. I never owned it. I may be able to own part of a printout or a printout of a subscription of Raytheon owned tscei pub-sub to the extent that Raytheon allows. I don't own Raytheon BYG software. I may work on a subscription of Raytheon owned BYG software. I can buy an issue of Time magazine and own it, but I only own that issue. I don't and never will own Time based upon the purchase of that issue. I don't have that identity. I can take my issue and write my name on it and in so doing that does not make all versions of that subscription mine. The only version of the subscription which is mine is the one I purchased which I wrote my name on. Time magazine can decide there is something offensive in that issue and pull all other issues from the shelf for that month, but they can't take away the one I already purchased. Time can re-issue a subscription in place of the one which it pulled from the shelf and I can buy that one too and I would own two different subscriptions of the same issue. Raytheon never asked me to create a software testing fixture for exceptions or constants – it asked me to produce working exceptions and constants. Raytheon never asked me to create a hash table it requested a port of a subscription of Raytheon owned tscei pub-sub from java to c++, Raytheon never asked me to produce the multi-threaded stress test which I created it, I produced a subscription and delivered it to Raytheon, Raytheon never asked for or used my initial checksum program or serialization program or event dispatcher – all things which I own and produced subscriptions of to Raytheon for payment during the process of the achieving Raytheon requested and owned deliverables. If you order a pizza and the delivery man arrives with fifteen, you are only responsible for what you ordered – your agreed to part of the verbal contract. Raytheon owns what it orders which includes the subscriptions it orders and the products it produces whether it produces them from those subscriptions or otherwise. I am not the one to complain to about these issues, may I suggest

Case 1:06-cv-00535-S-DLM Document 1-4 Filed 12/01/2006 Page 4 of 9
Exhibit 3 p 4-7

Congress.

To come back to the point, I have often done many things at a time.

2.4 Also when speaking with Claudia Dunn the issue came up of how I achieved such a low memory loss and one thing led to another and I had to explain how Rational Purify came into the picture a year and a half after I had been programming at Raytheon. I simply did not have the clout to make such a change happen. The last thing anyone wanted to hear was any suggestion from me. The day I brought up Rational Purify, Dan Courville expressed that he and Dick Amundson had just been speaking of hit over lunch. If anything I was accused of just learning C++ and the company made me prove I knew C++ every step of the way. Meanwhile other people were being assigned broader tasks in which they could take and use my code, in which their C++ skills were not in question, and which exposed them to the big picture.

3. Communication
Steve needs to improve his communication skills with peers, leads, and other stakeholders. Steve needs to learn how to use email and voice mail more selectively and avoid ambiguous, repetitive messages. Steve also needs to learn that after a decision has been made to let things go, and not dwell on issues and allow it to affect his performance. See Examples below:

3.1 I have to repeat in email, voice mail, and verbally often because I am not there to explain what I mean when people fail to understand what I am saying and find the meaning ambiguous as happened during our meeting when discussing Adam Dai.

4. Performance Rater A inputs "Steve would occosaionally have comments ( voice mail and e-email ) seemed to come from left field and left you wondering what he was talking about" "Tends to dwell on the problems too long."

Performance Rater B inputs "Seems to ramble and overanalyze

Performance Rater C inputs – "Needs to learn to relax a little and don't overreact to a situation"

4.1 An effort will be made to issue comments from right field, center field. Feel free to express fields of interest.

4.2 I suppose I ramble and overanalyze as much as the next person, yet I do not hide behind accusing others of rambling and overanalyzing. It is not the mainstay of my career. So as not to ramble, consider this a response from right field.

4.3 I highly suspect that these rater responses represent a corruption of the rating system. These responses do not sound like the responses of the raters which I chose. They do indeed sound like the responses of the one individual who was abusive to me for a long while. Coincidetally, he did become less abusive towards the end of the project and after I was coming off, but I digress. I am supposed to be able to choose my own raters. I did.
The above submissions do not appear to be from them. I propose that they represent a lie. Moreover, they represent a mockery of a program which I wrote on MCDP which had three main parts. In an effort to get the program, which I was having difficulty with getting working, working I broke the program up into programs A, B, and C and reported the results as such on my weekly activity reports. From then on I began to receive reponses from my section manager with uncanny mockery to A, B, and C.

