UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| STEPHEN T. SAMMARTANO<br>Plaintiff | : | |
| | : | |
| VS | : | C.A. NO. 06-535S |
| | : | |
| RAYTHEON<br>Defendant | : | |

**DEFENDANT RAYTHEON'S STATEMENT OF UNDISPUTED MATERIAL FACTS**

Joseph D. Whelan (#5694)
Hinckley, Allen & Snyder LLP
50 Kennedy Plaza, Suite 1500
Providence, RI 02903
401-274-2000
401-277-9600 (fax)
jwhelan@haslaw.com

Dated: November 1, 2007

Pursuant to Local Rule of Civil Procedure 56, Defendant Raytheon respectfully submits the following statement of facts that are not in dispute:

1. Plaintiff Stephen T. Sammartano ("Sammartano") is an individual who currently resides in Pawtucket, Rhode Island. First Amended Complaint ("Compl.") ¶ 1.

2. Defendant Raytheon is a corporation specializing in defense, homeland security, and other government markets throughout the world. Its headquarters are in Waltham, Massachusetts.

3. Raytheon's Integrated Defense Systems' Integrated Warfare and Sensor System Software Engineering Department ("Engineering Department") is located at Raytheon's Maritime Mission Center in Portsmouth, Rhode Island.

4. Raytheon employed Sammartano as a software engineer in the Engineering Department from November 10, 2003 until Raytheon terminated his employment on March 24, 2006.

5. Sandra W. Vanier ("Vanier") is a section manager in the Engineering Department, and was Sammartano's section manager from May of 2004 until January of 2006. Affidavit of Sandra W. Vanier ("Vanier Aff.") ¶¶ 2, 3.

6. Robert Froncillo ("Froncillo") is a manager in the Engineering Department, and was Sammartano's section manager from January of 2006 until Raytheon terminated Sammartano's employment. Affidavit of Robert Froncillo ("Froncillo Aff.") ¶¶ 2, 4.

7. John Kelly ("Kelly") is the Senior Manager of the Engineering Department, and was Sammartano's manager during the entire tenure of Sammartano's employment at Raytheon.

8. Heather Lemmon ("Lemmon") was a Consulting Human Resource Generalist in the Integrated Warfare and Sensor System Software Engineering Human Resource Organization

from November 6, 2004 until June 30, 2007. She currently is Manager III of Human Resources. Affidavit of Heather Lemmon ("Lemmon Aff.") ¶ 2.

9. When asked to identify the basis for his claim of disability discrimination, Sammartano testified:

> Q. So the basis of your claim is that the issue of communication came up in connection with your employment?
> A. And that I explained that – that, yeah – yeah, and that the – the – the –the – the connection of stuttering was made.
> …
> Q. Okay. Can you identify any instance in which somebody referenced or in any way inferred that your stuttering was creating a communication problem?
> A. In the Performance Improvement Plan, as an example, they had a section on communication.
> Q. Okay. Did it reference stuttering in any manner?
> A. It referenced communication and I – I – I understand what communication is; some people don't.
> …
> Q. Does communication and stuttering mean the same thing to you?
> A. Yes.
> …
> Q. Is there anything else other than the use of the word "communication"?
> A. No.

Deposition of Stephen Sammartano, August 8, 2007[1] ("Sammartano Dep.") 9:9-14, 10:24-11:9, 12:18-20, 15:18-20.

10. On March 11, 2005 at 7:39 p.m., Sammartano wrote an electronic mail message to Vanier comparing his stutter to an accent, writing that it "functionally has the same effect" as an accent and that "I can more often than not speak properly. My communication is effective." Vanier Aff. ¶ 13.

[1] The relevant portions of the deposition of Stephen Sammartano dated August 8, 2007, are attached hereto as Exhibit A.

