# Exhibit A

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| STEPHEN T. SAMMARTANO, Plaintiff | : | |
| VS. | : | C.A. NO. 06-535-S |
| RAYTHEON, Defendant | : | |

Deposition of **STEPHEN SAMMARTANO**, the Plaintiff herein, taken on behalf of the Defendant, on WEDNESDAY, AUGUST 8, 2007, 10:00 A.M., at the offices of HINCKLEY, ALLEN & SNYDER, 50 Kennedy Plaza, Suite 1500, Providence, Rhode Island, before Vivian S. Dafoulas, Registered Merit Reporter/Certified Realtime Reporter.

CONDENSED COPY

Vivian S. Dafoulas, RMR-CRR
50 Fieldstone Drive
East Greenwich, RI 02818-2064
(401) 885-0992

Q. Are you on any medication that in any way would impair your ability to recall events of the past few years?
A. No, I'm not.
Q. Do you have any medical condition that in any way impairs your memory?
A. No.
Q. What did you do to prepare for today's deposition?
A. I reviewed the -- the exhibits that I have on file with the court.
Q. Okay. Anything else?
A. That's it.
Q. Did you talk to anybody about it?
A. No.
Q. And you are representing yourself here today, correct?
A. That's correct.
Q. And have you represented yourself throughout the legal proceedings that you've brought against Raytheon?
A. As part of the unemployment hearing, I -- I did have an attorney represent me.
Q. Who was that?
A. That was Attorney Brier.



Q. Brier?
A. Attorney Matthew Brier.
Q. And have you consulted with Attorney Brier regarding any of the proceedings that you've initiated in Federal Court?
A. No.
Q. Have you asked Attorney Brier to review any pleadings or any documents that you've prepared and submitted in connection with that lawsuit?
A. No. No.
Q. All right. Based on your pleadings, it is my understanding that your claim against Raytheon is that you have been discriminated against on the basis of a disability or a perceived disability, is that correct?
A. That's correct.
Q. And your allegations are that that disability or perceived disability relates to your stuttering, is that correct?
A. That's correct.
Q. In one or two documents I saw a reference to the fact that obesity might be a disability. Do you recall making statements along those lines?
A. Yes, I do. Yes, I do.
Q. Are you claiming in your lawsuit against



Raytheon that obesity was in any way related to the alleged discrimination?
A. No, I'm not. I -- I -- I -- I -- I -- I have -- I had limited amount of time to construct the document and it was a lot of work for me and, you know, I had other things that I had to do, and no, I'm not. That -- that just got left in as a -- as a straggler.
Q. I want to be clear about this so I understand sort of the universe of the claim. Your claim is solely based on either a disability or a perceived disability that relates to stuttering --
A. That is correct.
Q. -- is that right?
A. That's correct.
Q. Now, what I would like for you to do for me is identify the basis of that claim. Meaning I would like you to tell me the reasons that you believe you were discriminated against on the basis of your disability or perceived disability.
A. Okay. I stutter. I've had -- I've had a history of stuttering. My stuttering is not as bad as it was when I was younger and as a result of occurrences that -- that came up at Raytheon in connection with my termination occurring the --



the -- the -- the -- the idea of communication I -- I -- kept coming up and I inquired about it, asked about it, explained the connection to my speech problem.
Q. What else?
A. That's it.
Q. That's it?
A. Uh-hum.
Q. So the basis of your claim is that the issue of communication came up in connection with your employment?
A. And that I explained that -- that, yeah, yeah, and that the -- the -- the -- the -- the connection of stuttering to that was made.
Q. Okay. And you made that connection? You made the connection between your stuttering and your communication issues at Raytheon, correct?
A. Well, as part for asking for reasonable accommodation, yes.
Q. And did -- we'll come back to the reasonable accommodation issue but before we get to that, did anybody at Raytheon write anything to you, say anything to you or in any way infer that your stuttering was a problem --
A. Yes.

Page 10

Q. -- or in any way impeded your employment?
A. Yes. They referenced communication.
Q. They referenced communication. Did they in any way --
A. Problems with communication.
Q. I understand that. Let me back up for a minute. You and I need to let each other complete what we are saying because Vivian can't take down both of us speaking at the same time. Okay?
A. Yes.
Q. Do you understand that?
A. I understand.
Q. Give me an opportunity to finish, I'll give you an opportunity to finish, okay?
A. Okay.
Q. Now, my question is this: Did anybody in any way reference your stuttering or suggest that it was your stuttering that created your communication problems?
A. Yes.
Q. Who and what did they say?
A. I don't -- I don't have a list off the top of my head.
Q. Okay. Can you identify any instance in which somebody referenced or in any way inferred

Page 11

that your stuttering was creating a communication problem?
A. In the Performance Improvement Plan, as an example, they had a section on communication.
Q. Okay. Did it reference stuttering in any manner?
A. It referenced communication and I -- I -- I understand what communication is; some people don't.
Q. Okay.
A. That's an English word.
Q. I want you to be clear.
A. I'm being clear.
Q. I'm asking very specific questions.
A. I'm answering very specifically.
Q. Does the PIP reference stuttering?
A. Absolutely.
MR. WHELAN: I'd like you to take a look at the PIP which we'll mark as an exhibit.
THE WITNESS: Do you understand that stuttering is a difficulty speaking?
MR. WHELAN: I ask the questions, but yes, I do understand that. Can you mark that as Exhibit 1, please.
(Whereupon, Defendant's Exhibit No. 1 was

Page 12

marked.)
(Witness perusing document.)
MR. WHELAN: Can you read back my last question, Vivian?
(The record was read by the court reporter, as requested.)
BY MR. WHELAN:
Q. Can you show me in the PIP where it references stuttering?
A. Communication.
Q. Okay. Is the word stuttering used there?
A. There -- it's -- it's -- it's -- it's -- it's a very similar word. It means the same thing.
Q. Communication and stuttering mean the same thing?
A. To many different people, yes. The connection is there.
Q. Does communication and stuttering mean the same thing to you --
A. Yes.
Q. -- Mr. Sammartano?
A. Yes, it does.
Q. It does?
A. Yes. Yes. Yes. Yes. In -- in context and that's why I asked for reasonable accommodation

