# Exhibit
# B

JUL 26 2007


**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| **STEPHEN T. SAMMARTANO** | : | |
| **Plaintiff** | : | |
| | : | |
| **Vs.** | : | **C.A. No. 06-535S** |
| | : | |
| **RAYTHEON** | : | |
| **Defendant** | : | |

## DEFENDANT RAYTHEON'S FIRST SET OF INTERROGATORIES PLAINTIFF RESPONSE

## I. Introduction

Plaintiff responds to Defendant Raytheon's first set of interrogatories in connection with action brought by the Plaintiff, Stephen T. Sammartano, seeking declaratory and injunctive relief, litigation expenses and other equitable relief, including back pay, as well as compensatory and punitive damages to redress unlawfull discrimination in employment the Plaintiff suffered on account of his perceived stutter disability in violation of the Americans with Disabilities Act of 1990, 42 U.S.C. sections 12101 et seq. ("ADA") as follows.

## Responses

1. I am working on assembling a list beyond those already mentioned in the documentation already provided.

2. as necessary/don't know at this time

3. none at this time

4. none at this time

5. Objection on the grounds that any inference made based upon such information will be speculation and is not related to liability of the alleged discrimination on the basis of a disability.

6. Plaintiff acquired a temporary job beginning February 12, 2006. The job title is software engineer 3. The rate of pay is $55/hour. There are no benefits. I object to providing further information at this time for fear of the Defense adversely affecting me by contacting my current employer to obtain information which can only be speculative and is not related to liability of the alleged discrimination on the basis of a disability.

7. Plaintiff acquired a temporary job beginning February 12, 2006. The job title is software engineer 3. The rate of pay is $55/hour. There are no benefits. I object to providing further information at this time for fear of the Defense adversely affecting me by contacting my current employer to obtain information which can only be speculative. Any additional information will have no value other than to make inferences which will be speculative and are not in connection with assessing any liability due to alleged discrimination committed by Raytheon.

8. I went to career fairs, I applied to jobs from the Providence Journal and the Boston Globe. I collected unemployment until about September 9th. I reviewed material which would be helpful in me obtaining future employment.

9. I have the information, but I object until it can be explained to me how this information will be used and or verified without slandering me.

10.a. State of Rhode Island Deparment Of Labor and Training on or about 02/17/06.

b.Hearing Date May 1, 2006 – discharged with no misconduct

c. $477.00/week for 26 weeks ending September 9th.

I did collect unemployment until September 9th through the Rhode Island Department of Labor and Training.

11. Yes. I am working on providing further information.

12. I stutter. I have difficulty speaking. The difficulty varies with time. Although there are certain words or letters I almost always have trouble saying, at times I can say those correctly without a thought. On some occasions I have trouble saying words correctly which I generally never have trouble saying. People develop speaking language vocabulary highly influenced by factors- environment, location ( often determines what language ), etc, various filters if you will. For someone who stutters an additional filter is words that he knows he will stutter on – he avoids them. While it often seems that I don't stutter, when I am working I will if I don't revert to email because I will be required to use words which I could otherwise avoid entirely or avoid by substitution of a similar word.

13. I had speech therapy forced on me through the public school system and later my parents paid for me to have speech therapy. I never found the speech therapy helpful aside to provide evidence that I have the problem. For some reason unknown to me at the time, my parents eventually stopped sending me to therapy. I cannot recall now if they decided it was not helping or if I decided it was not helping or if it we just all decided that it was not worth the investment. I never resumed therapy because I never had enough money to resume it and because I never found it helpful.

14. I generally don't mention that I have a speech problem until it becomes an impediment with someone in a conversation. I first exhibited a fluency problem with

Dennis Sagamang in January of 2004, but I didn't explain. The first written notification which I am aware of was 10/13/2005, Exhibit 5.

