**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| **STEPHEN T. SAMMARTANO** | : | |
| **Plaintiff** | : | |
| | : | |
| **Vs.** | : | **C.A. No. 06-535S** |
| | : | |
| **RAYTHEON** | : | |
| **Defendant** | : | |

# PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF IT'S MOTION TO OPPOSE SUMMARY JUDGEMENT BY OPPOSING DEFENDANT, RAYTHEON'S, MOTION FOR SUMMARY JUDGEMENT

**February 4, 2008**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| **STEPHEN T. SAMMARTANO** | : | |
| **Plaintiff** | : | |
| | : | |
| **Vs.** | : | **C.A. No. 06-535S** |
| | : | |
| **RAYTHEON** | : | |
| **Defendant** | : | |

# Plaintiff, Stephen Sammartano's Opposition To Defendant's Motion For Summary Judgement

Stephen Sammartano VS. Raytheon

Dated: February 4,2008

Stephen Sammartano, Pro Se
75 Arthur Street #4
Pawtucket,RI 02860
401.335.3412
February 4, 2007

# Table of Contents


Overview (Pleadings) & Introduction 6

Plaintiff's Position 6

Introduction 7

Sammartano Had No History Of Behavorial Issues 8

General 8

Incidents Prior To March 11, 2005 13

Skip Level Meeting 24

Sammartano's Mid Year Performance 2005 Review, 8/24/2005 25

Incidents Of October, 2005 26

Incidents Of November, 2005 29

Synopsis 30

The Performance Improvement Plan Deposition Support 31

Additional Conclusions 35

Time Of Issuance Of Email And Voice Mail 35

Necessity Of Information Technology 38

Some Issues Only Mentioned In Motion For Summary Judgement 39

Sammartano Was Discriminated Against On The Basis Of A Disability 40

Sammartano Is Disabled Within The Meaning Of The Law 40

EEOC's Position 40

Plaintiff Is/Was Disabled 42

Plaintiff Was Regarded As Disabled By Defendant 49

Sammartano Was Subject To Adverse Action Discrimination On The Basis Of His Disability 51

Sammartano Was Denied Reasonable Accomodation 59

Defendant Was Informed 60

Plaintiff Requested Reasonable Accommodation 60

Defendant Refused To Engage In Dialogue 61

Sammartano Was Subjected To A Hostile Working Environment Due To His Disability 68

Sammartano Was Retaliated Against 73

Sammartano Was Terminated For Non-Legitimate, Discriminatory Reasons In Connection With His Disability 75

Conclusion 76

Table Of Authorities 77

Supporting Documents

1. Exhibit 1 - March 11 e-mail, issues no big deal
2. Exhibit 2 - allegation of paranoid
3. Exhibit 3 - 8/23/2004 e-mail Lowrie frightened
4. Exhibit 4 - e-mails relative Lowried frightened
5. Exhibit 5 - Christine Erwind e-mails
6. Exhibit 6 - 7/23/2004 e-mail why I joined Bob Pulley's group
7. Exhibit 7 - 8/10/2004 e-mail association and joining Bob Pulley's group
8. Exhibit 8 - 8/10/2004 e-mail concern over Plaintiff leaving group 1

9. Exhibit 9 - 8/24/2004 e-mail noting concern over Plaintiff leaving group 1

10. Exhibit 10 - 2004 Performance Development Summary

11. Exhibit 11 - skip-level meeting

12. Exhibit 12 - 2005 mid-year review

13. Exhibit 13 - discovery for 2005 mid-year review

14. Exhibit 14 - leaving MCDP

15. Exhibit 15 - early October discussions

16. Exhibit 16 - email of 10/13/2005 I never asked for this meeting

17. Exhibit 17 - email of 10/13/2005 offer to meet with HR alone

18. Exhibit 18 - 10/18/2005 accepting meeting with HR alone

19. Exhibit 19 - 10/13/2005 letter to Maria Kumiega

20. Exhibit 20 - Musholt asserting Plaintiff not informed

21. Exhibit 21 - EEOC stating case not made

22. Exhibit 22 - recent speech evaluation

23. Exhibit 23 - affidavit Mr. Enright

24. Exhibit 24 - affidavit Mr. Stone

25. Exhibit 25 - letter to hr referencing poor communication skills/stuttering

26. Exhibit 26 - 16 pages of responses sections

27. Exhibit 27 - Exhibit 10 of Plaintiff's First Amended Complaint, references 9 e-mails

28. Exhibit 28 - Exhibit 11 of first amended complaint, the nine emails

29. Exhibit 29 alleged threat

30. Exhibit 30 - eeoc claim

31. Exhibit 31 - Condensed Deposition of Bob Pulley

32. Exhibit 32 - Condensed Deposition of Manny Goncalces

33. Exhibit 33 - Condensed Deposition of Al Gaines

34. Exhibit 34 - Condensed Deposition of Bob Dayson

35. Exhibit 35 - Condensed Deposition of Heather Lemmon

36. Exhibit 36 - Condensed Deposition of Rob Froncillo

37. Exhibit 37 - All Ratings

38. Exhibit 38 - Rating Scale Meanings

39. Exhibit 39 - Performance Improvement Plan Analysis

40. Exhibit 40 - Ineligible For Rehire

## Plaintiff's Position

Plaintiff, Stephen T. Sammartano ("Sammartano"), has brought claims for disability discrimination against Defendant, Raytheon. Sammartano asserts that he was terminated from his position with Raytheon as a software engineer because of his disability, i.e., stuttering. First Amended Complaint ("Compl."), ¶ 43. Sammartano asserts a "failure to accommodate" claim against Raytheon. Compl. ¶¶ 39, 40. Sammartano also asserts that Raytheon subjected him to a hostile work environment due to his disability. Compl. ¶¶ 42, 44. Finally, Sammartano asserts that Raytheon unlawfully retaliated against him for attempting to obtain a reasonable accommodation. Compl. ¶¶ 45, 46. Plaintiff alleges in Compl. ¶ 41 that Raytheon failed to engage in Dialogue, an allegation which is not addressed in Raytheon's Motion For Summary Judgement.

