# Sammartano Was Discriminated Against On The Basis Of A Disability

Plaintiff, Sammartano is disabled within the meaning of the law. Sammartano was discriminated against on the basis of his disability. Sammartano was denied reasonable accommodation. Sammartano was subjected to a hostile working environment due to his disability. Sammartano was retaliated against in connection with his disability. Sammartano was terminated for non-legitimate, discriminatory reasons in connection with his disability.

## SAMMARTANO IS DISABLED WITHIN THE MEANING OF THE LAW

### EEOC's Position

A disability according to the EEOC ( Equal Employment Opportunity Commission ) passes a three pronged test. A person who has a disability has:

- A physical or mental impairment that substantially limits one or more major life activities; or
- A record of having had such impairment; or

- Is regarded as having such an impairment.

Now Plaintiff recognizes that the EEOC's investigation did not show that Plaintiff's speech problem rose to the level of a disability and the Plaintiff recognizes EEOC's explanations and understands, however Plaintiff submits to the court Exhibit 21 which was issued by the EEOC. The notice is a Dismissal And Notice Of Rights. It is a form letter with check box options clearly stating the EEOC's position. One possible position was indeed that Plaintiff's allegations or word for word, " Your allegations did not involve a disability as defined by the Americans With Disabilities Act." The EEOC representative could have simply checked off this item and it would have been consistent with the EEOC letter generated specifically for this case, but the EEOC did not check this option.

The EEOC checked the option which says, "The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of statutes. This does not certify that the respondent is in compliance with the statues. No finding is made as to any other issues that might be construed as having been raised by this charge." Note that this option is also consistent with what the EEOC letter specific to this case said. In a nutshell the EEOC never says that Plaintiff is not disabled, the EEOC says that the information obtained by the EEOC does not make the Plaintiff's case. The EEOC did have the option of simply checking a box to indicate that the allegation did not involved a disability, but did not. The EEOC is claiming that the case was not made. This should not be a total surprise for the following reasons:

- Plaintiff is not a lawyer and constructed the claim to the EEOC himself. Plaintiff had not included supporting exhibits in the complaint and left it up to the EEOC to contact him to ask for additional information which the EEOC never did. Plaintiff did ask at the time if he would be contacted if

further information was required and he was told that he would be. Plaintiff did call back once to make sure the case was in process and upon learning that it had been assigned to someone, he saw no need to rush the situation and waited to allow the EEOC to do whatever it was going to do. It's not so hard to imagine that the EEOC representative did not know what to ask for as asking for anything in and of itself could be interpreted as bias in the Plaintiff's favor.

- In fact, there was no investigation that Plaintiff was involved with or aware of. While the the claim was filled out in such a way by the EEOC representaive such that it would be co-filed with the Rhode Island Commision for Human Rights, i.e. the state office as opposed to the Federal office, the claim was never filed with the state.

Nevertheless, the EEOC did explain its position in the letter specific to the case and of course by the choice of boxes as explained above – that position being that the case had not been made. During intake, the EEOC representative did not speak with Plaintiff for any length of time and generally asked questions requiring one word answers such as "yes" or "no".

**The Plaintiff Is/Was Disabled**

Since that time Plaintiff has had a recent speech evaluation performed and has been diagnosed as a severe stutterer as shown in Exhibit 22. Plaintiff has also obtained affidavits from Plaintiff's high school instructors from twenty years ago and references them here as Exhibit 23, Exhibit 24. As can be seen especially from the affidavit of Mr. Stone, stuttering was a disabling element of Plaintiff's life even twenty years ago. Plaintiff met with Mr. Stone when he was in high school twenty years ago between five

and ten times a week for two years and then weekly for a third year. Mr. Stone had ample opportunity to be aware of the severity of Plaintiff's stuttering and was in a position as an instructor to know what was normal and what was abnormal just by the experience of having classes of students cycle through his curriculum. Mr. Stone gave his Latin classes a closed book quiz five days a week. A day without a closed book quiz constituted a holiday week. Plaintiff would ask that the court recognize the role of teachers such as Mr. Enright and Mr. Stone in society. Teachers cycle through about thirty students per class and often have to meet with the parents of those students for a total of ninety people per class ( student and parents ). In such manner instructors prioritize and complete tasks and report in triplicate in mass quantity. Clearly a substantial amount of preparation is undertaken to express concepts to students and their parents who are employed in society in all walks of life as white collar and blue collar workers. Such preparation is undertaken in mass quantity that is an entire class. Thus such instructors have the opportunity to acquire knowledge and intelligence with regard to what is normal and what is not and furthermore are burdened by society to justify the student grades which they report to the student's parents who hold positions in society as white collar and blue collar workers in all walks of life. Every single year the opinions of Mr. Enright and Mr. Stone were evaluated by children's parents of all walks of life. How Mr. Enright and Mr. Stone arrived at those opinions were no doubt queried many times to assess whether the problems were in fact the child or the teacher. In this way, while it can be established that knowledge and intelligence are developed as a result of the requirements of society placed upon instructors in the presence of the opportunity to acquire said knowledge and intelligence and requirements to produce reports of such knowledge via report cards and meetings with parents of all walks of life, it can also be established that after college, no one cares about high school. Unlike others associated with this case, they have little conflict of interest today because no

one invests based upon their findings. The idea that Mr. Stone and Mr. Enright would not know what is normal or abnormal and or misrepresent Plaintiff twenty years later is a considerable concept for a juror to believe. The major life activity which Plaintiff was substantially limited in was and is speaking.

From time to time mention will be made of statements Plaintiff has made in connection with his disability. A few such statements in reference to Plaintiff's own disability by Plaintiff will be explained here:

"not that bad" – arbitrary and capricious, Plaintiff is not a speech therapist. What constitutes "not that bad"?

"not very pronounced" – arbitrary and capricious, Plaintiff is not a speech therapist. What constitutes "not very pronounced". Furthermore, the focus in such statement is based upon Plaintiff's perception of how others perceive his own problem other than Defendant. Listener's do not hear when Plaintiff substitutes words or when Plaintiff would stutter but does not because of his choice to use email. During such times while the speech problem is severe, it is not pronounced.

Comparisons to accents - still don't imply that the stuttering is bad or not bad, simply that problems of equal weight are not discriminated against.

Plaintiff's motivation of alluding to the idea that my speech was not that bad while at Raytheon as illustrated by Exhibit 10 ( last page ) was because Plaintiff felt the Defense was perceiving the problem as worse than it was. I was attempting to downplay my speech problem and have it perceived as little as possible because I did not want to be

tagged as disabled. While the defense may not have used the word stuttering, the Defense's arbitrary and capricious references to communication in the presence of only one communication problem, i.e. stuttering, indicated to me that the Defense was referring to stuttering. I was sending email because I stuttered. Plaintiff requested many times what was wrong with his communications and Defendant refused to explain. Such reasoning is not considered speculation. Asking that someone close a window in a room with only one window leaves no question as to which window to close. And when the person to whom the request has been made asks for clarification and receives the emphatic response that the requestor will not explain and ceases discussion, but continues with a glare. The window of discussion is apparent.

When approached while using a cell phone in a library and stared down upon by the approacher who explains, "I can't concentrate with you doing that here. Do you mind?" It's rather obvious that the cell phone and you speaking on the cell phone in a library is being referred to.

Now if the court has not recognized, Plaintiff will note that many involved in this case believe that the Plaintiff's degree of disability should be established by if they mind. In fact, they do mind. They are inconvenienced. And of course they recognize that such position is obnoxious and so attempt to disguise it with behavioral issues of which there are none. There are no behaviors of Plaintiff which do not arise through isolated incidents which are normal for Plaintiff and abnormal in general except stuttering. And the focus has often been not on how Plaintiff is disabled, such as the fact that he uses email because he stutters, but rather upon if listeners mind that he is disabled or upon whether they can understand Plaintiff. Whether listeners can understand Plaintiff or not has nothing to do with difficulties Plaintiff has speaking.

