**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| **STEPHEN T. SAMMARTANO** | : | |
| **Plaintiff** | : | |
| | : | |
| **Vs.** | : | **C.A. No. 06-535S** |
| | : | |
| **RAYTHEON** | : | |
| **Defendant** | : | |

## PLAINTIFF'S FACTS OF DISPUTE TO RAYTHEON'S STATEMENTS OF UNDISPUTED MATERIAL FACTS

## I. Introduction

Per Defendant's Motion For Summary Judgement "Defendant Raytheon's Statement Of Undisputed Material Facts", in connection with an action brought by the Plaintiff, Stephen T. Sammartano, seeking declaratory and injunctive relief, litigation expenses and other equitable relief, including back pay, as well as compensatory and punitive damages to redress unlawful discrimination in employment the Plaintiff suffered on account of his perceived stutter disability in violation of the Americans with Disabilities Act of 1990, 42 U.S.C. sections 12101 et seq. ("ADA"), Plaintiff stipulates these facts of dispute.

## II. Facts Of Dispute

1. Agree.
2. No Contest.
3. Agree.
4. Dispute. The Rhode Island Unemployement Commission has declared Plaintiff's last day of employment as February 6, 2006. Raytheon initially claimed that Plaintiff quit. See Exhibit 1 support for this document.
5. Plaintiff has no knowledge with regard to statements of this section of Raytheon's Undisputed Facts which refer to alleged facts after Plaintiff's period of employment with Defendant. Plaintiff admits Sandra Vanier was his section manager for the times

noted. The following subsections correspond to the sections of the affidavit of Sandra Vanier.

5.1 Plaintiff recognizes the statements as vague and broad and therefore has no knowledge of said statements.

5.2 Plaintiff does not knowledge of all facts stated.

5.3 No Contest..

5.4 , 5.5 Dispute. Plaintiff agrees that electronic messages were sent from Christine Lowrie to Sandra Vanier as exhibited. Plaintiff denies any allegations expressed or implied by Sandra Vanier, Christine Lowrie, or this section of Sandra Vanier's affidavit. Plaintiff has no knowledge of Christine Lowrie's difficulties, attempts, distresses, and paranoid behaviors aside from the fact that she was crying at time of the incident. At the time and today, Plaintiff was and is unable to recognize any faults with the emails which Plaintiff sent. Plaintiff can see nothing which necessarily requires correcting nor any issues to prevent. At the time, only one of the emails was shown to Plaintiff – the one referencing digital logic. Sandra Vanier showed Plaintiff the email during a meeting which included Sandra Vanier and Plaintiff. Beyond noting Christine Lowrie's distress, Sandra Vanier did not explain how the email was flawed. Plaintiff was unable to determine what the problem was. Plaintiff recalls an association made to Plaintiff regarding the email and Plaintiff telling Christine Lowrie how to do her job. Plaintiff was not telling Christin Lowrie how to do her job. Christine Lowrie was pressing Plaintiff for feedback and Plaintiff responded as best as Plaintiff could. If Christine Lowrie did not want such feedback from Plaintiff, Christine Lowrie could have said what she did want in way that would not be arbitrary and capricious to Plaintiff. Plaintiff's responses were both to provide Christine Lowrie what she wanted with due diligence and upon any failure to so identify the characerisitcs of that failure for purpose of providing Christine

Lowrie what she wanted or developing a plan by which Plaintiff and Christine Lowrie could translate to a mutually understood dialect. If Christine Lowrie had a problem or felt that Plaintiff was responsible for what happened if anything happened she could have just said so to Plaintiff. However, the issues expressed to Sandra Vanier by Christine Lowrie were never expressed to Plaintiff for the most part except as described herein. Plaintiff was attempting to keep Christine Lowrie updated. Christine Lowrie was serving as a temporary lead ( manager ) while Dick Amundson was in Sudburry. CEO Bill Swanson's unwritten rules of management rule #18 claim it to be a serious offense to go over a person's head in regards to an incident without giving the person a chance to address it. Christine Lowrie did just that – she went over Plaintiff;s head without giving Plaintiff a chance to address it. On other occasions where this rule of Bill Swanson applied, the remark was made that the person in question was already over Plaintiff's head, however, whether they are over Plaintiff's head or not is not the issue, the point is, if Christine Lowrie had a problem with Plaintiff she could have expressed it in a way that Plaintiff could recognize to address it or come up with a plan. As it was she left such responsibility to Plaintiff and Plaintiff undertook such responsibility. It was never Plaintiff's attempt to bother Christine Lowrie but to provide her with what she needed. Plaintiff mentioned Plaintiff's dismay at the one email which was shown to Plaintiff to John Kelly and even remarked that Plaintiff wished that Plaintiff would receive such good emails. Plaintiff discussed with him at the time if Plaintiff should approach Christine Lowrie for the purpose of apologizing and we both reached the conclusion that Plaintiff's attempts would probably only serve to agitate an old wound. However, such volunteering to apologize was in no way an admission by Plaintiff, but an attempt to keep the peace. As such, inferences implied by the Defense are arbitrary and capricious. They stand in contrast to the