5. March 10th 2005 – Section Manager met with Steve to go over his 2004 Performance Review. It was about 4.5 hours. He left over 20 voice mails in regards to his "Needs" section?

Section Manager also has various archive of 100's of e-mails from Steve and voice mail messages left regarding topics such as his 2004 raise, his 2004 Performance, who he wants as his raters, 2005 Performance goals, etc, etc.

Case 1:06-cv-00535-S-DLM Document 1-4 Filed 12/01/2006 Page 3 of 9

Exhibit 3 p 5-9

5.1 Is this about 2004 or 2005? From here on, my comments will assume it is should be 2005.

5.2 On a few occasions I began to suspect that I was sending too many emails to Sandra Vanier and so explicitly sent her an email stating such. I never received reponses or notices pressing for a change in my ways. One particular occasion the response came back in multiple choice format asking if the reason was

1. because I didn't like her
2. I can't recall this item
3. or was it just that she was willing to hear me out. ( in her own words )

I responded that it was 3 and we seemed to moved on. On other occasions she did agree that my email was a lot, but never mentioned that I must change my ways. I did make a decision to intentionally reduce the number of emails which I sent to Sandra Vanier and on at least one occasion, and I actually think a few, she commented, in a joking manner mind you, on how happy she was at having not received so many emails from me recently. Still she never sent me back a response to an email explaining that it in particular was an example of an unnecessary email. I don't recall even one email explicitly having the tone that I must change my ways, and or that there was no way that I could continue sending her emails in the volume that I was. Nor do I recall any emails from her which were of the tone that this particular email represented the n-th time which she had informed me of some discontent on her part in connection with my issueance of email to her. Perhaps I didn't receive them? She never took the time to tell me in person.

5.3 mis-characterization life sentence see 5.8

5.4 There were a number of long meetings with Sandra Vanier as my section manger. I actually began to wonder if she liked me and asked her if that was the reason for the long meetings, but it took me about a micro-second to realize that she was digging. She spent hours with me attempting to characterize things in ways which they were not, attempting to substitute vulgarities for words which were not vulgar. It reached the point where I sent her at least one email stating that what I said and did would never be anything other than what it was. The meetings thinned out greatly. We have not had a long meeting in a long time.

5.5 By the time of my 2005 mid-year review ( aka 8/24/2005 ), I had on my own chosen to reduce the number of emails I was sending to Sandra Vanier. I read the review and decided that I disagreed. I had combined feelings that I did not want to send too many emails and that I needed to speak with someone else, but I did not want to violate Bill Swanson's rule number 18, don't go over a person's head without giving them a chance to respond. I have copies of emails to Sandra Vanier and in which I specifically ask her if she expects responses. She replies that she does not. I ask her who I should speak to if she is not the person to respond to. At this point she sent another email accepting responses.

5.6 In an effort to build my effective communication perhaps we can view emails of others which represent effective communication. I am willing to believe that Sandra Vanier does not have anything against me, so I assume that she is saving emails from other people as well. Of course, I imagine that she must have far fewer from others as the volume which I send is being reported as being so much higher than the norm. Still twenty percent of a hundred is only twenty. I would like to see how my emails stand up against those of my peers or if I merely being placed under the spotlight to make scene in disregard for the quality of my emails and or in absence of the lack of quality of the emails of others.

5.7 Even if the volume of emails which I send is higher than the norm, people are immortalized for their idiosyncrasies. As a child I initially did not stutter and my father called me the motor-mouth - I talked a lot and added to the language words of my own making. Teen-age girls are touted as always being on the phone, etc. These are not issues of termination, but issues of uniqueness, comedy, and simple mathematics – somebody has to have the highest volume of email sent. Is Sandra Vanier simply refusing to grant me another credit which I so dearly deserve – aka The King Of Email ?

5.8 Sandra Vanier does not seem to know I am a human being. She issues reviews which characterize the last 730 days of my life and is surprised at the flurry of emails created. She only wonders what angel

Exhibit 3 p 6 - 9

from heaven or hell has brought to her such a deliverance.
Reviews constitute a characterization of the last 365 or 730 days of a person's life. Inaccurate characterizations or unfair characterizations rob one not only of one's past, but also of one's future and in so doing create a life sentence for the victim. One percent of 730 days is 7.3 days. I am sure I took less than one percent of the time under consideration in discussing the characterization of it.