11. When asked what accommodation he requested for his stutter, Sammartano testified:

> Q. Okay. What accommodation did you request?
> A. Well, in – in my case, there was unhappiness with e-mail being expressed and there was – there were – unhappiness was calling for a restriction, and my – my accommodation was to understand why the restriction was being placed upon me to better understand it so that I could – so that I could remove it.
> …
> Q. So that was your request for reasonable accommodation was to understand what you were doing wrong?
> A. Right. Right. Right. Right. They're calling out and saying there's a problem. As an example they would say your e-mails are rambling and not understandable. Okay. That's an allegation. Now, let's – let's – so I'd say, you know, I – I take you at face value. Let's print them out, look at them, understand what we can do to correct it; let me understand what I am doing wrong.

Sammartano Dep. 143:5-12; 144:24-145:9.

12. Sammartano also alleged that he "mentioned to a number of people including coworkers and managers during my time at Raytheon that I found it easier to send e-mail than to have a conversation because of my speech problem" and that in so doing, he was "implicitly requesting the alternative form of communication because of my speech problem." Plaintiff's Response to Defendant's First Set of Interrogatories, No. 15, attached hereto as Exhibit B.

13. On August 23, 2004 at 10:30 a.m., Christine Lowrie ("Lowrie"), who was at that time Sammartano's immediate supervisor under Vanier, wrote an electronic mail message to Vanier asserting that "I am in no way a fearful person, I think Steve is a bit scary and I have to admit that some scary thoughts have entered my mind. I have never felt this way about a fellow coworker." Lowrie forwarded to Vanier five (5) electronic mail messages that Sammartano sent to her on August 20, 2004 that alarmed her. Vanier Aff. ¶¶ 4, 5.

14. On December 7, 2004, Vanier met with Lemmon to discuss Vanier's concerns about Sammartano's behavior. Specifically, they discussed the following issues: (i) Sammartano frequently left lengthy voice mail and electronic mail messages at all hours of the day and night to managers in which he stated that people were plotting against him and preventing him from using his skills; (ii) Sammartano was always the first to be taken off a project when it was downsized because he was difficult to work with; and, (iii) he never accepted responsibility for any problems and instead blamed other people. Id. at ¶ 7; Lemmon Aff. ¶ 3.

15. In December of 2004, Vanier met with Sammartano to address his behavioral issues, including the fact that he frequently left lengthy voice and electronic mail messages at all hours of the day and night to his managers. Vanier Aff. ¶ 8.

16. On January 26, 2005 at 11:50 a.m., Christina Erwin ("Erwin"), another member of Vanier's department, forwarded to Vanier a series of electronic mail messages that she had received from Sammartano that she felt were offensive. Id. at ¶ 9.

17. On January 28, 2005, Vanier met with Sammartano to discuss his electronic mail messages to Erwin. Id. at ¶ 10.

18. On March 10, 2005, Sammartano and Vanier met to discuss the "2004 Performance and Development Summary" ("2004 Performance Summary"), which is the written summary of his 2004 performance review. The 2004 Performance Summary's "Key Development Needs" section stated that Sammartano needed to "Remain calm and professional when coping with demands from superiors, peers and subordinates" and "Improve effectiveness of communications and interactions within the team." Id. at ¶ 11.

19. The 2004 Performance Summary contained a section for "Employee Comments" in which Sammartano wrote that he thought that his written communication "is often very good"

and blamed any issues with verbal communication on the fact that he “write[s] software.” He also stated that he “sometimes” stutters, and compared his stutter to an “accent.” Vanier Aff. Ex. D.

20. On March 10th, and into the early morning of March 11th, Sammartano left more than twenty (20) voice mail messages for Vanier on her work phone with more responses to the “Key Development Needs” section of his 2004 Performance Summary. Vanier Aff. ¶ 12.

21. On August 24, 2005, Vanier gave Sammartano his “Mid Year Performance 2005,” which included areas for improvement. Id. at ¶ 14.