Page 13

in the way that I did.
Q. So your belief is every time the word communication was used, that meant stuttering?
A. No.
Q. Well, I'm confused. You just told me that they mean the same thing.
A. Well, you know, depending on the context they can mean that.
Q. I'd like you to read the PIP that's in front of you --
A. Yes.
Q. -- marked as Exhibit 1.
A. Yes.
Q. Read the section on communication.
A. Communication --
Q. You don't need to read it into the record. I'd like you to read it to yourself.
A. Yeah.
(Witness reading document.)
A. All right.
Q. I'd like you to show me in that document what you believe is referring to stuttering?
A. Well, communication.
Q. What about that section on communication?
A. Well, that's what I asked about. That's

what I asked about. That's what I tried to clarify.
Q. Let me take you through this and we'll parse this and go through this in great detail --
A. All right.
Q. -- so that I understand your position, okay?
A. All right.
Q. Under Section 2, communication --
A. Yes.
Q. -- the first sentence says, "Steve needs to improve his communication skills with peers, leads and other stakeholders. Steve needs to learn how to use e-mail and voice mail more selectively and avoid long, ambiguous, repetitive messages."
A. I've already --
Q. Let me ask you the question.
A. Okay.
Q. Is there anything about that sentence -- those two sentences that suggests that they were commenting on your stuttering?
A. I've already responded to -- to this in the exhibits.
Q. You are here and you are under oath and I'm entitled to ask you questions and you are required to answer them.



A. Repeat the question.
Q. I'll repeat the question. Is there anything in those sentences I just read to you that in any way leads you to believe that they were referring to your stuttering?
A. Yes.
Q. What is it?
A. Communication.
Q. Just the word communication?
A. Used -- used in that context, yes. There was a connection -- there was a connection to stuttering.
Q. Where is the connection to stuttering?
A. The communication.
Q. Just the word communication?
A. Communication is connected -- stuttering is related to communication.
Q. Is there anything else other than the use of the word "communication"?
A. No.
Q. Okay. Let's continue. "Steve also needs to learn that after a decision has been made to let things go."
A. Hold on, hold on.
Q. Let me finish my question, please,



Mr. Sammartano.
A. All right.
Q. We need to be clear on that, okay?
A. All right.
Q. I'll start again. "Steve also needs to learn that after a decision has been made to let things go, and not dwell on issues and allow it to affect his performance."
Is there anything in that sentence that you believe refers to or suggests that it's in any way tied to stuttering?
A. It seems like you've missed -- you've missed a few sentences. Initially when you were talking about the first paragraph of the first sentence, I thought you were talking about the first -- maybe I heard you incorrectly with the pressure of the situation -- are you talking -- were you talking about initially the first paragraph or the first sentence?
Q. I was talking about the first two sentences in my preceding questions.
A. The first two sentences in your preceding question, well, there are also e-mail and voice mail references that --
Q. And does that refer to stuttering?



A. Yes.
Q. How does that refer to stuttering?
A. The fact that I was -- that I was using -- stuttering -- stuttering -- stuttering affects -- affects my use of communication and it affects my use of voice mail and I use e-mail because I stutter.
Q. And does that in any way reference that? Does that say you shouldn't use e-mail? Does that say you shouldn't use voice mail or anything along these lines?
A. It suggests a restriction that I have to inquire about and -- and it is -- it is not a restriction that is imposed on other people, and I have a speech problem and it's being imposed upon me.
Q. Let me ask you a related question. Do you believe you left lengthy voice mails and wrote lengthy e-mails during your employment at Raytheon?
A. No.
Q. Going back to my question, in the third sentence there that begins "Steve also needs to learn that after a decision has been made, to let things go," do you see that sentence that begins with that?

A. Yes.
Q. Okay. Is there anything in that sentence that in any way suggests that they were referring to or commenting on your stuttering?
A. The -- the fact that it's in the category of communication, yes.
Q. Anything other than that?
A. If you want to take it out of context, the -- the -- the -- then -- then no. Taken out of context, then no.
Q. I don't want to take it out of context.
A. Taken in the context, it's in the heading communication, yes.
Q. So you believe everything under the heading "Communication" refers to your stuttering because it's in the context of commenting about communication skills?
A. Well, it's something I have to inquire about.
Q. What do you mean by that?
A. I have -- I have to inquire about it.
Q. Why do you have to inquire about it?
A. Because I -- I -- for -- for -- for a number of reasons. For -- for -- for the purpose of -- for the purpose of a whole -- a whole array of



reasons as an example. This is a Performance Improvement Plan. If I -- if I expect to correct the problem, if there is a problem, I have to understand it. For -- for -- for -- furthermore, from the point of view of the fact that I have a disability, I -- I have to -- I have to let people know, hey, you know, I'm doing this because I stutter.
Q. Anything else?
A. So there's a number of reasons and I may -- and I may -- I may think of something later on, but right now off the top of my head, there's -- there's -- there's a number of reasons.
Q. A number of reasons why you had to inquire about this?
A. Absolutely.
Q. Let's continue with this section of the document. It then says, "See examples below," and it sets forth what some of the performance raters had put in your -- in your performance evaluation, correct?
A. Correct.
Q. And the first one says, "Steve would occasionally have comments (voice mail and e-mail) that seemed to come completely from left field and



left you wondering what he was talking about." And then the second quote is "Tends to dwell on problems too long." Did I read that correctly?
A. I believe you did.
Q. Okay. Is there anything in either of those comments that you believe refers to or relates to your stuttering?
A. Voice mail and e-mail relate to my stuttering. The fact that it's under the heading of Communication relates to my stuttering and I would -- and I would have to further inquire for both the purposes of -- of -- of -- of getting reasonable accommodation for the fact that I stutter and also for the purpose of -- of correcting the problem. I mean as it stands, it's an allegation.
Q. And anything else? Does anything else connect those comments to your stuttering?
A. Not off the top of my head. I -- I -- I -- I will let you know in the future if I think of any.
Q. Okay. I'd ask that you do that. If at any time during this deposition you think of information that was responsive to a question that I've already asked you, feel free to let me know that and take me back to that information, okay?