15. I mentioned to a number of people including co-workers and managers during my time at Raytheon that I found it easier to send email than to have a conversation because of my speech problem. In so doing I was implicitly requesting the alternate form of communication because of my speech problem. In fact, although it may come as a surprise I sometimes mentioned that I stutter in emails. I was not bragging or just sharing a bit of trivia, but I was asking for understanding, reasonable accommodation. There was no apparent problem with me using email until the performance improvement plan was issued and in my response to the plan, i.e. Exhibit 3, I put my position and needs in writing. I never attempted to flaunt the fact that I stutter. I wasn't looking for sympathy nor did I think being tagged as disabled was desirable. The reasonable accommodation i.e. email was already available and I used it. Noone had to ask to use email. When issues concerning email arose, I investigated the issues and was not provided any explanation. Given that the reasonable accommodation was already available, my requests for reasonable accommodation therefore amounted to requests to understand the reasons for relative restrictions upon me regarding it's use. My efforts to produce information related to why reasonable accommodation was being restricted for me included.

- Exhibit 11, dated 1/30/2006
- Exhibit 3, section 1.3, section 5.2, section 5.5, section 5.6, section 5.7, section 5.8 dated 1/16/2006
- Exhibit 3, p9 sections 2,4 dated 1/16/2006

- Exhibit 5
- Exhibit 10

16. Generally there was no response – just acceptance without contest. The form of the request was often explanatory i.e. it followed an episode of stuttering. This happened with my managers and co-workers. Sandra Vanier, Christine Lowrie. When the performace improvement plan came out, management seemed to be ignoring all of my responses including those connected with my speech problem, but while issues came and went, communications and email kept arising all in disregard of my attempts to explain and request reasonable accommodation more explicitly. Management was leading, talking and not at all listening. They attempted to ignore and be aggrevated by everything I said, did, and wrote. They ignored me stuttering. They ignored me having a problem speaking even after being informed of exactly what the problem was and the connection to email. They would attempt to not let me speak at all and to consume all of the time in the meetings with blue-sky issues, issues which were void of any constructive detail. It was impossible to get them to engage in dialogue as all events of communication were more of a podium from which they would insist upon input until they realized I had some at which time they would allow no input and change to a new subject. All meetings were a controlled intentional consumption of time. Things which were not available were of extreme importance, those which were available didn't matter. However, email, in one form or another always came back as the center of attention. I constantly attempted to pacify them and focus upon what they wanted to focus on as I was really attempting to be non-confrontational. They would say be concise. I would be concise and they would act as though they did not understand. I thought things would

start to go somewhere in agreement with the performance improvement plan, but they never did nor did the Defendant ever acknowledge what I was saying regardless of how I said it. They would never investigate the details of anything. At most they would make a note of a claim I made and that would be the end of addressing it. They would bring up something else. The only connection to reality was to the fact that I stutter.

17. allegation – Steve needs to improve is communications skills with peers, leads, and other stakeholders.

allegation – Steve needs to learn how to use e-mail and voice mail more selectively and avoid along ambiguous, repetitive messages.

allegation -- Steve is not letting things go

allegation – Steve dwells on issues and allows it to affect his performance

allegation – Steve would occasionally have comments ( voice mail and e-mail ) that seemed to come completely from left field and left you wondering what he was talking about.

allegation – "Tends to dwell on problems too long"

allegation – "Seems to ramble and overanalyze at times

allegation – needs to learn to relax a little and don't overreact to situation

allegation – poor communication skills as referenced by Exhibit 5

18.1 a. Rob Froncillo

b. Heather Lemmon

c. Refusing to move forward.

d. Rob Froncillo's office

e. At one of the weekly performance improvement plan meetings

18.2 a Rob Froncillo

b. Heather Lemmon

c. characterized me as writing rambling and non-understandable emails

d. Rob Froncillo's office

e. At one of the weekly performance improvement plan meetings

18.3 a Rob Froncillo

b. Heather Lemmon

c. accused me of always going over people's heads and I don't/didn't

d. Rob Froncillo's office

e. At one of the weekly performance improvement plan meetings

18.4 a. Rob Froncillo

b. Heather Lemmon

c. alleged that I was associated with lack of teamwork

d. Rob Froncillo's office

e. At one of the weekly performance improvement plan meetings.