Sammartano brings his claims under the Americans with Disabilities Act of 1990, 42 U.S.C. §1231 et seq. ("ADA"); the Rhode Island Fair Employment Practices Act, R.I.G.L. §28-5-1 et seq. ("FEPA"); the Rhode Island Civil Rights Act, R.I.G.L. § 42-112-1 et seq. ("RICRA"); and the Rhode Island Civil Rights of People with Disabilities Act ("RIPDA"), R.I.G.L. § 42-87-1 et seq.

State law claims under RIPDA and FEPA "require the same analysis as that utilized for the corresponding federal statutes." Tardie v. Rehab. Hosp. of R.I., 6 F. Supp. 2d 125, 132-33 (D.R.I. 1998) (citing, *inter alia*, Newport Shipyard Inc. v. R.I. Comm'n for Human Rights, 484 A.2d 893, 897-98 (R.I. 1984)). See also DeCamp v. Dollar Tree Stores, Inc., 875 A.2d 13 (R.I. 2005) (citing federal law pursuant to the ADA in its analysis of whether the plaintiff

was disabled under FEPA and RICRA). Therefore, federal case law analysis is appropriate for Sammartano's state law claims.

# Introduction

Plaintiff will proffer evidence that Raytheon's claim to have terminated Sammartano on the basis on his ongoing behavioral issues is untrue. Plaintiff will also substantiate that the alleged threatening electronic mail message was a mischaracterization and in retaliation of Plaintiff's attempts to engage in dialogue and notification to Defendant of Defendant's refusal to participate.

Plaintiff will proffer evidence that Sammartano (i) was disabled within the meaning of the law; (ii) was discriminated against on the basis of his disability; (iii) was denied a reasonable accommodation in connection with failure to engage in dialogue; (iv) was subjected to a hostile working environment due to his disability; (v) was retaliated against; and (vi) was terminated for non-legitimate, discriminatory reasons in connection with his disability.

# Sammartano Had No History Of Behavorial Issues

## General

Defendant has identified isolated incidents created by other employees, albeit some at the management level and others acting at the management level, who were not working closely with Plaintiff and characterized relavant necessary communications as

- normal communications for the Plaintiff,
- as typical of communications with Plaintiff and Plaintiff's co-workers,
- and as abnormal for communications between co-workers and management in general.

Aside from relevant necessary communication, such communication would be abnormal for communications in general and was not typical of Plaintiff's communication on a day to day basis with other employees whether they were co-workers or managers. For example times of review are occasions when an employee is expected to have input and only arrive a few times per year. The effect of negative reviews can be devastating. The consequences of an employee ignoring negative reviews – even more devastating. Relevant necessary communications is of course normal. As support for Plaintiff's statements here consider excerpts from recent depositions from four employees of Raytheon who worked with Plaintiff, Bob Pulley ( a technical lead of Plaintiff's ), Manny Goncal, Al Gaines, and Bob Dayson on the project known as MCDP which Plaintiff joined roughly 8/24/2004 ( deducable from Exhibit 9) and was on until a short time after 9/30/2005 ( deducable from Exhibit 14 ).

When Manny Goncalves, a co-worker of Plaintiff of Plaintiff's last project was asked in deposition about working with Defendant's key witnesses, Manny Goncalves replied as follows.

19

Q. When I was working with you work, did we work with Christine Lowrie?

A. No.

Q. Did we work with Christina Erwin?

A. No.

Q. Did we work with Dan Musholt??

A. No.

Q. Did we work with Sandra Vanier?

A. No.

Q. Did we work with Heather Lemmon?

A. No.

Q. Did we work with Robert Froncillo?

A. No.

20

Q. Did we work with John Kelly?

A. No.

Q. Did we work wither Deborah Belsinger?

A. No

Q. Did we work with Irvin Kooris?

A. No.

A condensed copy of Manny Goncalves' deposition can be seen as Exhibit 32. Bob Pulley, Al Gaines, and Bob Dayson were explicit in saying that they and Plaintiff did not work with Defendant's key witnesses as can be seen in their corresponding condensed depositions – Exhibit 31, Exhibit 33, and Exhibit 34. Furthermore, each person here named, Bob Pulley, Manny Goncalves, Al Gaines, and Bob Dayson testified in deposition that they were working with Plaintiff and their grouped testimonies establish that Plaintiff was not antagonistic, that there was no problem with Plaintiff's e-mail or voice mail, that Plaintiff was a responsible, team player, that Plaintiff made his work publicly available to all on a shared network, that Plaintiff did prioritize and complete tasks in ways which had no negative impacts upon the project. This information can be verified from the attached condensed depositions of said named people as exhibits 31, 32, 33, and 34 in a rather simplistic method of locating the metric of interest in the depositions. For instance from Manny Goncal's deposition.

4

Q. Did you personally find me antagonistic?
A. No.

4

Q. Did you personally have any problems in
connection with me and e-mail or voice mail?
A. No.

4

Q. Did you personally think I was responsible or
irresponsible?
A. Responsible.

19

Q. You stated on your rating of me that you feel
I'm a team player. Do you agree with that?
A. Yes.

21

Q. Are you personally aware of any problems that I
had with regard to prioritizing and completing
tasks?
A. No.

21

Q. Are you personally aware of Steve, me doing
things my own way or in a way so different from
other team members that was noticeable in a bad
way?
A. No.

Now the astute may recognize that Manny was not aware of Plaintiff's work being public, however other people deposed were. Such information should be no surprise as people joined the project at different times while Plaintiff was one of the first to join. Al Gaines, for instance, was aware of Plaintiff's public work as noted from his Deposition.

9

Q. Are you aware that at the Checksum Code was on
the M-Drive for a period of time?
A. Yes.
Q. Is the M-Drive private to Steve Sammartano?
A. No. It's a public drive.

Q. Who has access to the M-Drive? To the best of
your ability could you answer that?
A. I would say anyone who is on the TSR.
Actually, DEG one-thousand project.
Q. Are you aware that Steve Sammartano's
Serialization Code was on the M-Drive?
A. Yes.
Q. I should have asked are you aware that Steve
Sammartano wrote Serialization Code?
A. Yes.