Regardless of how Plaintiff has expressed his speech problem or how others today claim to perceive Plaintiff's speech problem today or claim today how they perceived Plaintiff's speech problem in the past, Plaintiff does have and has had a speech problem and such has been recently verified by a speech therapist as severe, see Exhibit 22 as explained earlier. Whether people are sympathetic to it or not does not remove the problem and Exhibit 22 together with the Plaintiff's use of email because he stutters today and Plaintiff's use of email because he stuttered during his period of employment indicate Plaintiff is substantially limited in the major life activity of speaking and according to the affidavits of Mr. Stone and Mr. Enright, Plaintiff was substantially limited in the major life activity of speaking in the form of stuttering twenty years ago. It's not too much for a jury to believe that Plaintiff is and has been substantially limited in the major life activity of speaking for the past twenty years. Major life activities include speaking. See Reynold v Brock, 815 F2nd 571 (9th Cir 1987 ). Here, Plaintiff has put forth evidence that he has an impairment and had an impairment during his period of employment with Defendant that prevents or severly restricts(ed) Plaintiff from performing activities that are of "central importance to most people's daily lives." Toyota Motors Mfg., Kentucky, Inc. v Williams, 534 US 184, 198 (2002). The evidence indicates that Plaintiff's stutter is so severe as to restrict him from performing activities that are of "central importance to most people's daily lives" in the sense that Plaintiff does not speak when Plaintiff can use email. In fact Plaintiff asserts and did assert while employed by Defendant that he uses and used email because he stutters. In this case Plaintiff has clearly put forth evidence that his stuttering substantially limited his "ability to work, speak, and otherwise excel in each area of his life related to his employment." Blagrove v Walgreen Co., No. 06-P-870, 2007 WL 1791692 (Mass. App. Ct. June 21, 2007).

Contrary to an argument sometimes made, the U.S. District Court in *Detko v. Blimpies Restaurant*, 924 F.Supp. 555 (S.D.N.Y. 1996), did not hold that stuttering could not qualify as a disability under the Americans with Disabilities Act. The Court merely held that, in order to invoke protection under the ADA, the plaintiff cannot simply plead in his complaint that he "stutters." The Court said that the plaintiff must plead facts showing that his stuttering comes under one of the statutory definitions of a "disability" as set forth in the Act. However, Mr. Detko had failed to plead facts in his complaint that would bring his stuttering under one of the statutory definitions of "disability." The court stated:

"A disability is defined as 'a physical or mental impairment that substantially limits one or more of the major life activities of such individual . . . or being regarded as having such an impairment." 42 U.S.C. sec. 1232(2)(A). "Although speaking is a major life activity, see 29 C.F.R. sec. 1630.2(i), **Detko has not alleged that his impediment substantially limits his speaking or that he is regarded as having such an impairment**. To the contrary, he merely alleges that he stutters, and has particular difficulty with the letter 'M.'" Id., at 557 (emphasis added). A "physical or mental impairment" is: (1) Any physiological disorder, or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems; neurological, musculoskeletal, special sense organs, respiratory ( including speech organs ), cardiovascular, reproductive, digestive, genito-urinary, hemic and lymphatic, skin, and endocrine; or (2) Any mental or phychological disorder, such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities. 29 C.F.R. § 1630.2(h); see also Bragdon v. Abbott, 524 U.S. 624, 631-32 (1998) (using 28 C.F.R. § 41.31(b)(1) definition of impairment in ADA case).

Therefore, the Court dismissed Detko's complaint **without prejudice**. In other words, the Court allowed Mr. Detko the opportunity to rewrite his complaint to allege additional facts. It is not known whether he ever did so, because there are no further published opinions in

that case. Without excessive digression, Plaintiff will note that a substantial number of words in his dictionaries have the letter "M". The paper which could be saved by discarding all the words with the letter "M" from the English language and its dictionaries is quite substantial. Detko's argument is not lengthy, ambiguous, or repetitious. In some ways Detko's argument is clear and concise and not exactly arbitrary or capricious. Nevertheless, the point of the court presiding over Detko's case is made. In fact the point is made so well, that Plaintiff will today ask the court why Defendant is viewed any differently than Detko. Defendant has merely stated allegations using arbitrary and capricious phrases with terms such as lengthy, bizarre, rambling, long, non-understandable, antagonistic, ambiguous, and even repetitive and yet no notices of delinquency have been produced, no list of tasks which illustrate said failures have been provided, no clarification of the arbitrary and capricious has been provided except for additional arbitrary and capricious statements and or statements which are untrue and or mischaracterizations as explained in this document, the claim to the eeoc which is at the court as Exhibit 11 supporting the first amended complaint, and as explained in other documents presented to the court as exhibits by Plaintiff. Indeed, Defendant's productions have been summary like data as opposed to incident data on the basis that such production would be overburdensome for a billion dollar company. Yet according to society the production of such data is not overly burdensome for any high school instructor.

In light of Plaintiff's use of email because he stutters, Plaintiff avoids many of the afflctions discussed in Andersen v. Fuddruckers, Inc., No. Civ. 03-3294, 2004 WL 2931346 (D. Minn. Dec. 14, 2004) because the email functioned and functions as a reasonable accommodation. By using the reasonable accommodation of email together with word substitution and selecting when to communicate verbally, Plaintiff can enjoy a

reasonably normal life, not to say that the disability is gone or not present, but to say that Plaintiff can be reasonably accommodated.

**The Plaintiff Was Regarded As Disabled By Defendant**

Clearly Defendant regarded Plaintiff as having a communications problem as depicted in the Performance Improvement Plan section Communications. Indeed, Plaintiff does have a communications problem, Plaintiff stutters. Defendant began as early as the 2004 Performance Development Summary, Exhibit 10, referring to Plaintiff's delinquencies relative to "effective communications". In association with the assigned time to discuss such matters, Plaintiff did respond the following day by informing Defendant of the connection between communications and his disability, i.e. stuttering, as noted on the 2004 Performance and Development Summary via Exhibit 10 last page. Plaintiff clearly expresses his inability to relate to the issue of "effective communications" and notes the connection to stuttering ( on the last page of Exhibit 10 ). As explained earlier in this document, there are only a few reasons why someone might volunteer such information in connection to stuttering – for instance to meet a listener's obviously unmet expectations and/or because they feel they are unintentionally being harrassed in connection with the speech problem. And so the point was made earlier in this document that the phrase effective communication is arbitrary and capricious. In such manner the Defense continued to use arbitrary and capricious phrases like effective communications and associating or mischaracterizing those arbitrary and capricious statements with other arbitrary and capricious phrases which have a positive connotation such as clear and concise in the guise of illustrating what the Plaintiff lacked. During Plaintiff's period of employment, Plaintiff was not being arbitary and capricious. Plaintiff has continued to be case specific in the sense of using case specific examples. Since Plaintiff is often unable to complete his train of thought verbally without stuttering or often unable to keep his train

of thought because he stutters, he has used email. The non-arbitrary and non-capricious information as Plaintiff has expressed it in his emails and voice mails has been characterized by the Defendant as voluminous, bizarre, rambling, long, non-understandable, lengthy, antagonistic, ambiguous, and even repetitive – in other words the Defense uses arbitrary and capricious phrases which have a negative connotation along with just allegations which have no support, such as (unnecessarily) repetitive, to describe Plaintiff's case specific non-arbitrary and non-capricous information which Plaintiff submits. There is only one communication problem which Plaintiff exhibits which is different from the norm which is true and not an isolated incident and that is stuttering. Therefore Plaintiff is alleging that Defendant Raytheon regarded his stuttering as substantially limiting one or more major life activities. See Cook v. R.I. Dep't of Mental Health, Retardation, & Hosps., 10 F.3d 17, 23 (1st Cir. 1993) (plaintiff had to prove that defendant treated her impairment (whether actual or perceived) as substantially limiting one or more of her major life activities);Toyota Motor Mfg., Ky., Inc. v. Williams, 534 U.S. 184, 198 (2002) (ADA)(discussing "major life activity" to include "those activities that are of central importance to daily life."