Defense's stated agenda to address paranoid behavior as the acts of Christine Lowrie described within these sections of Sandra Vanier's affidavit can readily be seen as paranoid. Plaintiff did ask in his interrogatories if anyone else was requested to see a psychiatrist and Defendant answered that no one was. Plaintiff has noted as far back as his appeal to Rhode Island Unemployment Compensation ( see Exhibit 2 ) which is copied verbatim (almost) into Exhibit 4 of Plaintiff's First Amended Complaint ( i.e. complaint to EEOC ) as the section Experiences Of Employment that Plaintiff was aware that people in the first group that he worked with were unhappy with him, while people in a group in which he was interfacing with approved of both him and his work and they were using the same technology. Plaintiff cultivated this association very carefully as noted in Exhibit 3 A,B,C, and D support for this document. Note that CEO Bill Swanson's unwritten rules of management #6 encourage this association for all. Note that Exhibit 3 A, B, C, D are in direct contradiction to Defendant's claims that Plaintiff was always the first to be removed from projects. Exhibit 3 A, B, C, D span a time frame of sixty days during which time Plaintiff very carefully cultivated an existing relationship with a group doing similar work on the basis that such group members had absolutely no problem with Plaintiff or his work and were in a position to use and evaluate his work. In addition, the ease with which the opportunity became available for Plaintiff to move into a group so accepting was a spurning experience to Defendant as so noted in Exhibit 3C and 3D. The availability of a place for Plaintiff to move to was organized in a premeditated manner by Plaintiff and was met with so openly and immediately by members of the group which Plaintiff was moving into that some concern arose in Defendant over Plaintiff leaving existing group without an expert ( see Exhibit 3C ). Furthermore, Plaintiff must reference Exhibit 1 of Plaintiff, Stephen Sammartano's Opposition To Defendant's Motion For Summary

Judgement as an indication from the Defense, albeit Sandra Vanier herself whose affidavit this document is in response to, that things were indeed not so bad. Christine Lowrie had expressed resentment over Plaintiff leaving the group which Plaintiff was in as she was provided with such information – too much information Plaintiff would say especially for a temporary lead. Plaintiff believes that Christine Lowrie may have been retaliating at the time and Plaintiff noted so to Sandra Vanier explicitly verbally and in email. Plaintiff admits that the only such notice that seems to have survived is that of Exhibit 3C and 3D.

5.6 Dispute. In general, I have no knowledge of Sandra Vanier's concerns.

. I see no example of the allegation of antagonistic email. I am aware of Exhibit G which is characterized as antagonistic, yet I can't see how it is antagonistic. Note that at the time no one said that I was being antagonistic and so no one explained in what way I was antagonistic or what constituted being antagonistic. I see no mention of antagonistic email in the performance improvement plan. I was never informed of any antagonistic behavior until Defendant's Motion for Summary Judgement. I did ask for permission to provide feedback to what is labeled as Exhibit G of Sandra Vanier's Affidavit of Defendant's Motion For Summary Judgement.as can be seen in Exhibit 5. Sandra Vanier did and had express(ed) a problem with email which is why I was asking for permission to send as can be seen in Exhibit 5. Note that Sandra Vanier could have requested some other means of communication if email was bothering her that much, yet she did not. As can be seen in Exhibit 5, she said that I could send her an email. While Sandra Vanier had expressed problems with Plaintiff's emails, her statements were always arbitrary and capricious. I suggested that we print my emails to study how they were flawed so that she could explain how I could recognize and prevent any delinquencies. She declined. See Exhibit

26 sections 5.2, 5.5, and 5.6 of Plaintiff's Opposition To Summary Judgement. Aside from my stuttering, I was unable to recognize any flaws in my voice mails or emails. I worked all hours of the day/night while at Raytheon, and I can't say that I ever gave it thought that maybe I should not use the services to do my job which the company was providing me. However, I did use email because I stuttered and I used voice mail knowing that I stuttered. Because I stutter, if I had to make a phone call and email was not available, I would at times wait until I knew I would be able to talk without stuttering and or I would wait until I thought that no one would be there so that I could deliver a rehearsed message which I would not stutter on and avoid the situation where someone might be there to answer as it would create a situation in which I would be more prone to stuttering. Sometimes when I used voice mail the fact that I could not say the words I wanted to hampered the message. At other times because of my difficulty speaking I would run out of time and have to call back to complete the message.

5.7 Dispute. I have no knowledge of any meeting between Sandra Vanier and Heather Lemmon on December 7, 2004. In regards to item (i) of this section, I moved into a new group on August 24th, 2004 and even though the company did decompose the new group as explained in Exhibit 2 of this document and create a new group within the group, my rating from the new group leader, i.e. Bob Pulley, was a 7 ( see Exhibit 6 ) the implication being that I was doing well. Bob Pulley expressed no "loose cannon" concerns. The fact that Sandra Vanier was concerned was in contrast to what she was telling me, in contrast to how Bob Pulley was rating me, and certainly to what she expressed to me in March of 2005, see Exhibit 4. The implication was that I was doing well. No loose cannon concept came on the performance improvement plan. Plaintiff has no