6.0 Ability To Follow Common Raytheon Processes
Steve needs to willingly conform to standard Raytheon and team processes and procedures rather than performing tasks in his own way. Example: Rater A Inputs: "Steve also had problems conforming to project/team processes and procedures and would often argue the value of process activities ( i.e. unit test ) and once he finally was directed to do it he would still perform the task in his own way.

6.1 See section 2.1, 2.4

6.2 Not having the opportunity to participate in and learn Raytheon processes and standards has been an ongoing complaint on my part.

6.3 Of the little Raytheon process which I was informed of, I was never informed of any discrepancy with how I was doing things and Raytheon processes in connection with unit test or anything else

6.4 My leadership input was and is that CxxTest is worthless tool which gains the developer absolutely nothing at best and generally winds up taking away from the production of a quality product. Lazy people like it because it means nothing, does nothing. It just gives someone a box to check as a test having been done. Benefits from CxxTest arise as a circumstance. Use of the tool was chosen for political reasons and Mr McCann made a reference to all singing the same song to the Navy. It was an intentional way to satisfy the contractual testing requirement without doing anything at all, and McCann implied such.

7.0 Teamwork
Steve needs to understand that he is part of a Software Team – not isolated Peformance - does not "own" anything.
7.1 Raytheon has neglected to recognize that I am part of a team. During the pre-spec version of the event dispatcher there was no we and there was no team. I wrote the code. We did not write the code. Acting lead, Dan Courville kept the details of the spec close and since I was busy writing code he used the time to do whatever ever he did and to analyze my code and I wrote for him implementations of his ideas. He did not write code, there was no we. I wish there had been. In the same way at the start of MCDP there was a conspicuous looking time during which I accumulated deliverables produced solely and exclusively by myself on the M-drive for the review of who ever had access. There was no we who produced these deliverables – no team. I did. In a convenient sort of way, the design effort began where I stopped – I was informed so little that I didn't even know what questions to ask to be further involved and it was a period characterized by Dan Courville being abusive. It didn't make sense to me to be requesting more of him. He would request more of me so that I would have no time to share in the team effort. If there was a team, I was not part of it. In support of this point, Mr McCann was somewhat at a loss when I chose him as a rater, and I held him responsible to that position. I understand he has left the company. I mentioned these issues to Sandra Vanier in various ways during the year. It appears that the company tortures me and in hindsight attempts to justify it as some probationary period. In a previous email to Sandra Vanier I did report that company officials with any influence over me have held both the company's products and other people's work very close, while insisting that my work be placed for the review of others in the vobs or on the M drive at times during periods noted by the absence of contribution from other members. I propose that during these times when I was working alone that others had ample opportunity to improve their understanding of " the big picture ". Even Sandra Vanier herself has admitted that Dennis Sagamang instructs his people to hold their work close.

7.2 What I own is a legal issue – not an issue which has anything to do with me, Raytheon, or our beliefs. Legal issues don't belong in performance reports about me. For the sake of conversation, see sec 2.3.

7.3 If there was a team perhaps one can show me the contributions of the other members and illustrate

Exhibit 3 p 7-9

how may work was inferior.

8.0 Example: Peformance Rater A inputs: "Steve seems to have problems working in a team atmosphere, preferring to do his work hidden in his own area until it was complete or until he was directed to put it in the CDP area""

8.1 I have no problem working in a team atmosphere

8.2 If I accept what is being implied, why does the Rater refer to the work as "his work"? I thought the point was that there was a team somewhere. Note that I know what this is referring to and at the time there had already been multiple deliverables on the M-drive from me in absence of others for months. I was one of the few who had submissions in the vobs. Taken out of context this can be read as if everyone else's code was public and mine was not. Fact is I had stuff everywhere – the M-drive, public, and private. Some " team members " had code no where.

8.3 The statement is untrue and the untruth is demonstrable based upon historical fact. The untruth is not an issue of discussion but is an item which can be demonstrated as historical fact and current fact.