22. On October 25, 2005, Lemmon had her first in-person meeting with Sammartano to discuss management’s concerns about his troubling interpersonal behavioral issues, including his use of voice and electronic mail. Neither Lemmon nor Sammartano raised his stutter as an issue. Lemmon Aff. ¶ 5.

23. On November 7, 2005, Lemmon met with Kelly, Vanier, and Irvin Kooris (“Kooris”), who was the Manager of Raytheon’s Employee Assistance Program (“EAP”) and has since left Raytheon, to discuss management’s concerns with Sammartano’s behaviors and his refusal to acknowledge or take responsibility for any of the behavioral issues identified to him. Lemmon, Kelly, Vanier and Kooris decided to refer Sammartano to Daniel Musholt, Raytheon’s on-site EAP professional (“Musholt”). Id. at ¶ 6.

24. On November 8, 2005, Lemmon, Kelly and Vanier met with Sammartano to discuss his troublesome behavior, including complaints by his coworkers of frequent, incomprehensible and antagonistic electronic and voice mail messages, and complaints that his lack of interpersonal skills were affecting his performance. They also referred Sammartano to Musholt. Vanier Aff. ¶ 16; Lemmon Aff. ¶ 7.

25. On January 13, 2006, Raytheon placed Sammartano on a "Performance Improvement Plan" ("PIP") to address Raytheon's concerns relating to his poor interpersonal and communication skills and performance-related issues. At Raytheon, a PIP is generally a tool designed to help employees address specific performance issues and work towards improvement. Its purpose is to turn substandard performance around and to assist an employee in producing results that meet or exceed the established standard. A PIP is designed to assess individual performance against established and agreed upon goals and objectives. The ultimate objective is a successful outcome for the employee and Raytheon Company. A potential consequence of a PIP is termination if the employee does not improve his or her performance during the specified time period. An employee is typically placed on a PIP at anytime throughout the year when management determines he or she is not meeting the expectations of the job, e.g., missing key deadlines, poor teaming behavior. Lemmon Aff. ¶¶ 13, 14.

26. The PIP described six areas in which Sammartano needed to improve his performance: (1) Ability to Prioritize Tasks & Complete Tasks; (2) Communication; (3) Ability to follow Raytheon Common Processes; (4) Teamwork; (5) Knowledge of bigger Raytheon picture; (6) Ownership/Accountability of issues. Id. at Ex. C.

27. The section of the PIP regarding "Communication" stated the following:

> Steve needs to improve his communication skills with peers, leads, and other stakeholders. Steve needs to learn how to use e-mail and voice mail more selectively and avoid long ambiguous, repetitive messages. Steve also needs to learn that after a decision has been made to let things go, and not dwell on issues and allow it to affect his performance. see Examples below:
>
> Performance Rater A inputs "Steve would occasionally have comments (voice mail and e mail) that seemed to come completely from left field and left you wondering what he was talking about." "Tends to dwell on problems too long"

> Performance Rater B inputs "Seems to ramble and overanalyze at times"
>
> Performance Rater C inputs "Needs to learn to relax a little and don't overreact to situation"
>
> March 10th 2005 – Section manager met with Steve to go over his 2004 Performance Review. It was about 4.5 hours. He left over 20 voice mails (that went thru the night), in regards to his "Needs" section.
>
> Section Manager also has own various archive of 100's of e-mails from Steve and voice mail messages left throughout the night regarding topics such his 2004 raise, his 2004 Performance, who he wants as his raters, 2005 Performance goals, etc, etc.

Id.

28. The PIP identified the "Expectations of Standards To Be Met" for Communication/Knowledge as:

> Steve should show improved communication skills. It is strongly recommended that Steve join Toastmasters in an effort to improve communication skills. His voice mails and e-mails should be clear and concise. Steve should ask questions to ensure understanding of assigned tasks and team goals and should communicate clearly and in a timely manner with team leads, managers and team members.

Id.