A. Yes. Thank you, thank you for that.
Q. Okay. Good. Performance Rater B stated, "Seems to ramble and overanalyze at times." Did I read that correctly?
A. Yes, you did.
Q. Can you -- is there anything in that statement that you believe relates to or refers to your stuttering?
A. Yes. This is under the heading of Communication. Communication is a disability that relates to speech. Sometimes it affects my speech and sometimes it doesn't. And it skews a person's vocabulary. You favor words that you can say. You have periods of times that you can speak well and periods of time that you can't, and so being -- being under the heading of Communication, yes; it's something that I have to inquire, yes.
Q. Anything else?
A. No.
Q. Performance Rater C wrote: "Needs to learn to relax a little and don't overreact to situation." Did I read that correctly?
A. You did.
Q. And is there anything in that statement that you believe relates to or refers to your

Page 50

NDDS training?
A. Yes. Because that was -- that was the recurring theme for -- for the reasons that they had done the things that they had done.
Q. Other than a recurring theme, did they ever say to you you are not going to get this training because you have communications issues? Did they ever say anything like that to you?
A. No.
Q. Okay. Did they say anything to you that you believe makes a connection between your not receiving the NDDS training and what you say were a recurring theme about communications?
A. Yes. Yes. That was -- that was the -- the reason was -- the reason they did the things that they did, was -- was -- was communications.
Q. But you don't have any evidence of that; that's what your belief is?
A. That's what they said.
Q. Who said that to you?
A. He put -- they put down in the Performance Improvement Plan and I asked for -- I asked for -- for -- for reasonable accommodation and they -- and they were -- and they were -- they -- there were these events that -- that happened.

Page 51

Q. Mr. Sammartano, I want to be very clear.
A. Okay.
Q. I'm focusing on your allegation that you were not given proper training.
A. Right.
Q. Do you understand that?
A. I do understand that.
Q. And I'm asking you if you could provide me with any evidence --
A. That's what the --
Q. Let me finish, please. I want you to provide me with any evidence, anything that links your failure to receive proper training with your allegation that you were discriminated against on the basis of your disability or your perceived disability. Is there anything you can provide me?
A. Yes. There is -- there is -- there's the Performance Improvement Plan.
Q. Okay. Anything else?
A. Not right now. I'll let you know if I think of anything in the future.
Q. I appreciate it. I would appreciate it if you do that. What in the Performance Improvement Plan do you believe makes a connection between you not receiving proper training and your alleged

Page 52

disability or perceived disability?
A. The section on communications.
Q. Anything else?
A. Not at this time. I'll let you know if I -- if I -- I'll -- I'll let you know.
Q. Next you state -- and I'm back on your charge; do you see where I am?
A. Yes, I do.
Q. You next state: "And ultimately I was terminated from my position as software engineer." Did I read that correctly?
A. You did.
Q. Okay. So is it your allegation that you were terminated from your position as -- as a software engineer because of your disability or your alleged disability?
A. Yes, it is.
Q. And what supports that claim?
A. That's what the -- the defendant said.
Q. What did the defendant say?
A. That there were communications problems.
Q. Okay. Anything else?
A. Everything that -- that -- everything that -- that has been set forth in the exhibits that -- that -- that are at the court.

Page 53

Q. Okay. Is there anything else other than what's been set forth in the exhibits in court?
A. No.
Q. This document was executed on August 8th, 2006, correct?
A. That is correct. Hold on. That is correct.
Q. And in Section 3 you wrote: "I have a stutter condition and I believe the Respondents perceived me as being disabled." Did I read that correctly?
A. You did.
Q. In what manner do you believe that the Respondents perceived you as being disabled?
A. They believed that -- that -- that -- they believed I had a communication problem.
Q. Anything else?
A. As connected by the Performance Improvement Plan, the other -- the other sections of the Performance Improvement Plan and as elaborated by the -- the -- the -- the associated documents which are all on file with the court. Those connections have already been explained.
Q. Anything else?
A. Not off the top of my head, no.

Page 54

Q. You then went on to write or the statement goes on to say, "In fact, even though the stutter is not very pronounced, Respondent deliberately tried to perceive it as more pronounced than it is." Did I read that correctly?
A. That is correct.
Q. Okay. And is that a correct statement, you believe that at the -- as of the time that you were last employed, your stutter was not very pronounced?
A. Well, I -- I -- I -- given the fact that I use e-mail over -- over -- over voice mail, there are times when it's -- when it's pronounced and times when it's not very pronounced. Benjamin Nidus wrote this. He's the one who stamped it. I told him at the time that certain things don't seem exactly correct and he said it doesn't matter.
Q. So now let's go back. I thought you testified only moments ago that you read this document and you believed everything in it to be true?
A. Well, what I believed -- I believed I set forth in the -- in the -- the claim that I filed with the EEOC, I had -- I had -- I presented a whole claim to the EEOC. This was a form that had to be