18.5 a Rob Froncillo

b. Heather Lemmon

c. alleged that I am not a communicator

d. Rob Froncillo's office

e. At one of the weekly performance improvement plan meetings

18.6 a. Rob Froncillo

b. Heather Lemmon

c. not focusing on the performance improvement plan

d. Rob Froncillo

e. At one of the weekly performance improvement plan meetings

19. Plaintiff had noted to Defendant that he stutters. Stuttering is a difficulty talking. Plaintiff also noted this fact to the Defendant. Meetings involve a lot of talking. So after Plaintiff informed Defendant that Plaintiff had difficulty talking, Defendant created a situation which revolved about talking. The meetings seemed to have been created to intentionally place the Plaintiff in a position of difficulty and to allow the Defendant to take advantage of the Plaintiff in connection with his disability. While the meetings were supposed to be in connection with a performance improvement plan, the detail of the plan seemed to be beside the point.

20. I didn't make a list. I mentioned I had a speech problem when it exhibited itself in some way which created an unmet expectation in the listener. The idea that I was mentioning that I stuttered out of left field or that I was just sharing a piece of personal trivia is not true. I was mentioning the problem as information which could explain the listener's unmet expectations some of which I could envision and some of which perhaps I could not. I mentioned the problem at various times in emails. It's a way of asking for accommodation and if you disagree with this explanation then ask yourself why anyone would mention such a detail.

21. I didn't make a list. I mentioned it as appropriate.

22. I can't say that any of the Defendant's people actually threatened violence against me. I can say there was a gentleman who used to joke around with Bill Primiano when Bill sat close to Mike Solgar who was always saying "Oh, you're killing me, you're killing me". I can't remember his name, but I am sure Bill Primiano would remember his name.

The Defendant would do things which were unusual. Beginning from the skip level meeting when the Department Head explained what was considered normal for all and then failed to correct the abnormalities which I was experiencing. The meeting with human resources in November was certainly inexplainable as I was doing so well and the performance improvement plan which was void of any of the normal useful information typical of an instrument to induce correction was unusual. Details like this are all the types of things which would make anyone's concern rise. The Defendant had adopted a way of mocking or parroting my efforts to improve the situation. When I saw the performance improvement plan and noted the lack of useful of details I didn't understand it and I said so. I asked for a new section manager and was given one and I sent him an email saying that I would like to put my best foot forward. When we first spoke at the first performance improvement plan meeting he claimed my emails were non-understandable and that I was refusing to move forward in keeping with the parroting position. It became difficult to assess where the Defendant was going i.e. ultimately what was on the Defendant's agenda as their was no performance improvement plan. In addition, the performance improvement plan was in stark contrast to reality and it called out characteristics and applied them to me which were exhibited by everyone. The details explained herein will make one wonder where the people involved were going.

23. I had been placed upon administrative leave on Monday, February 6, 2006. On Monday, February, 20, Raytheon called me to convey the information described in Exhibit 19. The implication was that I would be unable to return to work if I didn't go to see a psychiatrist – refusing would result in me not being able to return to work. So on the spur of the moment I accepted under duress.

24. I explained that I was sending email because I stuttered as it was necessary. I explained it verbally. I made similar references in email.

25. I don't have a list.

Dated: July 24, 2007

Stephen Sammartano 7/24/2007

Stephen Sammartano
75 Arthur Street #4
Pawtucket, RI 02860
401.335.3412
Pro Se

State of Rhode Island
County of Pawtucket

Jisela Jimenez
July 24, 2007
Jisela Jimenez
my commission expires
06/09/10

CERTIFICATION OF SERVICE

To:

Joseph D. Whelan ( #5694)
Hinckley, Allen & Snyder LLP
50 Kennedy Plaza, Suite 1500
Providence, RI 02903

I hereby certify that on the 25th of July, 2007, a copy of the enclosed documents were served by mail on the above-named party.

Stephen Dannwater