Beyond stating such information into the record in recent depositions, both Bob Pulley and Manny Goncalves had been tasked to rate Plaintiff at the time. Bob Pulley gave Plaintiff a rating of 7 of 9 while Manny Goncalves gave Plaintiff a rating of 8 of 9. True and exact dated copies of Bob Pulley's rating, Manny Goncalves rating, and all other ratings are supplied together with an explanation of the rating scale as Exhibit 31-34,38. An average of the ratings taken for the year 2004 compared to the ratings taken for the year 2005 shows that overall the Plaintiff's rating went up and yet Plaintiff was still placed upon a performance improvement plan. Such detail is today inexplainable as Human Resources representative, Heather Lemmon, could offer no insight relative to this contradiction in her deposition, Exhibit 35 of this document, when asked on January 11, 2008.

6

Q. Now, I have a copy of -- looks like these are out of
order. From the rating forms, it seems like the
ratings went up from a 4.25 to a 5.33, and I was still

PIP'ed. My question would be if my ratings went up,
why was I still PIP'ed, put on the performance

7

improvement plan, if my ratings went up from Year 1 to
Year 2?

A. I do not know.

Q. All right. From reading the ratings forms from Year 1
to Year 2, it's apparent that the first year I was
marked as an E-3. The second year I was marked as an
E-4, and the question would be, so does that mean I
was promoted? Do you know that I was promoted from
E-3 to E-4?

A. I don't know.

## Incidents Prior To March 11, 2005

Plaintiff was and is exhonorated of all claims before March 11, 2005, by an email from Sandra Vanier to Plaintiff expressing the idea that these things are no big deal ( Exhibit 1 ). Plaintiff notes that he was only provided with information regarding the incidents noted on Exhibit 1 in connection with Christina Erwin and Christine Lowrie. Sandra Vanier's mention of additional names in Exhibit 1 was the only place they were mentioned. Plaintiff requests that the court recognize the following additional obversations above and beyond those just stated above in regards to the Defendants' description of these incidents in association with Christina Erwin and Christine Lowrie in Defendant's Motion For Summary Judgement.

First, while the Defendant has made notice of Plaintiff's alleged "paranoid" behaviors ( see Exhibit 2 i.e. Defendant's Motion For Summary Judgement page 7), the Defendant took no action whatsoever in connection with Christine Lowrie's statements in regards to their illustration of paranoia of Christine Lowrie ( see Exhibit 3 taken from Affidavit of Sandra Vanier of Defendant's Motion For Summary Judgement where it is Exhibit A ). Christine Lowrie was not asked to see a psychiatrist. Plaintiff did ask in his Interrogatories if anyone else was requested to see a psychiatrist and Defendant claimed that no one was. The implication is that the Defendant was not really concerned with paranoid behavior, but was more interested in singling out Plaintiff for the purpose of discriminatory action on the basis of paranoia as a pretext. The associated emails in connection with Christine Lowrie's fears can be seen as Exhibit 4 and as taken from Affidavit of Sandra Vanier of Defendant's Motion For Summary Judgement where it is Exhibit B. Information which would substantiate justification of why Christine Lowrie was scared has not been provided, nevertheless, Plaintiff was exhonorated of such by the email of March 11 from Sandra Vanier, Exhibit 1 .

Second, the associated exhibits of the incident in connection with Christina Erwin provided by Defendant's Motion For Summary Judgement illustrate that there is little difference if any between the emails of Plaintiff and his peers except perhaps that Plaintiff's are shorter. The associated emails in connection with Christine Erwin can be seen as Exhibit 5 as taken from Affidavit of Sandra Vanier of Defendant's Motion For Summary Judgement where it is Exhibit C.

Third, there is no mention of why Defendant does not accept that Plaintiff was joking as is stated as part of Exhibit 5 which was issued at the time of the incident.

Fourth, Plaintiff's short form of correspondence was connected to the incident in association with Christine Lowrie as Lowrie was unable to understand what * it's going * means and requested further elaboration. Plaintiff made his best effort to elaborate. However, later Defendant claims issue whith such elaborative style – yet it was their request. Reference to this detail can be see as Exhibit 4 page 6 of this document.

Fifth, while it was mentioned that Sandra Vanier expressed her concern over Plaintiff being the first to be removed from groups because he was difficult to get along with – such a claim is fictitious and without support. When Plaintiff first joined Raytheon, he was initially working with Paul Work and per request was interviewed by Dick Amundson and accepted into his group. Plaintiff created this successful move of his own initiative. As Plaintiff continued his employment, he did interface with members of another group, Bob Pulley's group, of which Al Gaines was a member, who were friendly, helpful, and overwhelmingly approving of Plaintiff – Plaintiff really connected with the members of this other group who were using similar technology as the group Plaintiff was in, i.e. Dick Amundson's group. By July of 2004, Plaintiff could see that he might be better off in this group which he had been interfacing with all along. Plaintiff had carefully cultivated this association as the members were so able to relate to him and as the work reached completion in Dick Amundson's group, Plaintiff initiated a move which was so well received by the group he wished to move into that members of the original group set aside their previously expressed discontent and began to express the idea that Plaintiff's expertise may be sorely missed. Such experiences are recounted in Exhibits 6, 7, 8, 9 which are emails issued during Plaintiff's term of employment. Bob Pulley testified in agreement with statements in connection with Exhibits 6, 7, 8, 9 stated here in his deposition of December 5, 2007 as the following excerpt from his deposition shows.

Q. And then that just brings us back to this one exhibit that I have to figure out how to phrase it.

MS. SIKET: Can you just remind us what exhibit that is?

MR. SAMMARTANO: This was concerning the idea that when I originally moved into MCDP, what I was trying to establish, the idea that I was not kicked out of the group that I was in. I was taking advantage of an existing relationship and --



MS. SIKET: Steve, I'm going to object. You can't testify into the record. What exhibit are we going to refer to.

Q. Exhibit 13. There are five pages of Exhibit 13. I'm just having trouble with this one exhibit. When I moved into your group it was a move that I initiated, do you recall that? Is that what this e-mail shows?

MS. SIKET: I'm just going to object. There's multiple questions.