Plaintiff is alleging that Defendant Raytheon regarded his stuttering as substantially limiting in the major life activity of speaking, in the major life activity of communications, and in the major life activity of working. See [is] "regarded as having such an impairment." 42 U.S.C. § § 120102(2), 12112; Sutton v. United Air Lines, Inc. 527 U.S. 471, 489-90 (1999) (ADA) (discussing the "regarded as having" standard); Murphy v United Parcel Serv., Inc., 527 U.S. 516, 521-25 (1999)(ADA)(same);Sheehan v. City of Gloucestor, 321 F.3d 21, 25-26 (1st Cir. 2003)(although city/employer regarded plaintiff as capable of work as police officer, to meet "regarded as" standard, plaintiff "would have to show that theCity regarded his hypertension as rendering him unable to perform a broad range of jobs."); Bailey v. Georgia-Pacific Corp., 306 F.3d 1162, 1166-67 (1st Cir. 2002)(same); Santiago

Clemente v. Executive Airlines, Inc., 213 F.3d 25, 33-34 (1st Cir. 2000) (ADA)(discussing and rejecting plaintiff's arguments that she had a record of impairment and that she was regarded as having an impairment). Deposition testimony already provided in this document illustrates that Raytheon's allegations are unsupported.

## SAMMARTANO WAS SUBJECT TO ADVERSE ACTION, DISCRIMINATION ON THE BASIS OF HIS DISABILITY

Sammartano was working for Raytheon for two years. Plaintiff had all sorts of accomplishments. Plaintiff had awards. At the end of two years Defendant pulled a performance improvement plan out of a hat which had no connection to reality. The performance improvement plan was all pretexts as explained in Exhibit 39 for the purpose of providing evidence as noted in Shorette v. Rite Aid of Me., Inc, 155 F.3d 8, 12-13 (1st Cir. 1998) ("evidence must be of such strength and quality as to permit a reasonable finding that the ... [termination] was *obviously or manifestly unsupported*") (emphasis in original) (citations and internal quotation marks omitted). Again, the same deposition testimony already provided in this document illustrates that Raytheon's allegations are unsupported. Moreover, the ultimate inference of discrimination is stronger when the reason for terminating the employee is "accompanied by a suspicion of mendacity." Neri v. Ross-Simons, Inc., 897 A.2d 42, 50 (R.I. 2006) (quoting Ctr. for Behavioral Health, R.I., Inc. v. Barros, 710 A.2d 680, 685 (R.I. 1998)). Plaintiff does not wish to be unnecessarily repetitive, however, with the purpose of making sure that the reader knows exactly what testimony is being referred to here, Plaintiff will state it here again. The following deposition testimony is the testimony being referred to as already mentioned in this section and in the previous section. Other previously stated testimony may also be relevant.

Deposition Support For Exhibit 39 By Section

Ability To Prioritize Tasks & Complete Tasks

From Deposition Of Bob Pulley Exhibit 31 ( One Of Plaintiff's Later Technical Leads )

- Bob Pulley identified his technical rating. Reiterated it was a 7 of 9. Testified to the best of his recollection to the validity of rating scale. See Bob Pulley's Technical Input Exhibit 37 page 4 and Rating Scale in Exhibit 38.
- Page 16 Q. "...Were you personally aware of any problems that Steve had with regard to prioritizing and completing tasks?". A. "No."

From Deposition Of Manny Goncalves Exhibit 32 ( of Plaintiff's last project )

- Manny Goncalves identified his technical rating. Reiterated it was a 8 of 9. Testified to the best of his recollection to the validity of rating scale. See Manny Goncalves Technical Input Exhibit 37 page 1 and Rating Scale in Exhibit 38.
- Page 21 Q. "Are you personally aware of any problems that I had with regard to prioritizing and completing tasks?" A. "No."

From Deposition Of Al Gaines Exhibit 33 ( of Plaintiff's last project )

- Page 16 "Q. Were you personally aware of any problems that Steve had with regard to prioritizing and completing tasks?" A. "No."

From Deposition Of Bob Dayson Exhibit 34 ( of Plaintiff's last project )

- Page 18 "Q. Were you personally aware of any problems that Steve had, that I had with regard to prioritizing and completing tasks." THE WITNESS: "Could you repeat that?" Q. "Were you personally aware of any problems that I had with regard to prioritizing and completing tasks?" A. "I wasn't aware of."

Communications

From Deposition Of Bob Pulley Exhibit 31 ( One Of Plaintiff's Later Technical Leads )

- Page 6 Q. "Did you personally have any problems with you when I was working for you?". A. "No."
- Page 6 Q. "Did you personally find me antagonistic?" A. "No."
- Page 6 Q. "Did you personally think I was responsible or irresponsible?" A. "Responsible."
- Page 6 Q "Did you personally have any problems in connection with me in e-mail or voice mail?" A. "No."

From Deposition Of Manny Goncalves Exhibit 32 ( of Plaintiff's last project )

- Page 4 "Did you personally have any problems in connection with me and e-mail or voice mail?" A. "No."

From Deposition Of Al Gaines Exhibit 33 ( of Plaintiff's last project )

- Page 5 Q. "Did you personally have any problem in connection with me and e-mail or voice mail?" A. "No."

From Deposition Of Bob Dayson Exhibit 34 ( of Plaintiff's last project )

- Page 4 Q "Did you personally have any problems in connection with me and e-mails?" A. "No problem."

Ability To Follow Raytheon Common Processes

From Deposition Of Manny Goncalves Exhibit 32 ( of Plaintiff's last project )

- Page 21 Q "Are you personally aware of Steve, me doing things my own way or in a way so different from other team members that was noticeable in a bad way?" A. "No."

From Deposition Of Al Gaines Exhibit 33 ( of Plaintiff's last project )

- Page 15 "Q. Were you personally aware of Steve doing things in his own way or in a way so different from other group members that it was noticeable in a bad way?" A. "No."

Teamwork

From Deposition Of Manny Goncalves Exhibit 32 ( of Plaintiff's last project )

- Page 18 Q. "You stated on your rating of me that you feel I'm a team player. Do you agree with that?" A. "Yes."

From Deposition Of Al Gaines Exhibit 33 ( of Plaintiff's last project )

- Page 15 Q. "Do you personally think I'm a team player?" A. "Yes."

Knowledge Of The Bigger Raytheon Picture

From Deposition Of Manny Goncalves Exhibit 32 ( of Plaintiff's last project )

- Page 23 Q. "Do you personally think I had an understanding of the big picture for Raytheon?" A. "Yes."

From Deposition Of Al Gaines Exhibit 33 ( of Plaintiff's last project )

- Page 16 "Q. Do you think I had an understanding of the big picture?" A. "Yes."

7. Ownership/Accountability Of Issues.

From Deposition Of Bob Pulley Exhibit 31 ( One Of Plaintiff's Later Technical Leads )

- Page 6 Q. "Did you personally think I was responsible or irresponsible?"

A. Responsible.

From Deposition Of Manny Goncalves Exhibit 32 ( of Plaintiff's last project )

- Page 4 Q. "Did you personally think I was responsible or irresponsible?" A. "Responsible."

From Deposition Of Al Gaines Exhibit 33 ( of Plaintiff's last project )

- Page 4 Q. "Did you personally think I was responsible or irresponsible?" A. "Responsible."