knowledge of (ii) expressed in the way it is. Plaintiff is aware that Sandra Vanier had a problem with Plaintiff's email and voice mail per Performance Improvement Plan and Plaintiff attempted to address such issues by identifying exactly what metrics needed to be worked on including the need for any elaboration of requests and requests for reasonable accommodations and such attempts of Plaintiff are partially recorded in Exhibit 3 supporting First Amended Complaint. Plaintiff's attempts were denied. Plaintiff worked all hours of the day and night and used services to do Plaintiff' job while Plaintiff was at work. Plaintiff was never instructed to avoid email and/or voice mail during off hours. To Plaintiff, voice mail and email seemed to be an easy way to handle concerns when the person to ask was not there to answer them and an easy way to reasonably accommodate his suttering as explained in sections 5.6 of this document. In regards to section (iii), section (iii) is in contradiction to Exhibits 3A,B,C,D. Plaintiff cultivated an association with a group he had been in association with very carefully as noted in Exhibit 3 A,B,C, and D support for this document. Note that CEO Bill Swanson's unwritten rules of management #6 encourage this association for all. Note that Exhibit 3 A, B, C, D are in direct contradiction to Defendant's claims that Plaintiff was always the first to be removed from projects. Exhibit 3 A, B, C, D span a time frame of sixty days during which time Plaintiff very carefully cultivated an existing relationship with a group doing similar work on the basis that such group members had absolutely no problem with Plaintiff or his work and were in a position to use and evaluate his work. In addition, the ease with which the opportunity became available for Plaintiff to move into a group so accepting was a spurning experience to Defendant as so noted in Exhibit 3C and 3D. The availability of a place for Plaintiff to move to was organized in a premeditated manner by Plaintiff and was met with so openly and immediately by members of the group

which Plaintiff was moving into that some concern arose in Defendant over Plaintiff leaving existing group without an expert ( see Exhibit 3C ). In regards to (iv), Plaintiff did act responsibly in the form of requesting associated information as so done in Exhibit G of Sandra Vanier's Affidavit of Defendant's Motion For Summary Judgement and such actions of Plaintiff were discouraged ( Defendant was not really interested in speaking to Plaintiff, see Exhibit 5, and note that Plaintiff had to ask to respond and Defendant first rejected and then accepted as shown in Exhibit 5 and by the way accepted a response by email! Yet supposedly there was a concern with email. ). Plaintiff then responded with Exhibit G of Sandra Vanier's Affidavit of Defendant's Motion For Summary Judgement in an attempt to clearly remove any arbitrary and capricious characteristics of delinquencies so that improvement could be made. Such actions of Plaintiff were ignored for their intended purpose and according to the Defendant's Motion For Summary Judgement mischaracterized as antagonistic. Plaintiff today cannot recognize Exhibit G of Sandra Vanier's Affidavit of Defendant's Motion For Summary Judgement as antagonistic.

5.8 Dispute. Plaintiff has no knowledge of behavioral issues. No one ever claimed that Plaintiff was eliciting antagonistic reactions or made any statements which expressed a similar concept to help me recognize and or prevent such flaws in myself. Plaintiff's comments made in Plaintiff's Objection and Motion For Continuance filed 11/8/2007 in which Plaintiff used the word antagonistic and derivatives thereof were made in reference to Defendant's Motion For Summary Judgement and it's supporting documents and do not refer to anything else. Plaintiff does not see such flaws in myself. However, in connection with 5.15 below, it appears based upon how Defendant's Motion For Summary Judgement is written that my attempts to engage in dialogue whether for the purpose of understanding a problem so that Plaintiff could recognize it, identifying an issue

as arbitrary and capricious in general or requiring further explanation, or identifying the need to make a request for reasonable accommodation were mischaracterized as antagonistic and my reaction to such mischaracterization were mischaracterized as paranoid in the sense of me noting the mischaracterizations were attributed as me believing that people were plotting against me. Refusal to engage in dialogue, but instead to claim that Plaintiff is paranoid is hostile. Plaintiff sees no support for Sandra Vanier's statements in Exhibit 6 or anywhere else. In Exhibit 4 which was three months later, Sandra Vanier expressed the idea that there was no problem.

5.9 Dispute. On January 21, 2005 Christina Erwin opened communication in an electronic and public way which was published directly to me as an email. Plaintiff responded based upon my sincere interest in the topic coincidentally stating views which were in direct agreement with those of Christina Erwin – Plaintiff agreed with Erwin's topic of communication, he was supporting it. Plaintiff was offended at Christina Erwin's boldness at critiquing Plaintiff's emails in light of Plaintiff's emails being no different than those of others in any way aside from on instances being shorter. In particular, emails of Christopher Goodrich as amongst the exhibits of the Defense's Affidavit of Sandra Vanier regarding this incident are in no way different than Plaintiff's. Plaintiff sees no difference between Plaintiff's emails and those of others nor does Plaintiff see that Plaintiff committed any infringement, rather Plaintiff was infringed. Exhibit 4 supports the idea that this incident was not a big deal according to Sandra Vanier. Plaintiff was responding on a public form of communications media and was never informed that Christine Lowrie was advising the public on what they could talk about or could not talk about or that time to talk about a topic had expired. Plaintiff did say he was joking. Given that the Defendant has such an

interest in associating wrong with Plaintiff, it's easier to believe that Defendant knew of Plaintiff's interest in the issue and was just making a scene.

5.10 I have responses from Sandra Vanier agreeing with my assessment that I had nothing wrong. See Exhibit 4.

5.11 Dispute. I know I met with Sandra Vanier to discuss the "2004 Performance and Development Summary". I reacted in a way to it to understand how to recognize delinquencies relative to the 2004 Performance and Development Summary so that I would be able to recognize good things and bad things for the purpose of creating and maintaining good things and for the purpose of correcting and preventing bad things. To that end I asked for information which I felt would be useful including to the extent of verifying that a delinquency actually existed when described for the purpose of not wasting company resources on something which required no expenditure. I investigated achievements in the same way to the best of my ability at the time. On the following day, Sandra Vanier was indicating that issues were not a big deal as in Exhibit 4.