8.4 The issue of hidden or not is a circumstance. DDX has available scripts which are distributed by John Black which explicitly remove one's history on a per window basis. I could say that the reason is so that people like Dan Courville cannot snoop through one's history files, but that would be a presumption. Everyone on DDX knows about these scripts. I believe I recall seeing the same script in BYG, so really even Sandra Vanier should know about this script. The view of the rater is a presumption. My acts do not differ from those of others. I have a presumption that Sandra Vanier's position is just an act to make a scene. I am at a loss to understood what force is motivating this action of Sandra Vanier.

9.0 Knowledge Of Raytheon Bigger
As an E4, Steve needs to understand how is specific tasks are a part of the larger team goals/program goals as well as how his efforts and the team efforts fit into the Raytheon IDS goals. Example: Performance Rater A inputs: Needs improvement on comprehension of the bigger picture. An E4 should understand the bigger picture ( in this case TSCEI Common Design Patterns ) of the project verses just coding little pieces. Discussed 5/11: Steve did not know the members of his immediate team and what they were working on. As a start, Steve should understand what everyone on his immediate team is doing and know how that fits into the "BIG" picture.

9.1 HELLOOOOOOOOOO
HOW MANY TIMES DO I HAVE TO REPEAT – THE PERSON ACTING AS A LEAD WAS ABUSIVE. THERE WAS NO TEAM. THERE WAS HIS HIGHNESS COURVILLE AND THE DUTCHESS VANIER. Now base upon what they've said it seems that doing right by people with years of service was a motivating factor. As I stated to Mr McCann, not only don't you have to wrong me to do right by these people, doing so would be incorrect, the consequences of doing any party wrong are undefined. Take note that I must repeat things many times for them to be heard.

9.2 Complaints in regards to me being an E4 and not being employed as such have been mentioned to Sandra Vanier and John Kelly have not been forthcoming. I have the emails.

9.2 Please note the differing thresholds of credibility. When someone can be paid to say that I did not know who my team members were, someone is being given too much creditability. Figure out who. One thing is for sure, it's not the guy who doesn't know who his team members are.....of course that's assuming he actually doesn't know and it may not even be the person reporting the fact that if it is true. I am not in a position to agree or disagree. With participants in Fort Wayne, Tewksbury, and Portsmouth, only those less qualified than I actually believe they know better.

9.3 I knew enough of the big picture to generate an event dispatcher pre-spec which served to act as a simulator and discover errors in the lead generated spec. I started before the spec and what I created was good for an entire year and I was prevented from participating to any greater extent than to further

Case 1:06-cv-00535-S-DLM Document 1-4 Filed 12/06/2006 Page 8 of 9

Exhibit D p 8-9

develop what I had done pre-spec for an entire year. It was an easy year for me. I asked to contribute to other projects when Mike Solgar was touting overtime for everyone.

10.0 Ownership/Accountability Of Issues
Steve fails to take ownership of identified performance issues
10.1 Correct.

11.0 by stating that management is trying to separate him from his technology
11.1 I have used the phrase but never with the other phrases which make up this sentence. I don't agree with the sentence.

12.0 and that he is not being provided the opportunities to peform
12.1 I agree with this

13.0 because he is one of the first removed from programs.
13.1 Actually, I was only one of the first to be removed from one program. I never connected the above phrase which is not true to the phrases here. Furthermore I never used the above phrase – John Kelly did and put in my mouth. I don't know where he heard it. He didn't hear it from me. I heard it from him. I had been complaining about the lead being abusive for a long time. I mentioned the problem to Sandra Vanier many times. I was attempting to not go over her head and eventually did speak to John Kelly. I have mentioned to human resources that John Kelly seemed to slant things against me. I have many emails which explain my view. Apparently Sandra Vanier and John Kelly buried the incident. I actually thought something was finally being done. MCDP is the only program I was one of the first to be removed from. The remainder is a lie.

14.0 A number of Steve's leads and managers have attempted to identify specifically the areas that are not meeting expectations in an effort to resolve this issue.