29. On January 14 and January 15, 2006—the Saturday and Sunday following the PIP meeting—Sammartano left approximately sixteen (16) voice mail messages on Lemmon's work phone in which he stated that the PIP was a misrepresentation; that he did not have a communication problem; that he used to have a speech problem; and that Raytheon's request for him to send fewer voice and electronic mail messages would cause him to be less productive because voice and electronic mail enabled him to do more than one thing at a time. Lemmon Aff. ¶ 15.

30. On January 16, 2006 at 9:34 a.m., Sammartano sent to Lemmon a lengthy single-spaced electronic mail message in response to the PIP ("Response"). Id. at ¶ 16.

31. On or around January 18, 2006, Froncillo replaced Vanier as Sammartano's section manager. Froncillo Aff. ¶ 4.

32. Sammartano was required to attend weekly meetings with Froncillo to discuss his progress in addressing the issues raised in the PIP. Id. at ¶ 5.

33. Sammartano attended three weekly PIP meetings: on January 19th, 23rd and 30th. Id. at ¶¶ 8, 9, 10.

34. Sammartano admitted that he was very tense during this during timeframe and that these meetings caused his level of tension to increase. Sammartano Dep. 123:14-125:8.

35. On February 6, 2006 at 8:18 a.m., Froncillo sent an electronic mail message to Lemmon and Sammartano about scheduling the fourth PIP meeting. Froncillo Aff. ¶ 12.

36. On February 6, 2006 at 9:08 a.m., in response to Froncillo's question about scheduling the PIP meeting, Sammartano wrote an electronic mail message to Lemmon and Froncillo (the "E-mail") that stated:

> Sorry, I guess I don't really feel comfortable meeting with either of you anymore. You continue to make allegations which you refuse to offer support for. … Your acts are irrational. Who is to say what your motives are. Certainly not I. Fortunately, there is in general no expectation that I nor anyone else determine the extent of, the implication of, or the reason for irrationality which potentially puts them at risk. …
>
> I will summarize by explicitly saying that I believe that these meetings are potentially unsafe for me and having been in the area of three incidents involving physical violence (the last incident occurring last week in New Bedford as reported in the local newspapers – the killing spree which led to numerous deaths), I believe I am eminently qualified to make such a determination.

Froncillo Aff. ¶ 13; Id. at Ex. A; Lemmon Aff. ¶ 20; Id. at Ex. G.

37. The E-mail referenced three violent incidents. The first occurred in New Bedford, Massachusetts and involved a man who entered a gay nightclub with a gun, a hatchet and a machete and indiscriminately attacked patrons. Sammartano Dep. 182:15-24.

38. Sammartano testified that the second incident was actually a series of incidents in which police officers were shot in Dover, New Hampshire a number of years ago. Sammartano testified that he lived and worked in Dover around this time, and that prior to these shootings he overheard patrons at a Bickford's restaurant in Dover discussing their disappointment with the police. Sammartano Dep. 182:25-184:8; 186:15-187:1.

39. Sammartano testified that the third incident occurred around the time he interviewed at another company, Edgewater Technology. Sammartano Dep. 184:8-185:6.

40. The three incidents referred to in the E-mail did not occur at Raytheon, nor were any of Sammartano's coworkers or supervisors at Raytheon involved in these incidents.

41. Sammartano admits that no person at Raytheon ever threatened him with violence. Plaintiff's Response to Defendant's First Set of Interrogatories, No. 22, attached hereto as Exhibit B.

42. Sammartano testified that he sent the E-mail during a time when his tension level was rising. Sammartano Dep. 125:9-126:4.

43. Sammartano testified that he believed his supervisors might harm him physically because he did not understand why he was criticized in the PIP, and based on that "disconnect," he feared for his physical safety. Sammartano Dep. 131:13-134:10.