Page 55

filled out and -- and Benjamin Nidus wrote up this form. It was -- it was -- it was completely to the best of my ability.
Q. But now you are saying you told him that you didn't agree with it?
A. What I'm saying, I -- I -- I told him -- I told him that it was hard -- I told him that -- that what I was saying was in the document that I had filed with the EEOC and he summarized it this way. And I said to him, you know, I -- I don't know if you're missing parts of it but I -- that -- that is what I said. This was his way of summarizing it and that was the best that we could do at that time.
(Whereupon, Defendant's Exhibit No. 4 was marked.)
THE WITNESS: He claimed that -- that it didn't matter. This -- this is what I wrote --
Q. Let's wait until we get it on the record. Can you take a look at what we have marked as Exhibit 4, please?
A. Yes.
Q. Do you recognize that document?
A. I do.
Q. And is this the document that you were just referring to when you said that you submitted a

Page 56

document to the EEOC?
A. Yes, it is.
Q. And does this document contain all of the reasons why you believe you were discriminated against on the basis of your disability or perceived disability?
A. This document contains a description of the employment discrimination charge. The -- this document is used in conjunction with the other documents that I have on file at the court.
Q. But this was everything that you filed at the EEOC, correct?
A. That is correct.
Q. Okay. And at the time that you filed this with the EEOC, the purpose was to convey to them the reasons that you believed you were discriminated against on the basis of your disability or perceived disability, correct?
A. That is correct.
Q. Okay. And you spent a fair amount of time putting this document together, correct?
A. I -- I tried, yes.
Q. It's a lengthy document, includes a lot of text, correct?
A. It takes -- it takes a while to write,

Page 57

yeah.
Q. And you were thoughtful in your preparation of this document, correct?
A. I tried to be, yes.
Q. And you consider yourself to be a very bright person, correct?
A. I'm -- I'm not going to go -- it's irrelevant to the subject matter.
Q. But you don't have inability to put together a document; you don't have any condition that would prevent you from putting your thoughts together and presenting them to the EEOC, correct?
A. I have -- I have -- I do have a -- I do have a -- I stutter.
Q. But you weren't asked to present -- this was presented in writing, correct?
A. It is.
Q. Does your stuttering affect your writing?
A. Well, yes, it can because it skews the vocabulary that you use on a -- on a -- on a daily basis and so you wind up using -- you wind up using only the words that you can say and so you -- you -- the vocabulary -- you wind up using the -- the vocabulary that you know less and so -- so it can.
Q. I'm trying to -- I don't want to

February 21 with Dr. Stewart, is that correct?
A. That's correct.
Q. And you had that conversation with Heather?
A. We did have the conversation, yes.
Q. And you did fail to go see Dr. Stewart, correct?
A. Yes, I did.
Q. And ultimately you elected that you did not want to go and get certified to return to work, correct?
A. That's not -- no, I didn't want to go see a forensic psychiatrist. I understand the power of a forensic psychiatrist and that's not -- I don't want to be around that power. I choose not to be around that power, first of all, but -- what I should say second of all. First of all, I couldn't see why. I hadn't done anything.
Q. You hadn't done anything?
A. I couldn't see why. I had not done anything.
Q. Right.
A. And so -- so now for the second reason, you know, the -- the -- for -- the first thing I'm saying is I don't know why, given that I haven't



done anything. The second reason is I know what forensic psychiatrists can do.
Q. All right.
A. And it's the same type of thing as, you know, the guy doesn't like you, you get a 3 or a 9 or, you know, they lock you up for a period of time. I'm not going there. And to me, this is going very far off the point. Okay? We went from the Performance Improvement Plan and now I'm going to see a psychiatrist? I'm not going to see a psychiatrist.
Q. Do you have any history of going to psychiatrists?
A. No.
Q. Have you ever studied psychiatry?
A. I had a course in psychology but I mean no, I -- I haven't studied psychiatry, no.
Q. So when you say you understand or you know the power of forensic psychiatry, where do you know that from?
A. Just -- just my -- just my -- just my, you know, just knowledge I picked up.
Q. And how do you believe this letter supports your claim that you were discriminated against on the basis of your alleged or perceived



disability, specifically your stutter?
A. Well, up until this point, the reason -- the reason I was given for the bad things that were happening was communication, so I had no reason to believe it was anything else.
Q. By the way, was there anything negative in your PIP that was not related to communication?
A. There were some things that were not related to communication. Some of those things were untrue so they weren't true beside the point and I -- at one point I felt that -- that -- that -- that it might be an issue to actually bring those up for the purposes, you know, for the purposes of this lawsuit.
And, again, I reached the realization that -- that it's irrelevant. Whether they are true, untrue is all beside the point. The fact that -- that -- that the -- that the -- that the -- the fact that -- what I'm saying is that if you have -- if someone -- if a police officer gives you a ticket because you were speeding and because you were a black guy, well, you know, it doesn't really -- it really doesn't matter whether you were speeding, whether you weren't speeding, none of it really matters at that point because he just said, you know, the way



he said it, does that mean that if you were speeding and you were a white guy, he wouldn't have given you the ticket?
Once you add in the -- the -- the -- the discrimination on the basis of a disability, then it's over. It doesn't matter what the performance was; it doesn't matter what the Performance Improvement Plan says, not really, until, you know -- you know, and -- and -- until you get over a threshold of equal force. You know what I mean?
You're able to -- my understanding of the law from a layman's point of view is that you're able to apply equal force. In other words, if I say I shot the black guy because he was shooting at me mainly because he's a black guy, you are a racist but you have the right to apply equal force.
Q. Anything else that you believe supports your -- anything else that suggests that Exhibit 19 supports your claim in this matter?
A. No.
Q. Let's go to 20. This is a letter from Heather Lemmon to you dated February 20 in which she stated that we are very concerned about your well-being. As a result, we have placed you on paid leave until we can arrange for you to have a full