Q. When I moved into the group, it was a move that

I initiated; do you agree with that?
A. Yes.
Q. It was accepted by the members of your group?
A. Yes.
Q. Do you agree that this e-mail shows that we had known each other and talked about this possibility?
A. Yes.
Q. So would it be fair to say that I was not kicked out of the group? Is that going down a bad path?
MS. SIKET: I'm going to object because that's vague.
Q. Is it fair to say that I wasn't kicked out of

18

the group that I was in, that I moved into your group?
A. I don't recall anything that sounds like that, no.
Q. You don't recall that I was kicked out, or you don't have any position whatsoever of it?
A. Right. I don't have any position.
Q. Well I don't mean to waste your time. I think

I've asked -- it's not my purpose to consume all
your time, Bob. I believe that I've asked the
questions that I wanted to ask you. You've
answered them to the best of your ability. And
that's all I wanted.

(EXHIBITS 1-6 WERE MARKED FOR I.D.)

(DEPOSITION CONCLUDED AT 9:35 P.M.)

Similarly, Al Gaines deposed December 10, 2007 supplied similar testimony in agreement with statements made in connection with Exhibits 6, 7, 8, 9 stated here in his deposition of December 10, 2007 as the following excerpt from his deposition shows.

6

Q. Now, when I moved into MCDP, you might call it
MCDP or Generic Services, Bob Pulley's group,
that was something that we had talked about; is
that correct? I'll refresh your memory
especially with this e-mail --

7

MS. SIKET: Objection.

MR. SAMMARTANO: I'm asking if he
had talked about that.

MS. SICKET: When you said "we"?

Q. Well, he and I. Especially that second page.

These -- right, that one right there. These e-mails all reference the ongoing association that we had; is that correct?
A. Yes.
MS. SIKET: Stephen, just for the record can we say what we're showing to the witness?
Q. We're going to mark these as Exhibit 1. And these are e-mails that referenced the move out of EVS into the Generic Services/MCDP.
MS. SIKET: Just give him a minute to look at that.
Q. I'll continue now. We'll mark that as Exhibit 1. Based upon your personal knowledge, do you recall that I initiated that move?
A. Yes.
Q. And based upon your personal knowledge, it was accepted by yourself, and to your knowledge, other members of the group as well; do you agree with that?

8

A. Yes.
Q. Now, do you agree that the exhibit shows that we

knew each other, we had talked about such a move?

A. Yes.

Q. Would it be fair to say that based upon your personal knowledge, I was not kicked out of the group that I was in, I moved into your group?

A. Not to my knowledge.

If there had been issues with Defendant's key witnesses as identified in Defense's reponses to Plaintiff's First Set Of Interrogatories, the issues were not illustrative of ongoing behavior with co-workers or managers as the above deposition testimony shows. Furthermore, the above testimony indicates that Plaintiff's move into Bob Pulley's group was proactive, as it was initiated by Plaintiff, and resulted in work arrangement acceptable to Plaintiff's co-workers and management.

In summary as of March 11, 2005, Defendant dismissed any ill feelings in connection with Plaintiff with Exhibit 1 . Defendant's proposed agenda with respect to concern over paranoid behaviors – unsupported. Defendant's concern over Plaintiff's communication – changes day to day and is therefore not recognizable for correction – arbitrary and capricious. However, one fact is clear and that is that communications was an issue. Indeed, reference to it was made on the 2004 Performance and Development Summary which was signed on March 10, 2004. A true and correct copy of the 2004 Performance and Development Summary is enclosed as Exhibit 10. The following day, Plaintiff informed Defendant of the connection between communications and his disability, i.e. stuttering, as noted on the 2004 Performance and Development Summary via Exhibit 10, last page.

Plaintiff clearly expresses his inability to relate to the issue of "effective communications" and notes the connection to stuttering. There are only a few reasons why someone might volunteer such information in connection to stuttering – for instance to meet a listener's obviously unmet expectations and/or because they feel they are unintentionally being harrassed in connection with the speech problem. Furthermore, what constitutes effective communication?

Some would say that effective communication is getting one's point across. Even so such a requirement could be itself arbitrary and capricious because it concerns what someone else is thinking, perceiving, specifically the inducement there of.

The spectrum of effective communication as defined as getting one's point across can be construed as quite broad. As proof, I cite English research

> Aoccdrnig to rscheearch at an Elingsh uinervtisy, it deosn't mttaer in waht oredr the ltteers in a wrod are, the olny iprmoetnt tihng is taht the frist and lsat ltteer is at the rghit pclae. The rset can be a toatl mses and you can sitll raed it wouthit porbelm. Tihs is bcuseae we do not raed ervey lteter by it slef but the wrod as a wlohe. Ceehiro.

The above gibberish does represent effective communications, but only for someone who speaks English. The above paragraph is not English. And so the point can be made that the phrase effective communication is arbitrary and capricious since simply a change in language can render effective communication ineffective.

Indeed there is a real connection to the phrase "effective communication" as explained here, as it arises in the 2004 Performance and Development Summary, as it is referred to in Exhibit 10 last page, and as Exhibit 10 as referred to in Defendant's Motion For Summary Judgement as Exhibit E of Sandra Vanier's Affidavit.

The connection is that I filed my complaint on the basis of perceived speech disability – i.e. the Defendant perceived it worse than it was. My entire motive of alluding to the idea that my speech was not that bad while at Raytheon as illustrated by Exhibit 10 (last page) was because I felt the Defense was perceiving the problem as worse than it was. I was attempting to downplay my speech problem and have it perceived as little as possible because I did not want to be tagged as disabled. While the defense may not have used the word stuttering, the Defense's arbitrary and capricious references to communication in the presence of only one communication problem, i.e. stuttering, indicated to me that the Defense was referring to stuttering. I was sending email because I stuttered. When the Defendant expressed unhappiness with email, I sought to understand how I could change my ways so that my use of email would not be perceived any differently than anyone else's. The Defendant refused to explain in a manner which was not arbitrary and capricious and or untrue ( unsubstantiated for example ambiguous and repetitive – while possibly an isolated incident may be found, there is no norm of such behavior on behalf of Plaintiff which can be established.) I was left without a reasonable accommodation. I did request that the Defense explain both verbally and in writing more than once and copies of such requests are on file with the court as exhibits. I did tell the Defendant both verbally and in writing that I stutter. Indeed all people who were working closely with me verified in their depositions that they were aware that I stutter i.e. Bob Pulley, Manny Goncalves, Al Gaines, Robert Dayson. Plaintiff would hope that the court will recognize that people in general are not speech therapists. They either know that someone stutters or does not and many people think the fact that someone does is indicative that the stutterer is more likely to in certain situations and that these situations must be accounted for possibly by eliminating the person who stutters. Furthermore, Plaintiff himself is not a speech therapist. Plaintiff's statements to whoever with the connotation that his speech problem was not that bad were made with caveats such as: Plaintiff is not a speech therapist. The