From Deposition Of Bob Dayson Exhibit 34 ( of Plaintiff's last project )

❖ Page 4 Q. "When you worked with me, did you personally think I was responsible or irresponsible?" A. "Responsible."

Deposition Support Regarding Usage Of Email / Voice Mail ( not Exhibit 39 support )

Deposition Support for Plaintiff's position with regard to time of day and use of email and voice mail is supported by the following

From Deposition Of Bob Pulley Exhibit 31 – "Is there a company policy regarding when e-mails can be sent?" A. "Not that I know of." "So to rephrase those. I was asking, are there only certain hours when e-mail can be used? You might as well just answer again?" A. "No." Q. "Are there certain hours when voice mail can be used?" A. "Like, I said, I don't think so."

From Deposition Of Manny Goncalves Exhibit 32 – "So to your knowledge are there only certain hours when e-mail can be used?" A. "No." Q. "To your knowledge are there only certain hours when voice mail can be used?" A. "No."

From Deposition Of Al Gaines Exhibit 33 - Q. "Are you personally aware of a company policy regarding when e-mails can be sent?" A. "I don't know of one." Q. "Are you personally aware of a company policy regarding when voice mail can be sent?" A. "No."

From Deposition Of Bob Dayson Exhibit 34 - Q. "Are there only certain hours when voice mail can be used?" A. "You're free to use voice mail for company business at any time." Q. "Are there only certain hours when e-mails can be used?" A. "You are free to use e-mail for company business at any time."

Ironically while Defendant's Motion For Summary Judgement draws issue with when Plaintiff used email and voice mail, Heather Lemmon of Human Resources was not able to provide any policy.

From Deposition Of Heather Lemmon Exhibit 35 - Q. " All right. When I was working at Raytheon, do you know if there was a company policy regarding when E-mail could be sent, as in time of day?" A. "I don't recall." Q. "Is there a company policy like that now?" A. "I don't recall."

Plaintiff hereby claims that he has demonstrated that there were no behavorial issues. Even if the court has some reservations, Plaintiff has produced "evidence that would support conflicting conclusions" to those presented by the Defendant and in such cases summary judgement should be denied. See Mohr v. Dustrol, Inc., 306 F3rd. 636 (8th Cir, 2002). In light of the explanation of how there were no behavorial issues as explained in this document, the above deposition support for allegations of Plaintiff, and the usage of unsupported arbitrary and capricious phrases in conjunction with untrue statements, the only connection to reality was a connection to the fact that Plaintiff stutters. I was sending email because I stutter. It was easier for me. In response to the performance improvement plan, Plaintiff mentioned that Plaintiff stutters and Plaintiff requested reasonable accommodations and Plaintiff explained that he was sending email because he stuttered. Plaintiff sought to understand how Plaintiff could change his ways so that Plaintiff's usage of email would not be perceived any differently than anyone else's. The defendant ignored Plaintiff's requests for reasonable accommodations and refused to engage in dialogue in regards to the issue, but in subsequent performance improvement plan meetings again reiterated that even Plaintiff's current emails were an issue in that they were rambling and non-understandable. Rather than argue what it means to be arbitrary and capricious, Plaintiff short-circuited the entire problem and requested that Defendant sit down, print out,

and review Plaintiff's emails with Plaintiff to explain how they were flawed and Defendant refused. Although the plaintiff "bears the burden of proposing an accommodation that would enable him [or her] to perform [the] job effectively and is, at least on the face of things reasonable." Kvorjak v. Maine, 259 F 3.d 48, 55 (1st Cir. 2001) (ADA); Reed v. LePage Bakeries, Inc., 244 F.3d 254, 258-260 (1st Cir. 2001) (ADA)(once plaintiff has met his or her burden, defendant bears the burden of proving that the proposed accommodation would be an undue hardship); An employer may be liable for a failure to engage in this interactive process if the plaintiff can demonstrate that "had a good faith interactive process occurred, the parties could have found a reasonable accommodation that would enable the disabled person to perform the job's essential functions." Kvorjak, 259 F.3d at 52; Jacques v. Clean-Up Group, Inc. 96 F.3d 506, 515 (1st Cir. 1996)(ADA)(upholding judgement for the defendant but noting that "there may well be situations in which the employer's failure to engage in an informal interactive process would constitute a failure to provide a reasonable accommodation that amounts to a violation of the ADA"). Plaintiff did request that Defendant explain both verbally and in writing more than once. Plaintiff did tell the Defendant that Plaintiff stutters both verbally in writing more than once. Plaintiff hereby claims that Defendant's refusal as stated here beyond being instance of refusing to engage in dialogue and refusal to provide reasonable accommodation also represents adverse action in the sense of failing to give the Plaintiff something that would have been a benefit to the employment relationship. See Lyons v. Gordon R. England, 307 F 3rd. 1092 (9th Cir. 2002)

Plaintiff explained to Defendant that their refusal was a lack of equal employment opportunity in email as shown in Exhibit 29 and in retaliation Lyons v. Gordon R. England, 307 F 3rd. 1092 (9th Cir. 2002)(discussing unlawful retaliation) Defendant escorted Plaintiff

out and later demanded that Plaintiff see a psychiatrist capitalizing on the connection between mental illness and stuttering.

Plaintiff did things in such a way that Plaintiff acted responsibly even when addressing allegations about Plaintiff to the extent that no one was hurt, killed, or damaged monetarily, but Defendant did not and instead discriminated against Plaintiff in connection with his disability. Consequently Plaintiff suffered damages. Our Supreme Court has held that prohibited discrimination "is not limited to 'economic' or 'tangible' discrimination. The phrase 'terms, conditions, or privileges of employment' evinces a congressional intent to 'strike at the entire spectrum of disparate treatment...' in employment." Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 64 (1986)(quoting Los Angeles Dep't of Water & Power v. Manhart, 435 U.S. 702, 707 n.13 (1978)). Defendant need only have engaged in dialogue to explain what the problem was. Kvorjak, 259 F.3d at 52; Jacques v. Clean-Up Group, Inc. 96 F.3d 506, 515 (1st Cir. 1996)(ADA)(upholding judgement for the defendant but noting that "there may well be situations in which the employer's failure to engage in an informal interactive process would constitute a failure to provide a reasonable accommodation that amounts to a violation of the ADA").

## SAMMARTANO WAS DENIED REASONABLE ACCOMODATION

According to Freadman v. Metro. Prop. and Cas. Ins. Co., 484 F.3d 91 (1st Cir. 2007), To survive a motion for summary judgment on a reasonable accommodation claim, an ADA plaintiff must produce enough evidence for a reasonable jury to find that: (1) he is disabled within the meaning of the ADA; (2) he was able to perform the essential functions of the job with or without a reasonable accommodation; and (3) the defendant, despite knowing of the plaintiff's disability, did not reasonably accommodate it. Americans with Disabilities Act, § 2 et seq., 42 U.S.C.A. § 12101 et seq.; Fed Rule Civ. Proc 56©, 28 U.S.C.A. Plaintiff has established that he is disabled by law as discussed above in the sense of presenting evidence that his stuttering is so severe as to restrict him from performing activities that are of "central importance to most people's daily lives" in the form of his speech evalutation, Exhibit 22, the affidavits of Mr. Enright and Mr. Stone, Exhibits 23 and 24, and the fact that he uses email because he stutters. Additionaly Plaintiff has put forth evidence indicating that Raytheon perceived his stuttering to be so severe as to constitute a

disability under the law as explained above. Therefore, Plaintiff has demonstrated that he is a qualified person with a disability. The Defendant is an employer covered by the ADA. Defendant was informed of Plaintiffs disability on the dates note as followings.

**Defendant Was Informed**

Defendant was informed of Plaintiff's stuttering on the following dates

March 11, 2005 in connection w/ Plaintiffs 2004 Year End Review (Exhibit10 last page),

October 13, 2005 in connection with reporting issues to human resources ( Exhibit 25 ),

January 16, 2006 in a response sent to human resources, Heather Lemmon, and Lou Dipalma to Defendant's placing Plaintiff on a Performance Improvement Plan ( Exhibit 26 page nine items 2 and 4).