5.12 Dispute. As described above I did investigate as I saw fit. I did so when I had the time. Voice mail and email are always available and I used them in the belief that such use could be employed with no ill effect in general and they served to reasonably accommodate my stuttering as explained in section 5.6 of this document. I was never informed that the time at which I chose to use such resources was an issue. If anything, I believed a phone call after hours to a voice system would be less intrusive than interrupting someone's day with a phone ringing. I worked while I was at work and I sometimes didn't around to using email and or voice mail until after work. My attempts to identify people's issues in connection my email and voice mail were not entertained. No one explained to me how I could recognize the flaws in my emails or voice mails to

prevent or correct them including referencing time of day. I did ask not just for the purpose creating recognizeable positive affects, but also for the purpose being able to recognize defects in order that they may be improved and prevented. My enquiries did engage in dialogue in connection with my speech disability to the extent that would be possible without implying that everything is connected to my speech problem as such a stance could be viewed as illogical ( possibly even paranoid ). Again, no one explained to me how I could recognize the flaws in my emails to prevent or correct them. In fact, such dialogue was refused and it was the dialogue which was necessary in regards to identifying any requests which would have to be made in regards to my speech disability. Such dialogue was intentionally engaged in a way which would not be deemed illogical, paranoid, or fixated upon my disability.

5.13 Dispute. While Plaintiff does not dispute what Plaintiff wrote, Plaintiff is guessing that implications will be made without taking into account details. First, Plaintiff never saw it in Plaintiff's best interest to tag himself as disabled. Second, while Plaintiff knew how bad his speech disability actually was, he was attempting to hide it . Third, he was aware that listeners were not hearing his difficulties avoided by replacing words or by using email, and on the basis that it was impossible for him to tell what each and every person heard of his problem and what they did not, it did not make sense for him to possibly blow his problem out of proportion. Fourth, Plaintiff did believe that some people were perceiving his problem worse than in it was. Fifth, Plaintiff is himself not a speech therapist. Sixth, the phrase ***effective communications*** is arbitrary and capricious and as such cannot be improved upon. Plaintiff's attempts to clarify what was meant were not entertained. In the presence of only one communication problem, i.e. stuttering, with no explanation of effective

communications Plaintiff had every reason to believe that the complaint was in connection with his stuttering.

5.14 Dispute. The Mid Year Performance 2005 Review had numerous positive aspects to it and was expressed in a positive tone as can be seen in Exhibit F of Sandra Vanier's affidavit of Defendant's Motion For Summary Judgement. The Mid Year Performance 2005 Review characterized Plaintiff's performance as by Sandra Vanier as "overall I think you are doing well" and "overall performance has been ok".

5.15 Dispute. I disagree that such interest expressed on my part to fully understand issues by engaging in dialogue whether they be connected to a disability or not represents antagonistic behavior. See section 5.8 above. Furthermore, my attempts to engage in dialogue are equivalent to asking questions which I was accused of not doing.

5.16 Dispute. Sandra Vanier was not at this meeting. This meeting did not address the issues claimed in Sandra Vanier's affidavit. Heather Lemmon expressed the idea that meeting with Human Resources is not a bad thing. We did talk about my responses to a Corba course offering, the fact that John Kelly didn't like my use email and voice mail with John Kelly, and my self assessment. There was no discussion of interpersonal problems which I was having. No problems were explained to me while I did present my position.

5.17 Dispute. I was expressing my lack of understanding of the situation.

5.18 Dispute. I have no knowledge of Sandra Vanier's confusion. I agree with the email which I wrote. In general someone volunteering that they have a disability, a speech problem, would be to meet a listener's obviously unmet expectations and/or because they feel they are unintentionally being harassed in connection with the speech problem.

5.19 Dispute. How would Sandra Vanier know if my stuttering was frequent or severe as she admits I used email. I used email because I stuttered. I did not work with Sandra Vanier and even if I had, I write software, I don't talk. The perception of people who stutter is that they can't communicate. I can communicate, I stutter. The point is Sandra Vanier did know that I stutter. People are not speech therapists and generally either know that someone stutters or someone does not and regardless of how good or how bad the stuttering is, the general concensus is that the stutterer will be worse in certain situations and managers will be held responsible.

5.20 Dispute. The communication issues as presented did relate to my stuttering. Any dialogue which would have further identified some other interpretation or confirmed such interpretation was refused yet such dialogue was requested. The requests were mischaracterized as antagonistic. My responses to such mischaracteristics were mischaracterized as being paranoid and such mischaracterizations created a hostile environment for me.

5.21 Dispute. I engaged in dialogue to request in reasonable accommodation to extent of engaging in dialogue to verify that a requested reasonable accomodation would be necessary and to so make it OR to determine that the problem was in fact nothing to do with my speech and at the same time to identify, in a way which would not be arbitrary and capricious, what the associate performance metric ( indicator was ) so that I could prevent delinquencies and produce progress with respect to such performance metric. Such dialogue was refused. Aspects of discovery such as the Defendant's motion for summary judgement have revealed in hindsight that such attempts were mischaracharacterized as antagonistic. My identification of such mischaracterizations were again mischaracterized as paranoid and such mischaracterizations describe a hostile environment with respect to engaging in

dialogue for making requests for reasonable accommodation for my speech disability.

6. Agree subject the following exceptions with regard to sections of the Affidavit. The following subsections correspond to the statements of the affidavit.