14.1 Ohhhh, give it up. They'll sell you a bridge. Ya know it's about time people started calling a spade a spade. Some white supremacist is given power and attempts to rationalize his efforts by taking the white out of supremacy and combine it with a wish to do right by people with a lot of service with Raytheon at my expense. And that white supremacist is not as all-knowing as people think. It took somebody from Fort Wayne to tell him that the serialization code which he was sitting on produced by me was based upon the floating point starndard. Most of the things he said about me were projections of his own short-comings onto me. He consistently attempted to discredit me for my initial event dispatcher. It was I who had to explain to all involved that it didn't need it's own DSO to be counted as six sigma as it was done in analogy to a safety procedure. He didn't have the foresight to recognize my intial efforts as professional so we had to go back and add in DOD headers. He made a big fuss of me morphing my event dispatcher to the spec suggesting it would take less time to start from scratch ( think about what that would have cost Raytheon ! ! !) and I was done before he could really make a scene. He couldn't write a correct spec which represented a working product and wouldn't let me get involved nor would he participate in writing code. He took a big fit at me switching back to posix threads to study memory loss overreacting by insisting that we were not going to be using posix threads. Then when I was able to gather and use the information to reduce a 20K leak to 2K with ACE threads, he stopped sending me emails. This guy would leave to go on vacation with 45 minutes notice. As of supposed delivery, he had about a million bytes loss of memory. The characterizations against me are all one big lie. They report problems about me which are exhibited by everyone. They are full of ambiguity – this is from right field. How's that for a start and it' s just a start?

15.0 ; however, each time Steve states it is not his fault.

15.1 I can say it again if you like.

16.0 Examples: Performance Rater A inputs: Steve seems to think that management is not always on his side.:

Case 1:06-cv-00535-S-DLM Document 1-4 Filed 12/02/2006 Page 9 of 9

Exhibit 3 p 9-9

16.1 Correction, I think management is not always on anyone's side. Management has very little against me specifically. It's only a few wrongly trusted people who are involved.

17.0 Steve's 2005 Self Assessment indicates that Raythoen is responsible for Steve's performance.
17.1 I have to agree again.

18.0 The concerns mentioned in this PIP were addressed with Steve at his mid year review
18.1 I have a copy of the mid year review email and the tone is overwhelmingly positive unlike here..

19.0 and on 11/8 with Human Resources the Department Manager.
19.1 a different issue entirely as I recall, as a matter of fact, I still don't know why we met on 11/8. We met on 11/8 because John Kelly said we had to meet and at the meeting he made it seem like I wanted to meet. The first time I pariticipated in an overwhelmingly negative toned event was Friday, 1/13/2006 and I have the emails to prove the positive tone.

Comments on the Expectation of Standards to be met
1.0 Showing improved communication skills is not what software engineering is about. Showing improved communication skills is a perception.
2.0 I used to have a speech problem and I still have a vestage of a speech problem. I will do what I can with voice mail. My emails are usually pretty good. Furthermore, a lot of people get into problems when attempting to summarize for instance the last 730 days in thirty seconds. That's not a lack of communication skill – that's a lack of understanding on the part of the listener of the true complexity of the issue. You can't stuff 730 days into a 30 second bag.
3.0 Historically I have not had enough clout to ask questions. Asking questions for me has been characterized differently. See section 2.1 above.
4.0 Toastmasters will not help me. I have no fear of public speaking. I have a problem speaking period. How many times must I repeat myself before I am heard?
5.0 In regards to me being able to explain, the threads – an interpretation.
6.0 I will need someone to ask about the BYG program, wow, this would have been a great thing to have for DDX. As it was Dennis wouldn't even allow me to go to the course on Realtime Innovations DDS Pub-Sub and I was using Realtime Innovations DDS Pub-Sub. Apparently that training was for a different team. There are people who have been helpful – Wai Chu, I promised him I would never forget him; Thom Jones – thanks for showing me Doxygen.
7.0 In regards to teamwork no one is going to tell people what to say. E4 or no E4 I don't think these expectations are reasonable for a new guy on a project. When I worked for Dick Amundson in EVS, he gave me the wrong coding standard THREE TIMES and code had to be changed as a result. He gave me half a spec once. Even Wai Chu once gave me the incorrect IDL. These people are and were well respected people. Even IIIII, respect Wai Chu – so much so that to this day I still think he did gave me the wrong IDL on purpose, but that's a different issue. In evaluating my code, Wai Chu eventually remarked, "Don't go by the other code – it doesn't work", lol. Another time Wai was helping me and he found a file of interest and said, "What does that do?",,,,and I told him. And he went to a different location in the source and he said, "And what does this do?" And I told him. And then he went to a third location and he said, "And why did you do this?", and I responded by saying, "Oh none of these things are my code, the code you are speaking of is all Frank Monte's code." We both started laugh. I will say I will try.
8.0 In regards to accepting constructive criticism – to date I have never refused to accept constructive criticism and as a matter of fact as soon as I get some I'll accept it. Same for developmental feedback.
9.0 I have always known that I am part of a team, you can't honestly believe that there is any other reason for which I would put up with the things which I do. Do you think I like it? Tell me, when are others going to be judged the way I am – in particular and in general?
10.0 Steve will issue a bulletin to all BYG employees to submit weekly activity reports to him on the basis of his Need To Know. In order that Steve may better have the time to review all such documents, Steve will request a laptop in order that he may read while commuting to and from work.