44. After receiving the E-mail, Lemmon and Froncillo forwarded it to the Raytheon Workplace Violence Committee at the Maritime Mission Center to determine what action they should take in light of Sammartano's exhibited level of tension and stress in the weeks after he

received the PIP, and his history of hostility toward management. Froncillo Aff. ¶ 14; Lemmon Aff. ¶ 23.

45. On February 6, 2006, the same day that Sammartano wrote the E-mail, he was placed on paid administrative leave pending a full psychological evaluation with a psychiatrist. Lemmon Aff. ¶ 23.

46. On February 20, 2006, Lemmon sent Sammartano a letter confirming the appointment that she made for him with Dr. Ronald Stewart, a psychiatrist, scheduled for February 21, 2006. Id. at ¶ 26.

47. Sammartano failed to attend the February 21, 2006 appointment with Dr. Stewart. Lemmon Aff. ¶¶ 27, 28; Sammartano Dep. 118:6-8.

48. Sammartano provided the following explanation for refusing to meet with Dr. Stewart or any other psychiatrist who could provide Sammartano with certification to return to work:

> Q. And you did fail to go see Dr. Stewart, correct?
> A. Yes, I did.
> Q. And ultimately you elected that you did not want to go and get certified to return to work, correct?
> A. That's not – no, I didn't want to go see a forensic psychiatrist. I understand the power of a forensic psychiatrist and that's not – I don't want to be around that power. I choose not to be around that power, first of all, but – what I should say second of all. First of all, I couldn't see why. I hadn't done anything.
> Q. You hadn't done anything?
> A. I couldn't see why. I had not done anything.
> Q. Right.
> A. An so – so now for the second reason, you know, the – the – for – the first thing I'm saying is I don't know why, given that I haven't done anything. The second reason is I know what forensic psychiatrists can do.

Sammartano Dep. 118:6-119:2.

49. On February 24, 2006, Lemmon sent Sammartano a second letter stating that Raytheon would place him on unpaid administrative leave effective February 25, 2006, and gave Sammartano until March 3, 2006 to schedule an appointment with Dr. Stewart or a provider of his choice and to provide documentation that he was fit to return to work. Lemmon Aff. ¶ 29.

50. By March 3, 2006, Sammartano had not provided Raytheon with the requested documentation. Id. at ¶ 30.

51. On March 10, 2006, Lemmon sent Sammartano a third letter informing him that he had until the close of business on March 17, 2006 to provide the requested documentation or to contact her to discuss Raytheon's request, or Raytheon would commence termination of employment proceedings. Id. at ¶ 31.

52. On March 24, 2006, Lemmon sent Sammartano a final letter informing him that Raytheon terminated his employment effective March 24, 2006. Id. at ¶ 33.

53. On August 8, 2006, Sammartano filed a charge with the Equal Employment Opportunity Commission ("EEOC") alleging that Raytheon discriminated against him based on his disability (stuttering). A true and accurate copy of the EEOC charge is attached hereto as Exhibit C.

54. On September 11, 2006, the EEOC determined that it lacks jurisdiction to investigate Sammartano's charge based on its finding that Sammartano does not have an impairment that rises to the level of a disability. A true and accurate copy of the EEOC Dismissal and Notice of Rights is attached hereto as Exhibit D.

Respectfully submitted,

RAYTHEON

By its Attorneys,

/s/ Joseph D. Whelan

Joseph D. Whelan (#5694)
Hinckley, Allen & Snyder LLP
50 Kennedy Plaza, Suite 1500
Providence, RI 02903
(401) 274-2000
(401) 277-9600 (fax)
jwhelan@haslaw.com

Dated: November 1, 2007

**CERTIFICATION OF SERVICE**

To:

Stephen Sammartano, pro se
75 Arthur Street #4
Pawtucket, RI 02860

I hereby certify that on this 1st day of November, 2007, I served a copy of the foregoing Memorandum by mail on the above-named party.

/s/ Joseph D. Whelan