evaluation. Did I read that correctly?
A. That's correct.
Q. Did you know why they believed -- why they were concerned about your well-being?
A. No. No. And to me -- to me, this didn't make any sense to me at all. I mean I read this and I looked at it and I said, I don't know what to make of it really.
Q. You had no idea what caused them to send this letter to you?
A. I had no idea why I was being asked to see a psychiatrist.
Q. Did you have any idea what caused them to be concerned and send you this letter?
A. No. I thought it was -- no. I can't say -- no, I can't say that I did, no.
Q. You had no idea?
A. No. I can't say.
Q. Nobody ever told you what the problem was? Nobody ever told you what their concern was? No one ever told you what caused them to have concern about your well-being and the well-being of others?
A. No. I -- I -- I -- they never explained it to me, no.
Q. Did they ever give you any indication as



to why they were concerned?
A. No.
Q. And you don't know -- as you sit here today, you have no idea what it was about and what caused them to be concerned and send you this letter?
A. Well, they put me on administrative leave. I mean I -- I -- I -- I -- I was placed on administrative leave and I mean I --
Q. And why were you placed on administrative leave?
A. That's what they chose, that's what they chose to do ultimately.
Q. And why did they choose to do that, to your knowledge?
A. Well, I would go to these Performance Improvement Plans and they -- they kept -- that I -- I was going to these Performance Improvement Plan meetings once per week and they were -- they were -- they were using the -- the -- the time to actually consume -- they weren't focusing on the -- on -- on the issues, and it was -- it was really causing my -- it was really causing my level of tension to actually rise and I didn't understand what they -- what they were trying to get at.



I mean they would consume the time in such a way. I would say I'm trying to put my best foot forward and they would say refusing to try to move forward. I would -- and so it was -- you know, I -- I went to three of these meetings and -- and eventually I sent -- and eventually I sent them an e-mail and I said, you know, I don't want to go these meetings -- I -- I don't want to go to these meetings anymore.
Q. Let me pick up on something you just said. You said that these meetings caused your level of tension to increase, correct?
A. Right.
Q. And you let them know that, correct?
A. I'm trying to -- yeah. I -- I -- I think that that's apparent that I'm -- yes. I was e-mailing Lou DiPalma. I was -- I was -- the idea that -- the idea that I was having a problem, and I didn't understand these things. I had e-mailed Heather Lemmon, I e-mailed Lou DiPalma, I e-mailed these people to tell them that -- that I didn't understand it and -- and people were not getting -- you know, and -- and beyond not understanding it, I would address the things that they wanted to talk about. They'd say there's a problem with your



e-mails. I'd say, let's print them out, let's talk about it. Let's see what the problem is.
Q. So this was at a time when your tension levels were rising and --
A. Well --
MR. WHELAN: Let me finish, please.
Q. That's correct, right?
A. That's correct.
Q. And isn't it true you wrote an e-mail at the same time to Robert Froncillo and you copied Heather Lemmon --
A. Right.
Q. -- and in that e-mail you wrote the following: "I will summarize by explicitly saying that I believe these matters are potentially unsafe for me, and having been in the area of three incidents involving physical violence (the last incident occurring last week in New Bedford as reported in the local newspapers - the killing spree which led to numerous deaths) I believe I am eminently qualified to make such a determination." You sent an e-mail that said that, correct?
A. That's part of the e-mail.
Q. That's part of the e-mail?
A. That's part of the e-mail.

Page 126

Q. That's right. At the time you felt that your tension level was rising, correct?
A. That's correct. That's taking it out of context.
Q. And it was after you sent that e-mail that you received this letter of February 20th, correct?
A. No. After that -- after that I sent an e-mail saying that I was willing to -- to -- if they wanted to send me lists of what they wanted me to do, that they could send them. In my way of thinking, if someone comes out and says I have a problem with your ability to prioritize tasks, they can tell you what the tasks are.
Q. You went on administrative leave immediately after you sent this e-mail, correct?
A. That's not correct.
Q. You didn't?
A. What was the time of that e-mail?
Q. It was February 6, 2006.
A. What time?
Q. 9:08 a.m.
A. I went on administrative leave at approximately 2:00 o'clock or 2:30.
Q. That day, that same day?
A. That's right. I went to lunch and --

Page 127

that's right.
Q. That same day you went on administrative leave?
A. That e-mail was sent about 9:08. Approximately a few seconds after that, a few minutes, within five minutes, I sent an e-mail saying if they wanted to send me lists of what they wanted me to do, that that would be fine.
They're telling me they're having all these problems but they're not telling me what the problem is. The only one that they're bringing up is communication.
Some guy comes over and cuts half your lawn, and he says, okay, I cut your lawn; I'm ready for payment. And the first thing you say is well, you didn't cut the other half. You don't have a problem not knowing what the tasks are. You know what he didn't do; you tell him.
Q. Okay.
A. This idea that you approach someone, you know, with -- with your -- with -- with -- I've got a problem, you know. You're working. My problem is you. You're working for me; you're not -- you're not prioritizing and completing tasks; it's giving me an ulcer; it's burning a hole in my gut; it's

Page 128

costing the company money; it's making me look bad.
What are the tasks? Do you think I have to ask you what the tasks are? As a listener, you know -- you know, as a listener, I've -- I've got -- this is my job. I'm hearing this and I'm saying this is a nightmare.
Q. Okay.
A. Why doesn't he tell me what the tasks are?
Q. Let's go back to Exhibit 20. Is there anything else about 20 that you believe supports your claim in this case?
A. Well, you know, all -- the -- the -- the -- Exhibit 20 is another one in connection with the psychiatrist. It didn't make sense to me, you know, why I was going to see a psychiatrist, and so I -- I -- it -- as far as -- it seemed like this was happening to me again, you know. The reason -- the reason I was given for the bad things that were happening to me were communications.
Q. Anything else?
A. That's it.
Q. Let's take a look at 21. Same thing for 21?
A. Yes. It's -- it's -- it serves to illustrate, it serves to illustrate that -- that --

Page 129

that bad things -- it serves to illustrate that I am not just alleging that bad things happened to me. Bad things did happen to me. The reason I was given was communication. And it had -- it had -- Raytheon had the opportunity to talk about whatever they wanted. I did not restrict them. If anything, they restricted me. They tried to restrict me.
Q. So you believe you were put on administrative leave, ultimately terminated because of a communication problem?
A. I was -- I was -- I was -- I was terminated because of discrimination in connection with a disability and -- and -- and to -- to put it in a nutshell, I put what I had to say in writing because I couldn't say it.
Q. And you think that's why they terminated you?
A. That is correct.
Q. Okay. And you don't think it had anything to do with the e-mail that you sent?
A. That was taken out of context. That was taken out of context. I was -- re-read the whole e-mail, re-read the whole e-mail, and it very well explains my position and -- and I was concerned, I was scared.