phrase "not that bad" is arbitrary and capricious. Comparisons to accents still don't imply that the stuttering is bad or not bad, simply that problems of equal weight are not discriminated against. Plaintiff believed and had reason to believe as explained here that Defense was perceiving the problem as worse than it was, it was impossible for Plaintiff to tell what listener's heard of his speech problem since he substitutes words and on that basis they may not be aware of just how much trouble he was having and so it would have been out of place to reference said problem if people were not aware, while Plaintiff cannot tell what people are thinking, he can see what they are doing and hear what they are saying. Whether people are aware of Plaintiff's difficulties with speech or not does not remove the difficulties, nor the affects of it which include Plaintiff's choice to use email. Plaintiff did inform Defendant of his disability. Now in retrospect, after Plaintiff was terminated he was evaluated as a severe stutterer by a certified speech therapist ( Exhibit 22).

## The Skip Level Meeting

After the first year, Plaintiff was invited by Department Head, John Kelly, to a skip level meeting in which John Kelly explained to attendees what were reasonable expectations for all such as what you would have to do or see happen to reasonably expect a good raise and the types of situations you should want to see yourself in such as working with more than one person so that there would be more than one person's input to say if you had done good or bad the previous year. Plaintiff had been in the lowest raise group the first year and was at the time of the skip level meeting really working with only one person. For the sake of improving, Plaintiff took responsibility and approached John Kelly and repeated what John Kelly had said as explained herein and further elaborated that he had been in the lowest raise group the first year after seeming to have had many accomplishments including a six sigma project and that Plaintiff was currently working with only one person. The associated corresonspondence can be seen in Exhibit 11 and occurred approximately 8/16/2005. In order to fix the year of 2005 and not have it be a repeat of the previous year in the sense of having many accomplishments and being in the lowest raise group and in light of the skip level meeting, Plaintiff did request of John Kelly that he might keep John Kelly informed so that some understanding could be had for the purpose of inducing correction. From an accomplishments point of view, Plaintiff again had good accomplishments and a six sigma project In light of such proactive measures on the part of the Plaintiff, it is difficult for Plaintiff to understand why Defendant seems to feel that he was not taking responsibility. Indeed, Plaintiff took every opportunity to understand and improve the situation which was available to him. Shortly, thereafter Plaintiff was issued his mid year performance 2005 review.

## Sammartano's Mid Year Performance 2005 Review, 8/24/2005

While the Plaintiff's midyear review did express weaknesses as well as strengths, It did express the idea that overall Plaintiff was doing ok as opposed to not ok. On the basis that doing ok would be satisfactory and not doing ok would be unsatisfactory, Plaintiff reasoned that he was doing ok, i.e satisfactory. The review can be seen as Exhibit 12. Plaintiff again took responsibility by asking if Sandra Vanier expected any response, at which point she declined, and Plaintiff then requested to whom Plaintiff should direct any response in light of her declining. At that point, Sandra Vanier agreed that Plaintiff could send an e-mail. Note that Sandra Vanier could have insisted on a certain means of communication or could have insisted that e-mail not be used, but did not. Plaintiff sent an email to further understand any expressed delinquencies expressed in the weaknesses section of the 2005 Mid Year Performance Review. The email in which Plaintiff expressed this enquiry and the associated request for permission to ask ( the ask for permission to ask as it were ) can be seen as Exhibit 13, page 2. For some reason, the Defendant in Defendant's Motion For Summary Judgement has characterized this act of Plaintiff both in it's manner of deployment and intent of responsibility as antagonistic. Plaintiff does not understand how the manner or the request is antagonistic, nor does Plaintiff understand what he could have done differently to accomplish the same intent of clarifying the arbitrary and capricious nature of relevant details in order that delinquencies could be recognized and progress be made.

## Incidents Of October, 2005

On September 30, 2005, Plaintiff was informed that he would be taken off of the project which he was on at that time, i.e. MCDP, at some near date in the future as noted in Exhibit 14. Exhibit 14 was originally written to send to Sandra Vanier and Plaintiff changed his mind after writing it and sent it to himself. Plaintiff did contact John Kelly in regards to this detail and John Kelly's feeling was that sometimes nothing could be done. Nevertheless Plaintiff had tried. Such details are recorded in Exhibit 15. Exhibit 15 even includes mention of Plaintiff's lack of understanding of why his acting lead would respond with, "why do you care?" when Plaintiff asked him when the deadline was. Plaintiff reminded John Kelly of his report of this incident to him in Exhibit 15 and noted that John Kelly had done nothing as can also be seen in Exhibit 15. Further discussions ensued and John Kelly sent an email to human resources saying that Plaintiff had requested a meeting with human resources – something which Plaintiff had never done. Plaintiff cancelled this meeting and contacted human resources on his own by emailing Maria Kumega who had been involved in his hiring. Maria Kumega referred

Plaintiff to the same human resources person, i.e. Heather Lemmon, who John Kelly had referred Plaintiff to explaining that she was the human resources person assigned to the group of people which Plaintiff was in. Emails at the time supplied as Exhibit 16, Exhibit 17, Exhibit 18, Exhibit 19 show that Heather Lemmon at least wrote as if she did not know what this was all about – rather a strange way to begin.....considering Defendant's Motion For Summary Judgement suggests that both Lemmon and Plaintiff had been notified in December of 2004 and in fact stands in contradiction to the idea that there were ongoing behavioural issues. Indeed, if one were to accept the idea that there were ongoing behavioral issues, then wouldn't one have to ask why ten months went by before human resources ever met with Plaintiff? The question almost begs to be asked. When I cancelled the meeting, Heather Lemmon, asked me if I would prefer that just she and I met so that she could assist as a neutral third party –

indeed a lot of leniency being provided to a supposed perpetrator of ongoing problems.