Note that Plaintiff volunteered such information – to meet listeners' obviously unmet expectations and/or because Plaintiff felt unintentionally harrassed in connection with his disability. Plaintiff did not and could not assume that everything was about speech as such a stance could be construed as paranoid or some variation thereof and Plaintiff did not. Plaintiff addressed his disability as applicable within the context of the situation and so noted it to Defendant in like manner. Plaintiff informed Defendant that he used email because he stutters.

**Plaintiff Requested Reasonable Accommodation**

Plaintiff's requests for reasonable accommodations are embodied in Plaintiff's attempts to engage in dialogue for the purpose of reaching an agreement/understanding on how Plaintiff's practice of using email could be employed in a way which would have been perceived no differently than it's use by other employees as the reasonable accommodation of email was already available to all and was being restricted for Plaintiff.

Plaintiff's attempts to reach such agreement are supported by the following:

Exhibit 26 sections 1.3, 5.2, 5.5, 5.6, 5.7, 5.8, Expectations 2, 4

Exhibit 27 % of rambling to Lou Dipalma

Exhibit 28 sent in response to meetings – First Amended Complaint Exhibit 21

Exhibit 29 ( alleged threat ) references that they ignored my attempt

**Defendant Refused To Engage In Dialogue**

On or about November 10, 2003, the Plaintiff was hired by Defendant, Raytheon, as a Software Engineer. Plaintiff had all sorts of accomplishments, awards, and during all relevant time periods the Plaintiff's work performance was satisfactory. On January 13th of 2006, the Defendant placed the Plaintiff on a Performance Improvement Plan which had no connection to reality. The Performance Improvement Plan was arbitrary and capricious. Plaintiff produced an unrequested timely response (Exhibit 26) to the Performance Improvement Plan and delivered said to the Defendant on 9:34 am the following Monday, January 16. The response mentioned the Plaintiff's speech problem in addition to addressing every aspect of Performance Improvement Plan by seeking clarification for 54 topics raised by the plan with an average response per topic of 8 single spaced lines of text delivered over eight pages with one additional page as an introduction. Defendant ignored the effort of the responses (Exhibit 26) to the extent of seemingly not being aware of any of it and claiming not to have read it. In so doing Defendant never engaged in dialogue to address the topics of the 54 topics which related to Plaintiff's stuttering and requests for reasonable accommodation.

**Exhibit 26 section 1.3**

1.3 I have a copy of emails between Sandra and I which include me mentioning my receipt of the above and asking her if it will be ok to respond. She first declines, at which point I accept her answer and ask her who to respond to in place of her to present my aside at which point she accepts. I asked her for permission to email her my responses presenting my opinion and facts relative to the review and she accepted. This was not the first time when I queried Sandra Vanier in regards to whether I issue too many emails to her regarding company business which involved me.
email.

As can be seen from the excerpt above from my performance improvement plan responses, section 1.3, I asserted that I had investigated, via Exhibit 13, the mid-year review, Exhibit 12, and requested explanation and attempted to define what I had done wrong. Management never indicated at this time how my attempt to follow up in connection with my mid-year review failed as they ignored all of Exhibit 26. It was not until the Defendant's Motion For Summary Judgement that I discovered that Exhibit 13 of this document had been characterized by the Defendant as antagonistic. It is not clear today how Exhibit 13 is antagonistic. In the context of the situation, the information conveyed in Exhibit 26, section 1.3, can be taken to report that Plaintiff was indeed taking responsibility even in the aspect of use of email, and such notification of responsibility is tantamount to requesting credit for Plaintiff's attempts to be responsible. Such credit could be construed as reasonable accommodation, yet Exhibit 26 was ignored in it's entirety. Clearly, section 1.3 above is conversation provoking in the sense of attempting to engage in dialogue.

**Exhibit 26 Section 5.2**

5.2 On a few occasions I began to suspect that I was sending too many emails to Sandra Vanier and so explicitly sent her an email stating such. I never received reponses or notices pressing for a change in my ways. One particular occasion the response came back in multiple choice format asking if the reason was

1. because I didn't like her
2. I can't recall this item
3. or was it just that she was willing to hear me out. ( in her own words )

I responded that it was 3 and we seemed to moved on. On other occasions she did agree that my email was a lot, but never mentioned that I must change my ways. I did make a decision to intentionally reduce the number of emails which I sent to Sandra Vanier and on at least one occasion, and I actually think a few, she commented, in a joking manner mind you, on how happy she was at having not received so many emails from me recently. Still she never sent me back a response to an email explaining that it in particular was an example of an unnecessary email. I don't recall even one email explicitly having the tone that I must change my ways, and or that there was no way that I could continue sending her emails in the volume that I was. Nor do I recall any emails from her which were of the tone that this particular email represented the n-th time which she had informed me of some discontent on her part in connection with my issueance of email to her. Perhaps I didn't receive them? She never took the time to tell me in person.

As can be seen from the excerpt above from my performance improvement plan responses, section 5.2, mentions among other things that "I never received responses or notices pressing for a change in my ways." It can be easily seen in context that I am referring to use of email. Indeed Plaintiff continues to say in section 5.2 above that Sandra Vanier "never sent me back a response to an email explaining that it in particular was an example of an unnecessary email. I don't recall even one email explicitly having the tone that I must change my ways, and or that there was no way that I could continue sending her emails in the volume that I was. Nor do I recall any emails from her which were of the tone that this particular email represented the n-th time which she had informed me of some discontent on her part in connection with my issuance of email to her." Clearly, I am asking for acknowledgement of these statements OR for the production of proof notifying that I am in error, AND OR I am engaging in dialogue to make it clear that if something is more that what I expect is wanted is wanted the Defendant can tell me yet, as explained Exhibit 26 was ignored in it's entirety. Clearly, section 5.2 above is conversation provoking in the sense of attempting to engage in dialogue to the end of pressing for information on how Plaintiff could change his ways at

the time to use email in such a ways in order that Plaintiff's email would be received no differently than anyone else's. In that sense, it is a request for reasonable accommodation, since in the context, that section 5.2 was a response a performance improvement plan section on communications. As it was, Exhibit 26 was ignored in its entirety and Plaintiff was left without a reasonable accommodation in light of Defendant's unhappiness with they way he was using email at the time and due to Defendant's failure to engage in dialogue. Such dialogue may have resulted in discussion regarding his disability or it may not have, regardless, either way a solution could have been arrived at and Plaintiff would have had a reasonable accommodation and Plaintiff's termination would have been avoided. Remember, section 5.2 represented Plaintiff's feedback to one of 54 topics. Plaintiff was provided the 54 topics on Friday and delivered his responses the following Monday morning at 9:34am – a timely effort which was all but ignored.

**Exhibit 26 Section 5.5**

5.5 By the time of my 2005 mid-year review ( aka 8/24/2005 ), I had on my own chosen to reduce the number of emails I was sending to Sandra Vanier. I read the review and decided that I disagreed. I had combined feelings that I did not want to send too many emails and that I needed to speak with someone else, but I did not want to violate Bill Swanson's rule number 18, don't go over a person's head without giving them a chance to respond. I have copies of emails to Sandra Vanier and in which I specifically ask her if she expects responses. She replies that she does not. I ask her who I should speak to if she is not the person to respond to. At this point she sent another email accepting responses.