6.1 Agree

6.2 Plaintiff has no knowledge of said statements.

6.3 No Contest

6.4 No Contest

6.5 Dispute. January 16, 2006 was the first meeting. Plaintiff believes there were three - January 16, 2006, January 23, 2006, January 30, 2006

6.6 Dispute. On Monday, January 16th, 2006. Plaintiff issued Exhibit 3 Supporting First Amended Complaint in response to Defendant's Performance Improvement Plan issued Friday, January 13, 2006.

Exhibit 3 references speech problem as detailed in Plaintiff's response to Defendant's Interrogatory 15 implicitly in sections 1.3, 5.2, 5.5, 5.6, 5.7, 5.8 and then Exhibit 3, page 9 sections 2 and 4 to the extent that is possible within the context of the situation in a way that cannot be framed as paranoid or ill framed in any other way in such of Plaintiff believing everything is about speech. Paragraph 21 of Plaintiff's First Amended Complaint references Exhibit 3 as the sixteen pages of responses ( actually nine pages ) and alleges that the Defendant was not aware of it and claimed not to have read it. Defendant's response to Plaintiff's First Amended Complaint, paragraph 21, issued on April 23, 2007, denies Plaintiff's allegation of not being aware of it or having not read it without qualification. So the Defendant read it and was aware of it and therefore was aware of speech problem and associated requests to request accommodation to the extent that could be done at that time within the context of the situation without be ill-framed ( as Plaintiff being paranoid or as Plaintiff believing that

everything is about speech ). Rob Froncillo and Heather Lemmon represented Raytheon in connection with the performance improvement plan and would therefore be responsible for responses not only addressed to it, but the fact that it was brought up in the meetings and Rob Froncillo referenced the document as refusing to move forward see Exhibit 10 supporting Plaintiff's First Amended Complaint. Rob Froncillo was indeed aware of Exhibit 3 supporting Plaintiff's First Amended Complaint and Exhibit 3 did mention stuttering. Rob Froncillo was in charge of the deployment of the performance improvement plan meeting and therefore should have been copied with the responses which were sent to Human Resources and referenced in the meetings.

6.7 Dispute. I did attempt to engage in dialogue in Exhibit 3 and I attempted during the meetings when Rob Froncillo claimed my emails were rambling and non understandable and such attempts are recorded as Exhibit 10 and Exhibit 11 in support of Plaintiff's First Amended Complaint.

6.8 Dispute. I started acting responsibly with regard to the PIP when it was provided to me and I identified 54 topics which the Defendant had raised.

I wrote a page of introduction in which I said the PIP was arbitrary and capricious and then attempted to engage in dialogue with respect to each of the 54 topics by supplying 8 lines of introductory dialogue per topic on average. I sent my attempts to Human Resources on January 16, 2006, 9:34 am and the responses as attempts to engage in dialogue were ignored.

Coincidentally, 8 lines of text on average for 54 topics yields 8 single space pages of 54 lines each. This correspondence of Plaintiff is at the court as Exhibit 3 supporting Plaintiff's First Amended Complaint.

6.9 Dispute. I had acknowledged the PIP in my responses to it which are at the court as Exhibit 3 Support for First Amended Complaint. Exhibit 3 details discrepancies which needed to be addressed. Rob Froncillo was not addressing

them. I did not believe the PIP addressed issues regarding my ability to work on a team. I did not find the comments in connection with teamwork of the PIP specific enough to be anything other than arbitrary and capricious and/or untrue. Deposition testimony support Plaintiff's position stated here:

From Deposition Of Manny Goncalves Exhibit 32 ( of Plaintiff's last project )

- Page 18 Q. "You stated on your rating of me that you feel I'm a team player. Do you agree with that?" A. "Yes."

From Deposition Of Al Gaines Exhibit 33 ( of Plaintiff's last project )

- Page 15 Q. "Do you personally think I'm a team player?" A. "Yes."

I refused to sign the PIP as it was inaccurate.

6.10 Disagree. I placed my responses to the PIP in Exhibit 3 Support for First Amended Complaint and Defendant refused to address the discrepancies itemized in Exhibit 3 which described inaccuracies/incompleteness of the PIP.

6.11 At one of the meetings I had to be excused because my heart was beating so hard that I thought I was going to have a heart attack. It was a meeting with just Rob Froncillo and I.

6.12 No Contest

6.13 Dispute. The reference to the email has the nine emails for which I requested explantion of how they were flawed removed.

6.14 Plaintiff has no knowledge. There is nothing threatening about described email. In reference to the Plaintiff being scared, many people in connection with this case have claimed to be scared at one time or another, yet only the Plaintiff seems to be held liable. The email represents the Plaintiff's notification to Defendant of Defendant's refusal to engage in dialogue and participate. Defendant never corrected Defendant's actions. Plaintiff was terminated because of this email which he sent because he stuttered. If he had not stuttered, Plaintiff would not have

sent email and would not have been terminated and so the email demonstrated Defendant's refusal to engage in dialogue and wrongful termination.

7. Dispute. John Kelly was Department Head after Lou Dipalma. I clearly knew he was a superior, but he was enough above me in my opinion that saying he was my manager would be like saying that the ceo is my manager – a true statement, but also a misrepresentation. As John Kelly was only the Department Head, saying that he was the my manager was less of a mischaracterization than saying that the ceo was my manager. I had very little iteraction with John Kelly and in fact my interaction with him began in connection with a skip level meeting which I was invited to per company policy, I presume. John Kelly presided over the skip-level meeting. I didn't make it a point of being in John Kelly's face any more than I made it a point to be in the ceo's face, but I admit that from my point of view John Kelly was closer to me on the food chain than the ceo.