Regards,

# Exhibit
# E

(1)

Stephen T Sammartano/US/Raytheon

01/17/2006 09:31 AM

To Heather_Lemmon@raytheon.com

cc

bcc

Subject Hello Heather

Hello Heather,

I sent you three voice mails recently. Maybe you deleted them. In summary I went over these points.

1. overanalyzing - I have been accused of overanalyzing. I don't think the participant parities involved are analyzing enough. The lack of analysis is approaching the level of the National Enquirer which reports stories of sightings of The Lost Squadron of World War 2 seen recently flying over Jupiter and it shows a picture of what appears to be a squadron of Northrupp Grumann Hellcats and the one of the pilots is actually waving towards the photogragher - all while flying over Jupiter, or the story of the birth of BatBoy at 15.3 pounds and an individual with baby-like and bat-like features is shown.
During a time when I was probably the only team member who had source on the M-drive, public unclassified, public classified, in the vobs, and hidden - a report that I do all my source hidden until it was complete or it was directed into the vobs ignores all of these other details. No one picked it up. A lack of analysis. Furthermore, DDX distributes scripts through John Black which remove a developer's history files. Should I presume that the reason is to stop people from snooping through others history files? How are my acts any different? BYG has the same script I think

2.mentoring - They want to see me mentoring. They don't specify in what field - althouth in other parts of the document they express a distaste for left field. Mentoring is a perception. When I make a statement like anything in these emails, if the reader concedes then at certain times it is indeed mentoring. However, for political reasons at one time or another the reader may disagree. On a different note - another example of a lack of analysis by participant parties.

3. Doing more than one thing at a time - The point has been made that I can't do more than one thing at a time. At the same time an agenda is being pushed that I specifically use less voice mail and less email. My use of voice mail and email suggests a life-style where I am doing more than one thing at a time. If I have to go around and physically find people and interrupt them it will severely negatively impact my performance and the people who I am interrupting somewhat. It seems that the life I am living is that I am doing many things at a time - as I approach obstacles I put them on someone else's voice mail or email queue and I move on with a record of what I put on queues at least for the other person in the case of voice mail and for me as well for email. The other person can address these items at their earliest inconvenience. I am being pushed to live a life which is conducive to doing one thing at a time and which will result in me wasting my time attempting to find people and forgetting what I was attempting to ask them and distracting from what I was attempting to do and I am being asked to do more than one thing at a time. I see a big problem which includes a lack of analysis - not mention my meeting at 8:30.