And -- and by this time, they had taken a parodying type of position where, as I say, I go in there and say, I want to put my best foot forward. They say, you're refusing to move forward.
So they're taking this parodying position and I don't know why people are doing the things that they do. I don't know why people discriminate. I don't know why they choose to do the things that they do but I can see that they're -- that the people involved are getting ideas from things that are happening out in the world.
Who am I to say when they start parodying someone else as opposed to parodying me? And -- and the -- and the reality is freedom doesn't dictate a response. The only response freedom dictates is force. It restricts me on the use of force. I didn't use force. I said I'm scared.
Q. You just testified that you were scared?
A. I was.
Q. What were you afraid of?
A. What I was afraid of is I didn't know -- I didn't understand where they were going with this. It's a simple thing. You know, you come to someone and say I've got a problem with you completing your prioritizing tasks.



I'm all ears. What do you want me to do? What are the tasks? I'm sitting here and -- and -- and there's nothing here. There's absolutely nothing. Ability to prioritize and complete tasks and there's nothing and I've got a whole list of tasks that I've completed. How do I correct that?
Q. What were you afraid of?
A. I was --
Q. Mr. Sammartano, what were you afraid of?
A. I was afraid -- I was afraid -- I was afraid that I didn't know who this guy is going to start parodying next.
Q. Were you afraid somebody was going to shoot at you?
A. I don't --
Q. Yes or no. Were you afraid that somebody was going to shoot at you?
A. It could happen.
Q. It could happen?
A. You're saying yes or no. I say it could happen. I don't know what motivates people.
Q. And who did you think was going to shoot at you, Mr. Sammartano?
A. Well, I mean, you know, I mean in -- in -- how -- I'm supposed to be meeting with Rob



Froncillo. Maybe he would. I understand -- I understand -- I understand where you're coming from but I mean, you know, when you're at the top looking down, you know, you -- you can take the position that -- that bosses don't -- bosses don't shoot their employees; employees shoot their bosses; but when you're at the top looking up, you know that there's people -- there were people like Joseph Stalin who ran a whole country and supposedly he shot a lot of people. There are people like the Nazis and they ran a whole country. It goes both ways.
You know, having a problem with someone failing to complete tasks, failing to prioritize tasks, it's not so hard.
Q. Did you think that you needed to have a weapon or did you think that you needed to protect yourself?
A. I wouldn't say that I thought I needed to have a weapon. I thought that this was no longer focused -- what I -- I thought was the Performance Improvement Plan was not happening during the time that it was specified for the Performance Improvement Plan to happen.
Q. And that caused you to be fearful?



A. Logic -- logic dictates that -- that if what was supposed to be happening during that time was not happening, that something else was going to happen. I didn't know what.
Q. You didn't know what? But you thought it might be violence?
A. I thought he -- he -- if he's parodying people; he's parodying me. I said I want to put my best foot forward. He says he refuses to move forward. I don't know where he's going. I don't understand people's motivations.
Q. That's what caused you to make the reference to the violence, correct?
A. What I was -- what I was saying is at the most -- at the most upper limit, at the most upper limit of -- already I -- I am in a situation where -- where I'm being presented with something where there's -- which is unusual.
You know, you know, I've got a whole list of tasks that I've completed. But what I'm saying is the most recent past in light of the Performance Improvement Plan is characterized by events which were unexpected, unexplainable. Why should I believe that the future will be any less shocking? I'm already --

Q. You thought you might be facing violence; is that what your testimony is?
A. I thought -- I thought I might be put in a position -- I thought -- I didn't know -- I thought that -- that I could -- I could be potentially facing the unknown and I would be blamed for it.
Q. And the unknown could be violence?
A. The unknown could be anything. And I said the way to stop this is to not be there. I said if I'm not there, it can't happen. And that was -- that was the way -- that was the way I chose to see it. I saw there were simple things. This was a simple thing. And I can go right down the list, but the one at the top is the ability to prioritize tasks, that's the easiest one.
Like I said, something is bothering you, you know what it is. I'm going to be honest with you, when I filed this complaint, the judge had a problem. Something was bothering him. He knew what it was. I didn't double space the complaint and didn't attach the exhibits.
He sent me three pages about how the system works. And by the way, in a little paragraph he said, by the way, if you don't attach exhibits and if you don't double space -- in his words -- you'll



be fined. And in three paragraphs there was that concise explanation. He had a problem with me, with what I was doing. He knew what it was and he told me. They weren't doing that for me. Raytheon was not doing that for me.
Q. Let's go back to Exhibit 21. Anything else about 21 that you believe supports your claim?
A. No. Just the fact that -- that bad things are happening to me and the reason I was given is, you know, the -- the -- it was communications.
Q. You were told that the reason why you were being suspended and ultimately terminated was because of communications?
A. The reason I sent an e-mail -- the reason I sent the e-mail --
Q. Answer my question, please.
A. Yes.
Q. Back up and answer my question.
A. Yes.
Q. Did anybody tell you that the reason you were suspended or the reason that you were terminated was because of communication problems? Did anybody tell you that?
A. Yes. Those were the reasons.
Q. Who told you that?