Exhibit 16, Exhibit 17, Exhibit 18, Exhibit 19 supports the idea that the meeting of October 25th was not a meeting for Heather Lemmon to tell Plaintiff things, but for Plaintiff to explain to her details of how the skip level meeting, which Plaintiff had been invited to by management, had lead Plaintiff to report to John Kelly details which Plaintiff responsibily addressed as pertinent issues of concern to any employee as explained in the skip level meeting. John Kelly had failed to be of assistance and Exhibit 15 illustrates Plaintiff's frustration. There was no mention at the October meeting of management's discontent with Plaintiff, rather this meeting had been a result of Plaintiff responsibly acting upon notices of the skip level meeting as what was normal and to be expected by all and Plaintiff taking action to prevent 2005 being a repeat of 2004. The word "notice" as used here is not a notice of delinquency, but a notice of what would have been reasonable expectations for all. Plaintiff was telling Human Resources, i.e. Heather Lemmon, what the problem was. Plaintiff at this point certainly did feel that there was a problem as expressed by his frustration to John Kelly in Exhibit 15. Plaintiff began to feel that his reports to John Kelly were being ignored and that his accomplishments were being ignored.

**Incidents Of November, 2005**

The meeting of November 8th was certainly a surprise to Plaintiff. This was the first time that management expressed any issue with Plaintiff as other issues referred to in Defendant's Motion For Summary Judgement arose as portions of reviews which detailed good things and areas for improvement or arose as a result of the skip-level meeting which Plaintiff followed up on in a proactive way not in light of notices of delinquency, but in light of notice of what were reasonable expectations for all as explained at the skip level meeting and which were not manifested in Plaintiff's Raytheon experience. Plaintiff could not understand why he was at the November meeting as he had many accomplishments, a six sigma project, and had attended a skip level meeting and had acted proactively in an effort to make sure that 2005 would not be a repeat of 2004 in the sense of having many accomplishments, a six sigma project, and being in the lowest raise group and in the sense that Plaintiff had been at least initially primarily working with only one person who was at times abusive to Plaintiff and Plaintiff had noted such abuse to Sandra Vanier and John Kelly ( Exhibit 15 even includes mention of Plaintiff's lack of understanding of why his acting lead would respond with, "why do you care?"). This meeting was with Heather Lemmon and John Kelly. Sandra Vanier was not present although her affidavit claims she was. Heather Lemmon noted that a lot of people think meeting with human resources is a bad thing, but that's it's not. Issues regarding Plaintiff's self evaluation were brought up ( Plaintiff had done well and expressed it. ), a corba course which Plaintiff was not allowed to attend ( Plaintiff had given feedback as he thought management was asking for his feedback and then not allowed to attend the course. ), and the fact that John Kelly neither liked Plaintiff's email nor voice mail ( Plaintiff could not understand how John Kelly expected Plaintiff to communicate with John Kelly. ). John Kelly expressed these ideas, Heather Lemmon acted as a neutral party so she said, and Plaintiff responded as recounted above. Plaintiff was not given

any tasks to accomplish or any agenda to fulfill. From Plaintiff's point of view, management had expressed their concerns, Plaintiff had responded and alleviated them. Heather Lemmon noted that she would record the meeting as more of a personality difference and the meeting concluded.

## Synopsis

The events described above really had no connection expressed or implied. They did not address any ongoing issues and the supporting exhibits shows that the alleged behavorial issues as described in Defendant's Motion For Summary Judgement were an afterthought – a much after thought – as in thoughts at the time of the writing of the Motion For Summary Judgement. Incidents prior to March 11 had been dismissed by the Defendant. The 2005 mid-year review claimed that Plaintiff performance was overall ok i.e. satisfactory. Plaintiff proactively and responsibily followed up on shortcomings of his employment situation ( not notices of delinquency ) as identified in the skip level meeting and Plaintiff's efforts were ignored as were Plaintiff's accomplishments. Plaintiff followed the company policy as best he could in regards to not going over people's heads until John Kelly scheduled a meeting with human resources and claimed Plaintiff had requested it. This did not make sense to Plaintiff and alarmed Plaintiff. Plaintiff cancelled the meeting and set up a meeting of his own to discuss such short comings with human resources alone in the form of the meeting of October 25. In such manner the events linked in the Defendant's Motion For Summary Judgement were not linked in the way described there, but rather in the way described here supported by the associated exhibits of this document. The meeting of November 8 was the first notice of management's discontent in the sense that it was the only notice which did not occur as part of a standard review which discussed strengths and areas for improvement as opposed to just areas of concern. Nevertheless Plaintiff's responses seemed to alleviate management's concerns. Plaintiff was requested to see Dan Musholt which Plaintiff did.

Dan Musholt asked Plaintiff why he was visiting and Plaintiff answered that he was visiting because John Kelly had wished him to. Dan Musholt's further questioning Plaintiff in such regard revealed that Musholt was unable to accept that Plaintiff simply did not have any other information at which time Plaintiff informed Dan Musholt that if he had nothing else to ask that this meeting was apparently over. Dan Musholt recounted the situation in Defendant's Motion For Summary Judgement as regarding that Plaintiff had not been informed as why he was there and Plaintiff claims today that Dan Musholt's perception is consistent with his claims that Plaintiff had not been informed of a situation requiring improvement. ( see Exhibit 20 ) If anything, Plaintiff believed the meeting on November 8th had ended on November 8th. Plaintiff believed he had addressed management's concerns during that meeting and that they were no longer concerns. As no requests were made of Plaintiff, there is no evidence to suggest otherwise.

## The Performance Improvement Plan

Plaintiff was placed upon a performance improvement plan which presented need for improvement in six areas Ability To Prioritize Tasks & Complete Tasks, Communications, Ability To Follow Raytheon Common Processes, Teamwork, Knowledge Of The Bigger Raytheon Picture, Ownership/Accountability Of Issues. Plaintiff's analysis as described in Exhibit 11 ( EEOC claim ) supporting Plaintiff's First Amended Complaint of the Performance Improvement Plan is applicable towards this argument against the Defendant's Motion For Summary Judgement and can be seen as Exhibit 39 of this document. To be used here as Exhibit 39, it has been modified with minor cosmetic changes and with functional additions of section numbers for referencing ( See Exhibit 39 ). This section will detail deposition support for sections of Exhibit 39.