As can be seen from the excerpt above from my performance improvement plan responses, section 5.5, I expressed the idea that my actions were influenced by three factors: First, I believed the review was in error. Second, on my own initiative I was attempting to reduce the number of emails which I sent, Third, I acted in keeping with Bill Swanson's Rule #18. With those three factors in mind I asked Sandra Vanier if she would accept responses. When she said no, I asked her who I should respond to. At that point, she accepts my responses. Plaintiff was attempting to be accountable/responsible with use of email as Sandra Vanier could have suggested some

other way to communicate, yet she did not ( see Exhibit 13 ). Again in the context of the situation, an express method of requesting acknowledgement if nothing more i.e. reasonable accommodation. Yet the Defendant ignored Plaintiff's effort, and indeed characterized all of Exhibit 26 as evidence of his "bizarre and unacceptable conduct only got worse after he received the PIP. He wrote a lengthy ( i.e. nine (9) pages ) and rambling…" One may well wonder if the Defendant did not wish to discuss the 54 topics, why did the Defendant bring them up.

**Exhibit 26 Section 5.6**

5.6 In an effort to build my effective communication perhaps we can view emails of others which represent effective communication. I am willing to believe that Sandra Vanier does not have anything against me, so I assume that she is saving emails from other people as well. Of course, I imagine that she must have far fewer from others as the volume which I send is being reported as being so much higher than the norm. Still twenty percent of a hundred is only twenty. I would like to see how my emails stand up against those of my peers or if I merely being placed under the spotlight to make scene in disregard for the quality of my emails and or in absence of the lack of quality of the emails of others.

As can be seen from the excerpt above from my performance improvement plan responses section 5.6 above, Plaintiff expressly requests a way to build his effective communications. Plaintiff was sending email as an already available reasonable accommodation because he stuttered. Defendant expressed unhappiness with email leaving Plaintiff without a reasonable accommodation. Plaintiff expressly requested here for a non-arbitrary and non-capricious explanation of how Plaintiff could use email without it being perceived as any different than anyone else's – a reasonable accommodation. Ignored by Defendant as all of Exhibit 26 was.

**Exhibit 26 Section 5.7**

5.7 Even if the volume of emails which I send is higher than the norm, people are immortalized for their idiosyncrasies. As a child I initially did not stutter and my father called me the motor-mouth - I talked a lot and added to the language words of my own making. Teen-age girls are touted as always being on the phone, etc. These are not issues of termination, but issues of uniqueness, comedy, and simple mathematics – somebody has to have the highest volume of email sent. Is Sandra Vanier simply refusing to grant me another credit which I so dearly deserve – aka The King Of Email ?

As can be seen from the excerpt above from my performance improvement plan responses section 5.7 above, an express request for credit – credit, acknowledgement, all forms of reasonable accommodation, yet it was apparently too much for Plaintiff to ask for. Too overburdensome for a billion dollar company to provide. All ignored by Defendant.

**Exhibit 26 Section 5.8**

5.8 Sandra Vanier does not seem to know I am a human being. She issues reviews which characterize the last 730 days of my life and is surprised at the flurry of emails created. She only wonders what angel

from heaven or hell has brought to her such a deliverance.
Reviews constitute a characterization of the last 365 or 730 days of a person's life. Inaccurate characterizations or unfair characterizations rob one not only of one's past, but also of one's future and in so doing create a life sentence for the victim. One percent of 730 days is 7.3 days. I am sure I took less than one percent of the time under consideration in discussing the characterization of it.

As can be seen from the excerpt above from my performance improvement plan responses section 5.8 above in context - an express request for credit as a human being – credit, acknowledgement, all forms of reasonable accommodation, yet it was apparently too much for Plaintiff to ask for. Too overburdensome for a billion dollar company to provide. Ignored by Defendant.

2.0 I used to have a speech problem and I still have a vestage of a speech problem. I will do what I can with voice mail. My emails are usually pretty good. Furthermore, a lot of people get into problems when attempting to summarize for instance the last 730 days in thirty seconds. That's not a lack of communication skill – that's a lack of understanding on the part of the listener of the true complexity of the issue. You can't stuff 730 days into a 30 second bag.

As can be seen from the excerpt above from my performance improvement plan responses section 2.0 of Expectations of Standards to be met. Clearly, a conversation provoking statement, yet ignored.

4.0 Toastmasters will not help me. I have no fear of public speaking. I have a problem speaking period. How many times must I repeat myself before I am heard?

As can be seen from the excerpt above from my performance improvement plan responses section 4.0 of Expectations of Standards to be met. Another, a conversation provoking statement, yet ignored.

The Plaintiff was granted a new section manager per request. The Performance Improvement Plan included weekly meetings. The Plaintiff was eager to remain employed and continue getting awards for his software and so allowed the Defendant to raise whatever issue was of interest. During the first weekly meeting Defendant sought from the Plaintiff evidence of due diligence to which the Plaintiff reminded the Defendant of the timely sixteen page response. The Defendant dismissed the effort as

refusing to move forward. Defendant continued to state numerous allegations. The Plaintiff would focus on each issue and explain how it was one sided and or lacked support. The Plaintiff was eagerly listening for supporting substance, something tangible, something beyond just an allegation. The Plaintiff did not hear anything beyond an allegation or a relation which was one-sided. The Plaintiff would explain such to the Defendant and ask for relevant information/elaboration and the Defendant would change the subject. Defendant claimed emails of the Plaintiff were rambling and non-understandable. The Plaintiff finally heard something of substance.

The Plaintiff reminded the Defendant of Defendant's stated interest in moving forward and that as a new Section Manager representative of the Defendant that only a handful of emails had been submitted to him. The Defendant reasserted that Plaintiff's emails were rambling and non-understandable. Rather than argue what it means to be arbitrary and capricious, Plaintiff short-circuited the entire problem and requested that Defendant sit down, print out, and review Plaintiff's emails with Plaintiff to explain how they were flawed. Defendant emphatically refused.

The Plaintiff forwarded all nine emails to Human Resources and a superior requesting explanation. While asking for further reasonable accommodation, Exhibit 27 records the event and Exhibit 28 contains all the emails forwarded. A week later zero had been provided.

As a result of Defendant's refusal to engage in dialogue and because Plaintiff stutters, Plaintiff sent an email, Exhibit 29, to Defendant notifying Defendant of Defendant's lack of participation, notifying Defendant of Defendant's failure to explain flaws with emails and, and notifying Defendant that the events as they were transpiring constituted a lack of equal employment opportunity for Plaintiff. Defendant made no effort whatsoever to correct Defendant's actions.

Plaintiff was escorted out. Had Plaintiff not stuttered, he would not have used email. No review of Plaintiff's notification would have been possible and Plaintiff would not have been terminated.

**SAMMARTANO WAS SUBJECTED TO A HOSTILE WORKING ENVIRONMENT DUE TO HIS DISABILITY**

Plaintiff has established that he is disabled by law as discussed above in the sense of presenting evidence that his stuttering is so severe as to restrict him from performing activities that are of "central importance to most people's daily lives" in the form of his speech evalutation, Exhibit 22, the affidavits of Mr. Enright and Mr. Stone, Exhibits 23 and 24, and the fact that he uses email because he stutters. Additionaly Plaintiff has put forth evidence indicating that Raytheon perceived his stuttering to be so severe as to constitute a disability under the law as explained above. Therefore, Plaintiff has demonstrated that he is a qualified person with a disability.

- On March 11, Plaintiff issued the last page of Exhibit 10 which clearly expresses his inability to relate to the issue of "effective communications" and notes the connection to stuttering. There are only a few reasons why someone might volunteer such information in connection to stuttering – for instance to meet a listener's obviously unmet expectations and/or because they feel they are unintentionally being harrassed in connection with the speech problem. And/or to discover what constitutes effective communication. Why the phrase is arbitrary and capricious has been explained in this document. Defendant made no clarification and yet held Plaintiff accountable to said undefined metric. Such actions do create a hostile environment and or constitute disparate treatment.

- Plaintiff used email because he stuttered. Defendant expressed unhappiness with Plaintiff's email and refused to explain how emails were flawed leaving Plaintiff without a reasonable accommodation. Such actions do create a hostile environment and or constitute disparate treatment.