8. No Contest subject to the following exceptions with regard to sections of the Affidavit. The following subsections correspond to the statements of the affidavit of Heather Lemmon.

8.1 No Contest.

8.2 No Contest

8.3 Dispute. Plaintiff has no knowledge of this meeting. Plaintiff has no knowledge of item (i) of section 3 of Affidavit of Heather Lemmon of Defendant's Motion of Summary Judgement and responds as written in section 5.7. Plaintiff has no knowledge of (ii) expressed in the way it is and responds as written in section 5.7 above. In regards to (iii) refer to section (iii) of section 5.7 above. (iv) see section 5.7 section (iv).

8.4 Dispute. Plaintiff has no knowledge of said statements. There were no ongoing behavorial issues. As Exhibit 16 and Exhibit 18 of Plaintiff's Opposition Summary Judgement show, Heather Lemmon did not know what this meeting

was all about, and so the meeting was not to support ongoing behavioral issues. For Plaintiff's version of how this meeting was in connection with events of the time see Plaintiff's Opposition to Defendant's Motion For Summary Judgement section Incident's of October 2005 as listed in the table of contents.

8.5 Dispute. For Plaintiff's version of how this meeting was in connection with events of the time see Plaintiff's Opposition to Defendant's Motion For Summary Judgement section Incident's of October, 2005 as listed in the table of contents.

8.6 Plaintiff has no knowledge of said statements.

8.7 Dispute. For Plaintiff's version of how this meeting was in connection with events of the time see Plaintiff's Opposition to Defendant's Motion For Summary Judgement section Incident's of November, 2005 as listed in the table of contents. Plaintiff does not know what is meant by communication and interpersonal skills. Plaintiff requested that Heather Lemmon elaborate in her deposition and Heather Lemmon claimed that she did not recall. Since what is meant by communication skills and interpersonal skills cannot be explained, Plaintiff does not know to what this is referring to. In the presence of only one communicatin problem, that is stuttering, Plaintiff believes it refers to his stuttering. Plaintiff does not send lengthy emails, was never talked to about sending lengthy emails, was never talked to about what constitutes a lengthy email. Plaintiff does not send rambling emails, while Plaintiff was talked to about rambling emails, what constitutes a rambling email was not explained. Neither of these issues were discussed at the November meeting. Plaintiff had on occasion noted mischaracterizations and pointed them out and Defendant did not investigate, but characterized Plaintiff's observations as Plaintiff believeing those who were mischaracterizing were plotting against him. The validity of Plaintiff's non-arbitrary and non-capricious specific statements were never

investigated by Defendant. Plaintiff does not know what issues he is alleged of not being accountable for. Heather Lemmon claimed that she did not recall what these issues were at her deposition on January 11. In fact, Heather Lemmon answered that she did not recall for approximately 150 of the 190 questions asked of her on January 11, 2008. For a condensed version of Heather Lemmon's deposition, See Opposition To Summary Judgement Exhibits 35. Many of these questions were in connection with her affidavit which is claimed to have been made only a few months ago. Yet she answered roughly 80% of the questions as her not recalling. Plaintiff does not know what this section of Heather Lemmon's affidavit is referring to as stated in (iv) that is Sammartano's poor interpersonal relationships and teaming skills with co-workers and management. Deposition testimony of Manny Goncalves, Exhibit 32 of Plaintiff's Opposition To Summary Judgement, and Al Gaines, Exhibit 33 of Plaintiff's Opposition To Summary Judgement, characterized Plaintiff as being a team player. When Plaintiff's manager, Bob Pulley was asked in deposition if he had any problems with Plaintiff he said, "No." See Exhibit 33 of Plaintiff's Opposition To Summary Judgement. Plaintiff's statements in connection with management attempting to separate him from his technology seem justified.

8.8 Dispute. Plaintiff has no knowledge to assert that this time was again.

8.9 Plaintiff does not recall

8.10 Dispute. In reference to stalking, Plaintiff stutters and isn't always able to say words which he wants. Plaintiff wanted to express the idea that he felt like he was being chased with mischaracterizations, lies, which were being said about him and not investigated. Plaintiff had great accomplishments, a six sigma project, and could not understand why he was being called in to human resources. It was as if he was being stalked. In a different choice of words, Plaintiff meant to imply that the Defendant had no cause.

8.11 Dan Musholt's recollection of the situation in Defendant's Motion For Summary Judgement as regarding that Plaintiff had not been informed as to what were Plaintiff's troubling behaviors was correct. Plaintiff always believed that he should be working as part of team. Plaintiff could not understand why Defendant insisted that he had to work with people who did not like Plaintiff, were abusive to Plaintiff, who were acting adversely to Plaintiff.

8.12 Plaintiff has no knowledge

8.13 Dispute. Plaintiff agrees the PIP was deployed on January 13, 2006. Plaintiff responded with Exhibit 3 support for Plaintiff's First Amended Complaint on January 16, 2006 which detailed the connection to stuttering to the extent that it could without making it seem like Plaintiff believed that everything was connected to stuttering.

8.14 Dispute. According to how Raytheon defines how PIP's are used there is no support as to why Plaintiff was PIP'ed. Ratings were acceptable (See Opposition To Summary Judgement Exhibits 37 – All Rating, Exhibit 38 Rating Scaled Guide), deposition testimony is in Plaintiff's favor. See condensed depositions in Opposition To Summary Judgement Exhibits 31, 32, 33, 34. The PIP was used as a tool to discriminate on the basis of a disability.