Furthermore and aside fom my voice mails my proposed failure in these areas are associated to the basis of an argument that maybe big companies are not for me. Somehow these issues have to do with a big company versus a small company. What field is such a proposal being issued from, and assuming it is not left field

Regards,

Stephen T. Sammartano
Senior Software Engineer
Raytheon Integrated Defense Systems
1847 West Main Road
Portsmouth, Rhode Island

# Exhibit
# F

Stephen T Sammartano/US/Raytheon
01/18/2006 10:06 AM

To Heather_Lemmon@raytheon.com
cc
bcc
Subject Hello Heather

Hello Heather,

I can't make any sense of the document you presented to me Friday. However more than that, it's like being rated poorly based upon hygiene issues or manner of dress and being forced to consent to a probationary period which is solely comprised of a solving a technical problem. How will that address the hygiene issue or manner of dress? Given that, there is an implication, it's almost implied, that if I do the work, I am consenting to such probation. You have said you are not challenging me technically, yet the probationary period is solely comprised of a technical problem. None of it makes any sense to me.

Regards,

Stephen T. Sammartano
Senior Software Engineer
Raytheon Integrated Defense Systems
1847 West Main Road
Portsmouth, Rhode Island
02871-1087 USA
Ph 401.842.3765

# EXHIBIT G

Stephen T Sammartano/US/Raytheon
02/06/2006 09:08 AM

To Robert E Froncillo/US/Raytheon@MAIL
cc Heather Lemmon/US/Raytheon@MAIL
bcc
Subject Re: PIP Meeting

History: This message has been forwarded.

Hello Rob, Heather,

Sorry, I guess I don't really feel comfortable meeting with either of you anymore. You continue to make allegations which you refuse to offer support for. As an example, you said last week that my emails to you represented an issue. I printed them out, forwarded them to Heather, etc. There were only nine emails. I received no explanation from either of you. I have come to believe that I am the only one who is taking the PIP seriously. You and Heather continue to act as if you feel your actions are beyond judgement. The PIP has become nothing more than a DSO for you both to charge to at best perhaps to further suggest that I am costing the company this money ??? I have explained why your actions are arbitrary and capricious. Since they are only directed at me, they constitute a lack of equal employment opportunity for me. Your acts are irrational. Who is to say what your motives are. Certainly not I. Fortunately, there is in general no expectation that I nor anyone else determine the extent of, the implication of, or the reason for irrationality which potentially puts them at risk. While I agree that there is an expectation to document and or report the irrationality to higher authorities in order that they may deal with it, I have done that. . I will add that as an author of numerous technical documents for industry that my written communication skills stood the test of time long before anyone at Raytheon had anything to say about it. I am forty years old with experience, not twenty two years old. I don't think any resemblance of my emails to Bill Swanson's or Dan Smith's make me any more at fault.

I will summarize by explicitly saying that I believe that these meetings are potentially unsafe for me and having been in the area of three incidents involving physical violence ( the last incident occurring last week in New Bedford as reported in the local newspapers - the killing spree which led to numerous deaths ), I believe I am eminently qualified to make such a determination.

Regards,

Stephen T. Sammartano
Senior Software Engineer
Raytheon Integrated Defense Systems
1847 West Main Road
Portsmouth, Rhode Island
02871-1087 USA
Ph 401.842.3765

Robert E Froncillo/US/Raytheon

Robert E Froncillo/US/Raytheon
02/06/2006 08:18 AM

To stephen_t_sammartano@raytheon.com, Heather Lemmon/US/Raytheon@MAIL
cc
Subject PIP Meeting

Steve, Heather,

Sorry for the change of plans... I am here at the MMC today and will be going to Tewksbury tomorrow. I'll be in phone conferences throughout the morning. Are you avaiulable for a 2:30 meeting?

thanks, Rob

# EXHIBIT H

Raytheon
Integrated Defense Systems
1847 West Main Road
Portsmouth, Rhode Island
02871-1087 USA

February 20, 2006

Stephen T. Sammartano
260 Fountain St.
Apt A1
Fall River, MA 02721

Stephen,

We are very concerned about your well-being. As a result, we have placed you on paid leave until we could arrange for you to have a full evaluation.

Irv Kooris, who is the manager of our Employee Assistance Program, has set up an appointment for this evaluation. Per the telephone conversation John Kelly and I had with you this afternoon, the details for the appointment are:

Date: February 21, 2006
Time: 3:00 pm
Location: 277 Waterman Street, Providence, RI
Phone Number: 401-331-7777
Provider: Dr. Ronald Stewart

I know you are eager to return to work. The best way to do that is to commit to attending all appointments with this doctor and to provide him with any information he needs. I am always available to you as is John Kelly (phone: 401-842-4070).