A. The people who wrote the Performance Improvement Plan, that was the reason I was --
Q. You were given the Performance Improvement Plan well before you were terminated. Who told you that you were suspended --
A. Well --
MR. WHELAN: Let me finish the question.
Q. Who told you that you were suspended and that you were terminated because of communication problems?
A. If it -- if you're saying it's not to do with -- if it's not to do with communication problems, then -- then -- then -- then --
Q. My question is very simple. Who told you that you were -- you just testified that you were told you that were suspended and terminated because of communication problems. Who told you that?
A. Well, the Performance Improvement Plan. That's what they were talking about.
Q. That was well before you were suspended and terminated, so it couldn't be telling you that you were suspended and terminated because of communication problems because it happened beforehand. I want to know --
A. If it happened after hand, it could be.



Q. I want to know who told you, at the time or after you were suspended, that that was because of communication problems? Who told you that?
A. Well, aside from the Performance Improvement Plan, that would be it.
Q. Okay. And that couldn't have been explaining why you were suspended because you were given that before you were suspended, correct?
A. It has to happen before. How could it happen afterwards?
Q. You were given the Performance Improvement Plan before you were suspended, correct?
A. Right.
Q. It was -- in fact it was almost two months before you were suspended, correct?
A. No.
Q. Or a month?
A. About three weeks.
Q. Okay. It was three weeks beforehand. So no one could have told you that you were suspended because of -- the Performance Improvement Plan could not be explaining why you were suspended because you hadn't been suspended yet, correct?
A. No, that's not correct.
Q. Why is that not correct?

Page 142

position and -- and I was put on administrative leave for it and -- and -- and I sent an e-mail because I can't say it. I couldn't say it at the time, so I put it in writing.

And so I -- I -- I don't believe that, you know, I -- based on what the defendant did, that -- that -- that the -- that the defendant is acting upon communication. Their interest is in communication, they're responding to events of communication, attempted to restrict communication, and that is -- that is the nature of -- of the defendant's issue with me and that led to my termination.

And -- and I did ask for -- you know, I did ask for -- for -- for -- in various ways, I did ask for accommodation and I have to -- have to -- have to reiterate that I was -- I was not informed by management that there definitely was a problem until January 13, 2006 when the Performance Improvement Plan was issued.

If I think of anything to add to that, I will. I don't think that's the best summary I've ever given but that is the summary.

MR. WHELAN: Thank you.

THE WITNESS: Thank you for your patience.

Page 143

Q. Mr. Sammartano, throughout the deposition today you've indicated that you requested an accommodation, correct?

A. Right.

Q. Okay. What accommodation did you request?

A. Well, in -- in my case, there was unhappiness with e-mail being expressed and there was -- there were -- the unhappiness was calling for a restriction, and my -- my accommodation was to understand why the restriction was being placed upon me to better understand it so that I could -- so that I could remove it.

The -- the important point to understand here is that, in general, nobody has to ask to use e-mail. People just use it. Yet with me there was unhappiness with e-mail so that -- it was not an official restriction but by the same token, it was not an official problem until January the 13th of 2006. You see what I mean?

So while it was -- my -- my inquiries which were to investigate to understand the -- the -- what the problem was -- you know, at different times I said let's print them out, so -- so as to actually refer to it, I don't mean to be beating around the bush at all. There are exhibits, the 16 pages of

Page 144

responses which is your Exhibit --

Q. No. 2?

A. No. 2, I -- I tried to -- in response to the interrogatories, I went through and listed the -- the sections where I tried to elaborate to them. I've listed them in the response to the interrogatories.

And Exhibit 3 has -- has responses where I've responded in connection with communication to understand the nature of the problem with communication and -- and -- and that would be -- that would be in Section 5 but I've listed these in the interrogatories. Listed these -- listed the sections is what I mean.

And, furthermore, at the -- at the end of the -- of Exhibit 3, Section 2 and 4, and those are also listed in the interrogatories. So what I'm trying to summarize, what I'm trying to say is my inquiries in reference to reasonable accommodation were to understand -- my inquiries in reference to reasonable accommodation was to understand what I was doing wrong that -- that -- that -- that I could correct, and it was not entertained.

Q. So that was your request for reasonable accommodation was to understand what you were doing

Page 145

wrong?

A. Right. Right. Right. Right. They're calling out and saying there's a problem. As an example they would say your e-mails are rambling and not understandable. Okay. That's an allegation. Now, let's -- let's -- so I'd say, you know, I -- I take you at face value. Let's print them out, look at them, understand what we can do to correct it; let me understand what I'm doing wrong.

Q. And anything else that you believe constituted a request for an accommodation?

A. I've -- I've listed the -- I want to bring your attention to the fact that I've listed them in the -- the response to the interrogatories and those are on file with the court as an exhibit that I have presented. I didn't see it here.

Q. What is that?

A. You sent me 25 interrogatories?

Q. Right. Right. I have those here.

A. Well, the answers to one of those --

Q. Yes.

A. -- answers that question.

Q. Okay.

A. In case I've omitted something or in case you read the deposition and get the idea that I've

All they had to do was tell me what the tasks are. All they had to do was tell me what I was doing wrong and I could have improved it. Anyone in a situation that's in a similar situation like that could react that way.

They were not in that situation. They were in a situation where -- where they said they wanted to talk to me and I said, fine, I'm ready. And I agree with you. When Heather and Robert were in the situation when someone says they want to talk with Heather or Rob and that person doesn't know -- doesn't know what they want to talk about, then they will start to be suspicious. But they were not in that situation.

Q. Mr. Sammartano, I want to direct your attention to the last paragraph again. You refer to three incidents involving physical violence. What were you referring to?

A. Well, there -- there was the one incident I actually named in New Bedford. That was -- that was -- that was the Robida incident.