Deposition Support For Exhibit 39 By Section

1. Ability To Prioritize Tasks & Complete Tasks

From Deposition Of Bob Pulley Exhibit 31 ( One Of Plaintiff's Later Technical Leads )

- Bob Pulley identified his technical rating. Reiterated it was a 7 of 9. Testified to the best of his recollection to the validity of rating scale. See Bob Pulley's Technical Input Exhibit 37 page 4 and Rating Scale in Exhibit 38.
- Page 16 Q. "…Were you personally aware of any problems that Steve had with regard to prioritizing and completing tasks?". A. "No."

From Deposition Of Manny Goncalves Exhibit 32 ( of Plaintiff's last project )

- Manny Goncalves identified his technical rating. Reiterated it was a 8 of 9. Testified to the best of his recollection to the validity of rating scale. See Manny Goncalves Technical Input Exhibit 37 page 1 and Rating Scale in Exhibit 38.
- Page 21 Q. "Are you personally aware of any problems that I had with regard to prioritizing and completing tasks?" A. "No."

From Deposition Of Al Gaines Exhibit 33 ( of Plaintiff's last project )

- Page 16 "Q. Were you personally aware of any problems that Steve had with regard to prioritizing and completing tasks?" A. "No."

From Deposition Of Bob Dayson Exhibit 34 ( of Plaintiff's last project )

- Page 18 "Q. Were you personally aware of any problems that Steve had, that I had with regard to prioritizing and completing tasks." THE WITNESS: "Could you repeat that?" Q. "Were you personally aware of any problems that I had with regard to prioritizing and completing tasks?" A. "I wasn't aware of."

2. Communications

From Deposition Of Bob Pulley Exhibit 31 ( One Of Plaintiff's Later Technical Leads )

- Page 6 Q. "Did you personally have any problems with you when I was working for you?". A. "No."

- Page 6 Q. "Did you personally find me antagonistic?" A. "No."
- Page 6 Q. "Did you personally think I was responsible or irresponsible?" A. "Responsible."
- Page 6 Q "Did you personally have any problems in connection with me in e-mail or voice mail?" A. "No."

From Deposition Of Manny Goncalves Exhibit 32 ( of Plaintiff's last project )

- Page 4 "Did you personally have any problems in connection with me and e-mail or voice mail?" A. "No."

From Deposition Of Al Gaines Exhibit 33 ( of Plaintiff's last project )

- Page 5 Q. "Did you personally have any problem in connection with me and e-mail or voice mail?" A. "No."

From Deposition Of Bob Dayson Exhibit 34 ( of Plaintiff's last project )

- Page 4 Q "Did you personally have any problems in connection with me and e-mails?" A. "No problem."

3. Ability To Follow Raytheon Common Processes

From Deposition Of Manny Goncalves Exhibit 32 ( of Plaintiff's last project )

- Page 21 Q "Are you personally aware of Steve, me doing things my own way or in a way so different from other team members that was noticeable in a bad way?" A. "No."

From Deposition Of Al Gaines Exhibit 33 ( of Plaintiff's last project )

- Page 15 "Q. Were you personally aware of Steve doing things in his own way or in a way so different from other group members that it was noticeable in a bad way?" A. "No."

4. Teamwork

From Deposition Of Manny Goncalves Exhibit 32 ( of Plaintiff's last project )

- Page 18 Q. "You stated on your rating of me that you feel I'm a team player. Do you agree with that?" A. "Yes."

From Deposition Of Al Gaines Exhibit 33 ( of Plaintiff's last project )

- Page 15 Q. "Do you personally think I'm a team player?" A. "Yes."

5. Knowledge Of The Bigger Raytheon Picture

From Deposition Of Manny Goncalves Exhibit 32 ( of Plaintiff's last project )

- Page 23 Q. "Do you personally think I had an understanding of the big picture for Raytheon?" A. "Yes."

From Deposition Of Al Gaines Exhibit 33 ( of Plaintiff's last project )

- Page 16 "Q. Do you think I had an understanding of the big picture?" A. "Yes."

6. Ownership/Accountability Of Issues.

From Deposition Of Bob Pulley Exhibit 31 ( One Of Plaintiff's Later Technical Leads )

- Page 6 Q. "Did you personally think I was responsible or irresponsible?"

A. Responsible.

From Deposition Of Manny Goncalves Exhibit 32 ( of Plaintiff's last project )

- Page 4 Q. "Did you personally think I was responsible or irresponsible?" A. "Responsible."

From Deposition Of Al Gaines Exhibit 33 ( of Plaintiff's last project )

- Page 4 Q. "Did you personally think I was responsible or irresponsible?" A. "Responsible."

From Deposition Of Bob Dayson Exhibit 34 ( of Plaintiff's last project )

- Page 4 Q. "When you worked with me, did you personally think I was responsible or irresponsible?" A. "Responsible."

## Additional Conclusions

Note the Analysis of this document is precisely the same with minor cosmetic modification as the associated section of the Plaintiff's claim to the EEOC ( Equal Employment Opportunity Commission, i.e. Exhibit 11 Supporting First Amended Complaint ).

Readers familiar with Exhibit 11 Supporting First Amended Complaint ( see Exhibit 30 ) will only wonder what is the connection between the Defendant's Motion For Summary Judgement which relates concern over behavorial issues and the performance improvement plan. Not only are the details of the performance improvement plan groundless, but they are in addition disconnected from Defendant's claims of ongoing behavorial issues which are also groundless as alleged in the Defendant's Motion For Summary Judgement. Such behavior clearly indicates a lack of focus aside from a focus on communications. And perhaps the one new feature of the Defendant's claims ( from Defendant's Mottion For Summary Judgement ) is a regard for time of day at which voice mail and email are used.