- Plaintiff was placed on a performance improvement plan which was arbitrary and capricious. The performance improvement plan was all pretexts and was executed with a focus on communications. Such actions do create a hostile environment . and or constitute disparate treatment.

- The Plaintiff created Exhibit 26 over the weekend and delivered it to Human Resources representative, Heather Lemmon, on Monday, January 16, 2006. All told, Plaintiff identified approximately 54 topics which Defendant had brought up as part of Defendant's Performance Improvement Plan in eight pages, the first page being an introduction in which he states that the document is arbitrary and capricious. Over the following eight pages of 54 lines each, Plaintiff on average attempts to clarify the arbitrary and capricious nature of each topic with eight lines

of text – on average. Plaintiff's genuine attempt to deal with Defendant's incomplete Performance Improvement Plan was later characterized on Defendant's Motion For Summary Judgement as described on Page 8 as evidence of "Sammartano's bizarre and unacceptable conduct only got worse after he received the PIP. He wrote a lengthy ( i.e. nine (9) pages ) and rambling single- spaced electronic mail message to Lemmon discussing his response to the PIP... " – quite a hostile depiction of non-arbitrary and non-capricious dialogue of Plaintiff and a substantial attempt of Plaintiff to seek clarity brought forth by the obscurity of the Performance Improvement Plan. Such actions do create a hostile environment and or constitute disparate treatment.

- Sammartano was alleged to have difficulties in all the areas outlined by the performance improvement plan and none of Defendant's allegations were supported by deposition testimony of people who had worked closely with Plaintiff on Plaintiff's last project. Such unsupported allegations served as torment and mental anguish to Plaintiff as Defendant would not define what specifically Plaintiff had failed to do or had done wrong. No information was provided which noted incidents or notifications of delinquency in association with each delinquency. Only the issue of communication persisted in the presence of only one communication problem which Plaintiff was aware of – Plaintiff's stuttering. Such actions do create a hostile environment and or constitute disparate treatment.
- Plaintiff testified to Defendant's First Set Of Interrogatories, Interrogatory 19, Identify and describe the basis for **Plaintiffs** statement "that the meetings themselves were to intentionally place him in a position of difficulty in light of his difficulty talking" as alleged in paragraph 30 of the First Amended Complaint. Plaintiff had noted to Defendant that he stutters. Stuttering is a difficulty talking. Plaintiff also noted

this fact to the Defendant. Meetings involve a lot of talking. So after Plaintiff informed Defendant that Plaintiff had difficulty talking, Defendant created a situation which revolved about talking. The meetings seemed to have been created to intentionally place the Plaintiff in a position of difficulty and to allow the Defendant to take advantage of the Plaintiff in connection with his disability. While the meetings were supposed to be in connection with a performance improvement plan, the detail of the plan seemed to be beside the point. Such actions do create a hostile environment and or constitute disparate treatment. .

- As part of the performance improvement plan meetings, the Defendant asked Plaintiff what Plaintiff needed to complete the pip. Plaintiff expressed the idea that he could not understand why he was on the PIP and referenced his sixteen pages of responses. Defendant asserted that Plaintiff's responses were rambling and non-understandable and continued to state that Plaintiff's email were also rambling and non-understandable. Plaintiff requested that flaws of emails be explained. Defendant refused. Such actions do create a hostile environment and or constitute disparate treatment.

- When Defendant emphatically refused, Plaintiff notified Defendant of Defendant's lack of participation, and Defendant had Plaintiff escorted out. Defendant later asked Plaintiff to see a psychiatrist to maybe return to work. At no time did Defendant define what was wrong in a manner which was not arbitrary and capricious so that Plaintiff could correct his actions. Such actions do create a hostile environment. and or constitute disparate treatment.

- Alleging behavorial issues when no behavorial issues are present creates a hostile environment and or constitute disparate treatment.

- Plaintiff was using email because he stuttered. Email dialogue initiated by Plaintiff generated for well intentioned purposes was mischaracterized as antagonistic, rambling, and using other arbitrary and capricious words and phrases with negative connotations. My responses to such mischaracteristics were at times mischaracterized even further as being paranoid on the basis that those who were making the mischaracterizations as identified by Plaintiff were plotting against Plaintiff. Defendant made no effort to investigate the mischaracterizations, but only exerted effort to further blame Plaintiff.

  There is nothing antagonistic about Exhibit 13.

  There is nothing threatening about Exhibit 29.

  Such actions do create a hostile environment and or constitute disparate treatment.

- It appears based upon how Defendant's Motion For Summary Judgement is written that my attempts to engage in dialogue whether for the purpose of understanding a problem so that Plaintiff could recognize it, identifying an issue as arbitrary and capricious in general or requiring further explanation, or identifying the need to make a request for reasonable accommodation were mischaracterized as antagonistic and my reaction to such mischaracterization were mischaracterized as paranoid and such refusal to engage in dialogue is hostile and or constitutes disparate treatment.

DeCamp v. Dollar Tree Stores, Inc., 875 A.2d 13 (R.I. 2005) states opinions regarding testing for a gender-based hostile environment. It would seem plausible that a similar test could be executed for disability based hostile environment. If nothing more, the case is made for disability based disparate treatment as discussed in DeCamp V. Dollar Tree

Stores, Inc., 875 A.2d 13 (R.I. 2005) for gender – here an overlooked adverse action is that Plaintiff has been labeled as ineligible for rehire, Exhibit 40, apparently in connection with Defendant's unwritten rules concerning rehire and Defendant's policies of misconduct, see Raytheon Co. v. Hernandez, 540 U.S. 44 (2003). There has been no miconduct committed by Plaintiff, Defendant has created a work environment which adversely treats Plaintiff disparately in connection with his disability and in such manner Defendant has discriminated against Plaintiff on the basis of his disability.

## SAMMARTANO WAS RETALIATED AGAINST

Plaintiff's requests for elaboration and notice of Defendant's failure to participate were retaliated against as illustrated by Defendant's response to Exhibit 29. Plaintiff was escorted out. Plaintiff used email because he stutters. Now Plaintiff is aware that Defendant has characterized Exhibit 29 as threatening. Nevertheless, even it was threatening the entire situation could have been avoided. Plaintiff was sending email because Plaintiff stutters. It was easier for Plaintiff. In response to the performance improvement plan, Plaintiff mentioned that Plaintiff stutters and Plaintiff requested reasonable accommodations and Plaintiff explained that he was sending email because he stuttered. Plaintiff sought to understand how Plaintiff could change his ways so that Plaintiff's usage of email would not be perceived any differently than anyone else's. The defendant ignored Plaintiff's requests for reasonable accommodations and refused to engage in dialogue in regards to the issue, but in subsequent performance improvement plan meetings again reiterated that even Plaintiff's current emails were an issue in that they were rambling and non-understandable. Rather than argue what it means to be arbitrary and capricious, Plaintiff short-circuited the entire problem and requested that Defendant sit down, print out, and review Plaintiff's emails with Plaintiff to explain how they were flawed and Defendant refused. Although the plaintiff "bears the burden of proposing