8.15 Dispute. Everyone knows I still have a speech problem. People deposed at Raytheon knew I had and have a speech problem.

8.16 Plaintiff did send this document. Plaintiff has entered it at the court as Exhibit 3 of Plaintiff's First Ammended Complaint. Plaintiff regarded the PIP as a serious document and responded in a serious way using a medium which he felt most comfortable with in light of his speech disability which he noted in the document itself where applicable. The PIP was inaccurate in ways detailed in this response, i.e. Exhibit 3 of Plaintiff's First Amended Complaint. Inaccuracies can mask needed performance improvements and suggest performance improvements which

are not required. Plaintiff disagrees with all negative connotations of this document. Plaintiff does not see his responses as either lengthy or rambling. The PIP was so vague, broad, untrue, and incomplete that it intentionally or inadvertently addressed 54 topics. In response to the PIP, Plaintiff submitted one introductory page explaining that the PIP was arbitrary and capricious and on the following pages supplied on average eight lines of engaging dialogue per topic in an effort to address all topics which the PIP addressed. Plaintiff's responses to each topic were not long or rambling and any flaws present should be forgiveable in light of its timely response.

8.17 Dispute. Plaintiff agrees he sent the email. Plaintiff did not feel that management was being realistic in regards to honestly recognizing the shortcomings of the PIP. Plaintiff was attempting to get the Defendant to be more honest.

8.18 Dispute. I did say I did not understand the PIP. I was attempting to get management to assist me with the flaws of the PIP.

8.19 No Contest

8.20 Dispute. The quote removes the connection to the nine emails and therefore the meaning implied or part of it. As such it removes the proof that the email offers of the Defendant's failure to engage in dialogue and and proof that the email offers with regard to wrongful termination. All the Defendant had to do was to explain how the emails which they chose to discuss and characterize as flawed were flawed – such engagement in dialogue would have resulted in Plaintiff correcting the problem and or explaining the connection to his disability if there was one. As a result of the Defendant failing to engage in dialogue, Plaintiff sent the referenced email because he stuttered. The email was and is not threatening. The Defendant retaliated and Plaintiff was ultimately terminated. If the Plaintiff had not been disabled, he would not have used email and there would have been no email to review. Plaintiff was terminated because of his disability.

8.21 I have no knowledge of what is said in this paragraph.

8.22 I have no knowledge of what is said in this paragraph.

8.23 Dispute. There is no evidence that Plaintiff was anymore or less stressed than anyone else.

8.24 I have no knowledge of what is said in this paragraph other knowing that an appointment was scheduled by someone with Dr. Stuart.

8.25 No Contest.

8.26 Dispute. I have no knowledge of what is said in this paragraph. I did not receive the letter until February 28.

8.27 No Contest

8.28 No Contest

8.29 No Contest

8.30 No Contest

8.31 No Contest

8.32 No Contest

8.33 No Conest

8.34 Dispute. I sent Exhibit 3 support for Plaintiff's First Ammended Complaint regarding all aspects of the PIP including it's connection to my speech disability where applicable to Heather Lemmon of human resources on January 16, 2006 and it was ignored. I requested reasonable accommodation as appropriate to the extent that I could as opportunities arose in a way which could not be deemed as paranoid or as believieng everthing is connected to stuttering.

8.35 Dispute. I requested reasonable accommodation as appropriate to the extent that I could as opportunities arose in a way which could not be deemed as paranoid or as believieng everthing is connected to stuttering. Raytheon refused to engage in dialogue.

9. No Contest.

10. Dispute. I agree with what I said. However, I disagree with some implications made regarding my statements which don't acknowledge the context of the situation. The context of the situation at the time was that:

- I saw no point on March 11, 2005 as tagging myself as disabled as I saw such a tag as a possible detriment to employment
- I was in fact attempting to hide how bad I knew my stuttering was by using email again because I saw my stuttering as a detriment to employment
- I used email because I stuttered
- In light of the above, I knew that I was not talking much, I didn't have to talk much as a software engineer, and furthermore I am aware that people don't know how many times I substitute words which I cannot say with words which I can say or how many times I avoid a situation because of my speech problem. I knew that people could not hear a problem which I chose to avoid by not saying words. On that basis I did not want to attract attention to myself by making it seem like I thought everything was to do with stuttering by overstating the problem from their point of view. Since I was attempting to hide the problem anyway, such explanation was easier for the listener to accept.
- I believed some people were perceiving the problem worse than it was and in comparing the problem to accents I was making the point that differences in speech of equal weight are not discriminated against.
- Plaintiff is not a speech therapist. His position at the time that he can more than often speak properly is not a professional opinion.
- It was my experience which led me to enquire in the way in which I did. To enquire in any other way would have allowed the listener to deny any connection to speech and support a theory of me being paranoid by saying

that I believe everything is in connection to speech. The way I conducted myself was proper in all respects, including that of not being paranoid, but the Defendant is responsible for not engaging in dialogue.

11. Agree

12. Agree.

13. See section 5.4 and 5.5 above.

14. See section 5.7.

15. See section 5.8

16. see section 5.9

17. see section 5.10

18. Dispute. Only the issue of communications persisted in future dialogue ( of any form ). See 5.11.

19. Dispute. I dispute implications. I do stutter. I was at the time attempting to downplay the severity of my speech problem because I did not want to be tagged as disabled. I did feel that some of the Defendant's agents were perceiving my speech problem as worse than it was.