Sincerely,

Heather Lemmon

Heather Lemmon
IDS Engineering Human Resources
401-842-2474 (office)
401-225-0786 (cell)

CC: John Kelly

# EXHIBIT

# I

Raytheon
Integrated Defense Systems
1847 West Main Road
Portsmouth, Rhode Island
02871-1087 USA

February 24, 2006

Stephen T. Sammartano
260 Fountain St.
Apt A1
Fall River, MA 02721

Stephen,

This letter is to confirm our telephone conversation on Friday, February 24, 2006. As a result of your failure to attend your scheduled appointment on Tuesday, February 21, 2006 with Dr. Stewart for fitness to return to duty evaluation, effective Saturday, February 25, 2006 you will be placed on an unpaid status.

Raytheon is concerned about your safety as well as the safety of our employees; therefore, you will not be permitted to return to work until you are able to provide Raytheon with the documentation necessary to illustrate your fitness to return to duty. You have until 6:00 pm Friday, March 3, 2006 to either schedule an appointment with Dr. Ronald Stewart (277 Waterman Street, Providence, RI 401-331-7777) *or* visit a provider of your choosing and provide documentation to Raytheon regarding your status to return to work. If no information if received by March 3, 2006, Raytheon will revisit your employment status.

I know you are eager to return to work. The best way to do that is to commit to providing the requested documentation to Raytheon. I am always available to you as is John Kelly (phone: 401-842-4070).

Sincerely,

Heather Lemmon

Heather Lemmon
IDS Engineering Human Resources
401-842-2474 (office)
401-225-0786 (cell)

CC: John Kelly

# EXHIBIT

# J

Raytheon
Integrated Defense Systems
1847 West Main Road
Portsmouth, Rhode Island
02871-1087 USA

March 10, 2006

Stephen T. Sammartano
75 Arthur Street
Apt 4
Pawtucket, RI 02860

Stephen:

In a conversation and in a follow-up letter dated February 24, 2006 you were informed that you would not be permitted to return to work until you provided Raytheon with medical documentation evidencing your fitness for resuming your duties. At the same time you were given a deadline of Friday, March 3, 2006 to provide such information. To date, we have not received any information nor have we received any indication from you, or any of your medical care providers that such information is being prepared or will be forthcoming shortly.

We need to come to some resolution regarding your employment status, and sincerely hope that we can do so in a mutually agreeable manner. However, unless such information is actually received in the meantime, or unless you contact me at 401-842-2474 on or before the close of business Friday, March 17, 2006 and we agree on an alternative arrangement, please understand that we will immediately commence processing the termination of your employment with Raytheon.

Sincerely,

Heather Lemmon

Heather Lemmon
IDS Engineering Human Resources
401-842-2474 (office)
401-225-0786 (cell)

CC: John Kelly

# EXHIBIT K

Raytheon
Integrated Defense Systems
1847 West Main Road
Portsmouth, Rhode Island
02871-1087 USA

March 24, 2006

Stephen T. Sammartano
75 Arthur Street
Apt 4
Pawtucket, RI 02860

Dear Stephen:

This letter is to inform you that your employment with Raytheon has been terminated effective Friday, March 24, 2006. In a letter sent to you dated March 10, 2006 it was clearly stated that unless you provided requested medical documentation addressing our concerns regarding your return to our workplace or contacted me on or before the close of business Friday, March 17, 2006 and we agreed on an alternative arrangement, that we would commence processing the termination of your employment with Raytheon. We have received no documentation, and I did not receive any communication from you.

Please contact me to make arrangements to obtain your personal items that you may have onsite at Raytheon as well as to return any Raytheon property that you may have in your possession.

Attached to this letter is the outline of your benefits information, including contact numbers. By separate correspondence, the Raytheon Benefits Center will be sending you additional information regarding the status of your benefits.

If you have any questions, please contact me at 401-842-2474 or via e-mail at heather_lemmon@raytheon.com.

Sincerely,

Heather Lemmon

Heather Lemmon
IDS Engineering Human Resources
401-842-2474 (office)
401-225-0786 (cell)

CC: John Kelly