Q. And that was when somebody went into a bar and stabbed and shot people?

A. Did all these crazy things. That's right. Another incident, a number of years ago, I was



working up in Dover, New Hampshire, and I was in a position where I happened to be -- I -- I -- I happened to, you know, just be -- just be -- just being aware and around that time when I was working in Dover, New Hampshire, there was a series of police who were shot and -- and at the time, you know, I was -- I was -- the places that I was frequenting, there was a -- have you ever been to Bickford's? They have a Bickford's around here.

Q. Yes.

A. I'm trying to be specific.

Q. All right.

A. I'm not trying to ramble. There was a Bickford's. The reason I say Bickford's is the way it's set up there, it's almost like a bar but you go in and have breakfast. There's no drinks served but it's like a bar, so you sit down at this bar and serve these breakfasts and there's people around talking.

And I'm listening to things that people are saying and they're just -- I don't want to repeat some of those things, they're just crazy, you know, the disappointment that people had with police at that time and I'm listening to this, and a few months later police are getting shot, you know, and



it's not something normal for someone like me. You know what I'm saying?

And then on a different point of my life, I was being interviewed by Edgewater Technology and I'm going -- this is -- this is the second -- this is the third instance.

The first being New Bedford, the second being me being up in Dover, New Hampshire. The third, I'm interviewing with Edgewater Technology and -- and it's like there was a complete disconnect between what I'm saying and what they're saying, and a short while after that, they -- they -- they had -- they had the incident up there, and basically I was in these situations and --

Q. What was the incident there, at Edgewater where a program was --

A. After -- after I interviewed there, there seemed to be this disconnect, you know, between -- I interviewed there. There was a disconnect between what I was saying and what they were saying, what I was doing and what they were doing, similar to the types of things in my Performance Improvement Plan in the sense that, you know, I -- I would show them -- I would show them a database application on a laptop, we'd talk about it. Then they'd come back



and say he has no database skills or something like that.

It was like bizarre, and there was an incident where someone walked in with a bag of -- of guns or something like that. I can't remember the man's name. But you asked me what these three incidents were and I'm telling you what they were.

Q. Yes.

A. I'm telling you what they were. What I'm saying myself here, I'm in a position where there's this disconnect again between what the Performance Improvement Plan says and what actually happened in -- in -- in -- I come in to the Performance Improvement Plan. I say I want to put my best foot forward. They say you're refusing to move forward.

They say that my e-mails are rambling and not understandable. I said, okay, let's print them out. Let's see what the problem is.

They refused to print them out. So there's -- there's -- there's a lack of engagement. All they do is they're making allegations and where they're parodying me and I'm saying, Jesus, right now they're parodying me. When are they going to start parodying things that are happening out in the real world?

And this is the situation I'm in. It's a pretty simple thing. Someone has the ability to prioritize and complete, someone has a problem with ability to prioritize and complete tasks, it's a pretty simple thing to say, you know, here's what the tasks are. They weren't doing that.
Q. I want to stay on the subject that we were just discussing.
A. All right.
Q. Did you know anybody in Dover, New Hampshire, that was either accused of shooting those police or did you know any of the police that were shot?
A. No.
Q. And it was just that you overheard a conversation in Bickford's where somebody --
A. Well, I was there. I was -- I was in the vicinity. To me, that's the vicinity.
Q. How -- where were you when those shootings took place?
A. I mean I was living in Dover, New Hampshire, at the time. I was not -- I was not -- I mean it wasn't -- it wasn't happening in California, it wasn't happening in Nebraska; it was happening in New Hampshire, which was to me -- was -- is -- is as



far as I'm concerned is in the vicinity.
Q. Have you ever had a gun licensed to you?
A. No, I have not.
Q. Have you ever owned a gun?
A. I don't own a gun.
Q. Have you ever owned any kind of weapons?
A. Me personally? I mean no.
Q. Well, what about close family members such as your father or anybody else?
A. My father, I mean I -- I grew up where my father had -- had -- had -- had, you know, had a BB gun license.
Q. And did you shoot the BB gun?
A. I shot the BB gun.
Q. He had a BB gun license?
A. Right. And the way -- the way the license was written is provided that he was with me, I could use it.
Q. And where did you grow up?
A. In Methuen, 30 miles north of Boston.
Q. And is that Massachusetts or New Hampshire?
A. That's Massachusetts.
Q. And what about the incident in New Bedford, did you know anybody that was involved with



that?
A. No. No.
Q. And why did that come to mind? Why did you say that you were eminently qualified to make such a determination at the close of that paragraph?
A. Well, you know, you've asked two questions.
Q. I have.
A. In terms of why that comes to mind, that's what came to mind. You know, it's like -- it's like asking why did you choose to say a certain word at a certain time. That's what came to mind.
I saw this disconnect and it seemed like -- it seemed like people were not -- they weren't coming out and saying what the problem was and this was three weeks into the plan and I didn't understand why, and where they were parodying me and these are -- that's -- that's what came to mind.
Q. Did you ever have a fear that you might get to a point where you would have to do something, where you would have to take actions into your own hands?
A. I never envisioned that happening but I mean -- I mean but I mean what was a concern to me is that if there's -- if anything were to ever



happen and I was being in a position of having to defend myself, you know, afterwards I would be blamed for it and I said I don't want to be in a position where -- where -- where someone else gets aggravated and then they say I start something. I don't want -- I don't want to go down that road.
Q. Did you ever have any fantasies or any -- any thoughts of doing something proactively rather than waiting until somebody attacked you?
A. No. That's just bizarre. If anything, if anything, you know, I'm in a position where -- where, you know, I feel like I -- I have a lot to lose. You know I -- I -- I enjoy my life. I think I have a lot to lose.
MR. WHELAN: Let's mark that as Exhibit 9.
(Whereupon, Defendant's Exhibit No. 9 was marked.)
BY MR. WHELAN:
Q. Mr. Sammartano, can you take a look at Exhibit 9, please?
A. Yes.
Q. Do you recognize that document?
A. I do.
Q. This is an e-mail that you sent to Rob Froncillo, Heather Lemmon and --