## Time Of Issuance Of Email And Voice Mail

Plaintiff had responsibilities to fulfill during the day. Sometimes Plaintiff did not have time to contact management in regards to these issues of reviews which were above and beyond Plaintiff's responsibilities to produce software until after hours. During other times, Plaintiff felt himself unable to speak or able to engage in dialogue and so Plaintiff purposely waited until he was able to talk ( at least better ) to deliver a voice mail. Plaintiff's obligations in this regard were daily. During those occasions when Plaintiff thought of something after hours or intentionally left something until after hours, there was absolutely no restriction expressed or implied

by Defendant relating to use of email and/or voice mail. In particular, Plaintiff worked all hours of the day and night and sometimes did not get to use email or voice mail until after hours due to other responsibilities of his employment with Defendant. Plaintiff never thought about times which he sent email or voice mail. In particular, Plaintiff believed that sending voice mail after hours was less of an interruption as there was no one there for the ringing phone to interrupt. Plaintiff further reasoned that beyond there being no one there for the ringing phone to interrupt, that he would be providing feedback in such a way that the content of the conversation/details themselves would not be an interruption, but would be presented in such a way as to be replayable, considered and reconsidered, and so from these points of view Plaintiff believed that his use of voice mail and e-mail were less of an interruption to anyone with responsibilities above and beyond interpersonal goals. When such reviews had no connection at all to what Plaintiff was doing, Plaintiff initially issued emails, and when Defendant rose an issue with emails, Plaintiff attempted to use voice mails. Plaintiff was never given any direction with regard to hours of acceptable use. Plaintiff even left voice mails for himself as reminders of things to do. Plaintiff is reasonably sure that he interrupted no one as there was no one there to interrupt nor was it Plaintiff's intention to interrupt, but rather to allow the opportunity for those of genuine intent to create a positive affect. Plaintiff was required to submit weekly activity reports and did and when reviews had no connection to what was happening on a daily and weekly basis Plaintiff responded to that affect. Plaintiff furthermore believed the disconnect of hours and after hours served as a buffer to substantiate that Plaintiff worked and communicated and was not doing one instead of the other. Due to Plaintiff's speech problem, Plaintiff tended to run out of time when delivering a message via voice mail and so would have to call back to continue the message where he had left off. With regard to use of voice

mail, Plaintiff did plan his use of voice mail for use during times when he knew he would not stutter. Plaintiff also believed that by sending voice mail after

hours, he would be able to deliver a rehearsed message, stutter free, at times by re-recording the message. Since there would be no one there to engage Plaintiff in dialogue and thus create a situation in which Plaintiff would be more apt to stutter, Plaintiff could deliver message without any noticeable stuttering impairment.

Deposition Support for Plaintiff's position with regard to time of day and use of email and voice mail is supported by the following

From Deposition Of Bob Pulley Exhibit 31 – "Is there a company policy regarding when e-mails can be sent?" A. "Not that I know of." "So to rephrase those. I was asking, are there only certain hours when e-mail can be used? You might as well just answer again?" A. "No." Q. "Are there certain hours when voice mail can be used?" A. "Like, I said, I don't think so."

From Deposition Of Manny Goncalves Exhibit 32 – "So to your knowledge are there only certain hours when e-mail can be used?" A. "No." Q. "To your knowledge are there only certain hours when voice mail can be used?" A. "No."

From Deposition Of Al Gaines Exhibit 33 - Q. "Are you personally aware of a company policy regarding when e-mails can be sent?" A. "I don't know of one." Q. "Are you personally aware of a company policy regarding when voice mail can be sent?" A. "No."

From Deposition Of Bob Dayson Exhibit 34 - Q. "Are there only certain hours when voice mail can be used?" A. "You're free to use voice mail for company business at any time." Q. "Are there only certain hours when e-mails can be used?" A. "You are free to use e-mail for company business at any time."

Ironically while Defendant's Motion For Summary Judgement draws issue with when Plaintiff used email and voice mail, Heather Lemmon of Human Resources was not able to provide any policy.

From Deposition Of Heather Lemmon Exhibit 35 - Q. " All right. When I was working at Raytheon, do you know if there was a company policy regarding when E-mail could be sent, as in time of day?" A. "I don't recall." Q. "Is there a company policy like that now?" A. "I don't recall."

## Necessity Of Information Technology

Plaintiff must note that the sheer physical placement of personnel and Plaintiff's obligations made communication via any other media other than voice mail or email almost impossible. Human Resources, Heather Lemmon, sat about an 1/8th of a mile away. Plaintiff sat in one of numerous closed areas - a different closed area on a different floor than either John Kelly or Sandra Vanier until well after October 13th of 2005 ( Plaintiff recalls that he moved into their area February 1, 2006). As such before February 1st of 2006, Plaintiff was unable to physically visit Sandra Vanier or John Kelly without contacting them to arrange such a visit – using voice mail or email because they were both in a different closed area to which Plaintiff did not have access. It seemed a time saver to use voice mail or email to just send the message as opposed to making an appointment to meet and deliver the message in person. Plaintiff was required to send a weekly activity report. With this arrangement as described here, life was such that no sooner had Sandra Vanier finished discussing her concerns about email that Plaintiff was again sending her an email which through Plaintiff's way of thinking Plaintiff had to send. Sandra Vanier's concerns did not notify Plaintiff of abuse or that Plaintiff must change his ways. Certainly there was

never at any time mention of time of day for which Plaintiff could send Sandra Vanier voice mail or email. Plaintiff never received a response back from Sandra Vanier to the affect of, "Did you miss the meeting you just attended with me ?????" It would not have even made sense for Sandra Vanier to make such a comment as there were things Plaintiff had to send to Sandra Vanier. As such Plaintiff could not determine what Sandra Vanier wanted in this regard. Her statements were arbitrary and capricious as it was impossible to recognize delinquencies and improvement. Her statements did not even constitute a notification of any delinquency to address. After February 1st, 2006, there was a time when I was in the same closed area as Sandra Vanier and John Kelly. Still Plaintiff had work to do during business hours. Plaintiff saw no purpose in being in Sandra Vanier's or John Kelly's office to speak with them as they might not be there and that could be a bad thing, they may be there and that could be a bad thing, they or someone else may be wherever they thought I should be looking for me. Plaintiff was only interested in delivering a message and therefore used media which would eliminate all other interpretations or at least as many as possible.

## Some Issues Only Mentioned In Motion For Summary Judgement

Issues of Defendant's Motion For Summary Judgement mentioned in no other place could not be addressed during Plaintiff's term of employment because they came up long after Plaintiff's term of employment. While Plaintiff recognizes employment at will with regard to reasons for termination – Performance Improvement Plans are not reasons for termination, but instruments to induce correction and so where arbitrary and capricious statements exist clarification must be sought. Plaintiff did seek such clarification with proper explanation.