an accommodation that would enable him [or her] to perform [the] job effectively and is, at least on the face of things reasonable." Kvorjak v. Maine, 259 F 3.d 48, 55 (1st Cir. 2001) (ADA); Reed v. LePage Bakeries, Inc., 244 F.3d 254, 258-260 (1st Cir. 2001) (ADA)(once plaintiff has met his or her burden, defendant bears the burden of proving that the proposed accommodation would be an undue hardship); An employer may be liable for a failure to engage in this interactive process if the plaintiff can demonstrate that "had a good faith interactive process occurred, the parties could have found a reasonable accommodation that would enable the disabled person to perform the job's essential functions." Kvorjak, 259 F.3d at 52; Jacques v. Clean-Up Group, Inc. 96 F.3d 506, 515 (1st Cir. 1996)(ADA)(upholding judgement for the defendant but noting that "there may well be situations in which the employer's failure to engage in an informal interactive process would constitute a failure to provide a reasonable accommodation that amounts to a violation of the ADA"). Plaintiff did request that Defendant explain both verbally and in writing more than once. Plaintiff did tell the Defendant that Plaintiff stutters both verbally in writing more than once. Plaintiff hereby claims that Defendant's refusal as stated here beyond being instance of refusing to engage in dialogue and refusal to provide reasonable accommodation also represents adverse action in the sense of failing to give the Plaintiff something that would have been a benefit to the employment relationship. See Lyons v. Gordon R. England, 307 F 3rd. 1092 (9th Cir. 2002). Thus Plaintiff engaged in protective activity, suffered an adverse employment action, and there was a causal link between the protected activity and the adverse job action in which case a prima facie case of retaliation under Title VII is shown. See Benoit v. Technical Mfg. Corp., 331 F.3d 166 (1st Cir. 2003); Shoucair v. Brown Univ., 917 A.2d 418 (R.I. 2007)

## SAMMARTANO WAS TERMINATED FOR NON-LEGITIMATE, DISCRIMINATORY REASONS IN CONNECTION WITH HIS DISABILITY

According to Reynold v. Brock 815 F2nd 571 (9th Cir 1987) To establish prima facie case of wrongful termination under Rehabilitation Act, plaintiff must demonstrate both that she is otherwise qualified handicapped individual, and that she was terminated because of her handicap; if she can establish prima facie case of wrongful termination, then burden of producing evidence shifts to defendant to demonstrate legitimate nondiscriminatory reason for terminating her. Rehabilitation Act of 1973, § 2 et seq., 29 U.S.C.A. § 701 et seq.

Plaintiff sent email because he stuttered. Plaintiff was escorted out because of an email sent to Defendant illustrating Defendant's lack of participation. Had Plaintiff not stuttered, he would not have used email to the degree that he did. No review of Plaintiff's notification would have been possible because it would have never been sent. The circumstances would have been entirely different. As it is Plaintiff's notification email clearly notes Defendant's lack of participation, notes Plaintiff's requests to explain flaws with emails and Defendant's failure to do so, notes that the events as they have transpired constitute a lack of equal employment opportunity. Defendant made no effort whatsoever to correct Defendant's actions.

Defendant need only have engaged in dialogue to prevent the situation. Clearly, this paragraph could have been written from an entirely different viewpoint, that being that if Defendant had participated, whether Plaintiff stuttered or not would not have been an issue, however, Defendant exercised it's capabilities to the limited extent that outcomes of events hinged upon Plaintiff's stuttering as explained here. Indeed, Defendant is neither responsible nor held responsible for anything. More specifically if Defendant had participated, Defendant could have enaged in dialogue and explained what the problem was in a non-arbitrary and non-capricious way and Plaintiff could have corrected it. Other reasons for termination proposed by Raytheon including behavorial issues, the performance improvement plan were not supported and or untrue.

# Conclusion

For the reasons set forth, Plaintiff objects to Summary Judgement and in the event of Summary Judgement believes Summary Judgement should be entered in Plaintiff's favor.

**TABLE OF AUTHORITIES**

**Cases**

Andresen v. Fuddruckers, Inc., No. Civ. 03-3294, 2004 WL 2931346 (D. Minn. Dec. 14, 2004)............................48

Bailey v. Georgia-Pacific Corp., 306 F.3d 1162, 1166-67 (1st Cir. 2002)........................50

Benoit v. Technical Mfg. Corp., 331 F.3d 166 (1st Cir. 2003)..........................................77

Blagrove v. Walgreen Co., 868 N.E.2d 953 (Mass. App. Ct. 2007).................................46

Bragdon v. Abbott, 524 U.S. 624, 631-32 (1998) (using 28 C.F.R. § 41.31(b)(1).............47

Cook v. R.I. Dep't of Mental Health, Retardation, & Hosps., 10 F.3d 17 (1st Cir. 1993).....50

DeCamp v. Dollar Tree Stores, Inc., 875 A.2d 13 (R.I. 2005) ....................................6,72

Detko v. Blimplies Rest., 924 F.Supp 555 (S.D.N.Y. 1996)......................................47,48

Freadman v. Metro. Prop. and Cas. Ins. Co., 484 F.3d 91 (1st Cir. 2007). .......................59

Jacques v. Clean-Up Group, Inc. 96 F.3d 506, 515 (1st Cir. 1996) (ADA)..............57,58,74

Kvorjak v. Maine, 259 F 3.d 48, 55 (1st Cir. 2001) (ADA)..............................57,58,73,74

Lyons v. Gordon R. England, 307 F 3rd. 1092 (9th Cir. 2002)................................57,74

Meritor Sav. Bank, FSB v. Vinson 477 U.S. 57, 64 (1986) (quoting Los Angelas Dep't of Water & Power V. Manhart, 435 U.S. 702,707 n.13 (1978))......................................58

Mohr v. Dustrol, Inc., 306 F3rd. 636 (8th Cir, 2002)...................................................56

Murphy v. United Parcel Serv., Inc., 527 U.S. 516, 521-25 (1999) (ADA).....................50

Neri v. Ross-Simons, Inc., 897 A.2d 42 (R.I. 2006) .....................................................51

Newport Shipyard Inc. v. R.I. Comm'n for Human Rights, 484 A.2d 893 (R.I. 1984)...........6

Raytheon Co. v. Hernandez, 540 U.S. 44 (2003).........................................................73

Reed v. LePage Bakeries, Inc., 244 F.3d 254, 258-260 (1st Cir. 2001) (ADA)............57,73

Reynold v. Brock 815 F2nd 571 (9th Cir 1987).......................................................46,75

Santiago Clemente v. Executive Airlines, Inc., 213 F.3d 25, 33-34 (1st Cir. 2000) (ADA)..........................................................................................51, 77

Sheehan v. City of Gloucestor, 321 F.3d 21, 25-26 (1st Cir. 2003)....................50

Shorette v. Rite Aid of Me., Inc, 155 F.3d 8 (1st Cir. 1998) ....................51

Shoucair v. Brown Univ., 917 A.2d 418 (R.I. 2007) ....................74

Stacks v Southwestern Bell Yellow Pages, Inc., 27 F.3d 1316 (8th Cir. 1994)....................77

Sutton v. United Air Lines, Inc. 527 U.S. 471, 489-90 (1999) (ADA)

Thomas v. First Nat'l Bank, 111 F.3d 64, 66 (8th Cir. 1997) ( quoting Kriss Communication Co., 58 F.3d 1276, 1282 (8th Cir. 1995))....................77

Tardie v. Rehab. Hosp. of R.I., 6 F. Supp. 2d 125 (D.R.I. 1998) ....................6

Toyota Motor Mfg., Ky., Inc. v. Williams, 534 U.S. 184, 198 (2002) (ADA)....................46,50

**Statutes**

42 U.S.C. §

12102(2)....................

**Rules**

Fed.R.Civ.P.

56(c)....................

[illegible] 2/4/2008
75 [illegible] St #4
Pawtucket, RI 02860
401.335.3412

# CERTIFICATION OF SERVICE

To:

Joseph D Whelan

Hinckley, Allen & Snyder LLP

50 Kennedy Plaza, Suite 1500

Providence, RI 02903

(401) 274-2000

(401) 277-9600 ( fax )

I hereby certify that on the 4th day of February, 2008, a copy of the foregoing document was served by mail on the above-named party.

Stephen Sammartano 2/4/2008

Stephen Sammartano

75 Arthur St #4

Pawtucket, RI 02860

401.335.3412

stevesammartano@hotmail.com