20. Dispute. I never counted the voice mails. The correct time to engage in dialogue is at the time of the incident. My stuttering if often preventative of me getting my point across. Defendant had expressed an unhappiness with emails, so Plaintiff would use voice mail. When Plaintiff stuttered using voice mail, Plaintiff would call, run out of time stuttering and have to call back. Even when Plaintiff did not stutter using voice mail, he attempted to choose a time when no one would be there to create a situation in which he would stutter and forget what he wanted to say. This incident was an isolated incident in the sense that the company had designated this time as a time for me to talk about the 2004 Performance Summary and I wanted to get the most from it that I could. The following day Sandra Vanier

expressed the idea that these things were not an issue as seen in Exhibit 4. See section 5.12.

21. The overall tone of the review was positive. It still is. See Opposition To Summary Judgement Exhibits 12.

22. see section 8.5

23. I have no knowledge of what was said except that I am aware of how the Defendant makes mischaracterizations. See 8.6.

24. No one ever used the phrases troublesome behavior, antagonistic electronic and voice mail messages, or interpersonal skills or made any connection to my performance. See 8.7.

25. See 8.13,8.14

26. Dispute. Plaintiff agrees that the PIP did have the six named areas. Plaintiff denies that he needed improvement in those areas. Deposition testimony is in favor of Plaintiff. See Opposition To Summary Judgement Exhibits 31, 32, 33, 34.

27. Dispute. The section on communications is written in such a way as it is impossible for anyone to recognize the problem to correct and prevent it. Moreover it is possible for someone to make such statements and apply them to anyone. My efforts to engage in dialogue for the purpose of understanding how to recognize the metrics in question for the purpose of progress or to recognize that the problem for the purpose of correction and prevention or to determine that a more specific request for reasonable accommodation were not entertained. Such failure to engage in dialogue is failure to engage in dialogue in connection with my speech disability. It would have been paranoid for me to immediately attempt to insinuate that everything had to do with speech, but whether it does or does not is not really the issue because the reasonable party will address any and all issues which need to be defined as recognizable to be corrected and prevented. The Defendant has acted as an unreasonable party in light of a myriad of attempts by the Plaintiff to address all

issues in a non-paranoid way whether they are in connection with his disability or not.

Furthermore, the quote from the Performance Improvement Plan section on Communications is not accurate. The Performance Improvement Plan made no reference to time of day such as * throughout the night *. See copy of PIP of Opposition To Summary Judgement Exhibits 30. What is stated by Defendant for item 27 of Defendant's Undisputed Facts is arbitrary and capricious. Progress can not be recognized with respect to what is stated nor can shortcomings. As such, there is no way to say that Plaintiff has not succeeded and did succeed while employed. Condensed depostions of Bob Pulley, Al Gaines, Manny Goncalves, and Bob Dayson support that Plaintiff had no such problems, but they all were aware that Plaintiff stuttered and stutters. See condensed depositions as Opposition To Summary Judgement Exhibits 31, 32, 33, 34.

28. Dispute. Arbitrary and capricious. Progress can not be recognized with respect to what is stated nor can shortcomings. As such, there is no way to say that Plaintiff has not succeeded and did succeed while employed. Condensed depostions of Bob Pulley, Al Gaines, Manny Goncalves, and Bob Dayson support that Plaintiff had no such problems, but they all were aware that Plaintiff stuttered and stutters. See condensed depositions as Opposition To Summary Judgement Exhibits 31, 32, 33, 34.

29. Dispute. I had been provided the PIP on January 13th of 2007. The pip presented a threat of termination. The PIP was untrue and or true but beside the point and or a mis-characterization and I have been describing examples of what I mean since I was terminated and attempting to collect unemployment. See 8.15.

30. See 8.16

31. Dispute. Plaintiff recalls the first pip meeting as January 16.

32. No Contest

33. Dispute. Plaintiff thought the three meetings were on January 16, 23, and 30th of 2006.

34. Dispute. Very tense is arbitrary and capricious. Others probably felt the same way. The fact is meaningless and not applicable to anything.

35. No Contest

36. References to emails are removed. See 8.20.

37. No Contest

38. No Contest

39. No Contest

40. No Contest

41. No Contest

42. Dispute. Tension rising is arbitrary and capricious. Others probably felt the same way at the same time. The fact is meaningless and not applicable to anything.

43. Dispute. Only part of Plaintiff's testimony was given. Plaintiff testified that he did not know what was going to happen.

44. Dispute. Plaintiff was not hostile towards management or coworkers.

45. Dispute. I was only told that I had been placed on leave. I was not given any other information regarding a psychiatrist or anything else.

46. See 8.26

47. No Contest

48. No Comment

49. See 8.29

50. See 8.30

51. See 8.31

52. See 8.33

53. No Contest

54. Dispute. The EEOC's position is described in Plaintiff's Opposition To Summary Judgement section EEOC's position page 40.

Dated: February 4, 2008

Stephen Sammartano 2/4/2008

Stephen Sammartano
75 Arthur Street #4
Pawtucket, RI 02860
401.335.3412
Pro Se

CERTIFICATION OF SERVICE

To:

Joseph D Whelan

Hinckley, Allen & Snyder LLP

50 Kennedy Plaza, Suite 1500

Providence, RI 02903

(401) 274-2000

(401) 277-9600 ( fax )

I hereby certify that on the 4th day of February, 2008, a copy of the foregoing document was served by mail on the above-named party.

Stephen Sammartano

75 Arthur St #4

Pawtucket, RI 02860

401.335.3412

stevesammartano@hotmail.com